## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| GREGORY GODFREY, JEFFREY SHELDON, and DEBRA ANN KOPINSKI, on behalf of the MCBRIDE & SON EMPLOYEE STOCK OWNERSHIP PLAN, and on behalf of a class of all other persons similarly situated,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>GREATBANC TRUST COMPANY, McBRIDE & SON CAPITAL INC., McBRIDE & SON MANAGEMENT COMPANY, LLC, JOHN F. EILERMANN, JR., MICHAEL D. ARRI, ANDREA TEMPLETON, THE McBRIDE & SON EMPLOYEE STOCK OWNERSHIP PLAN ADMINISTRATIVE COMMITTEE, McBRIDE & SON COMPANIES, LLC, JOHN DOES 1-10, JEFFREY SCHINDLER, and JEFFREY TODT,<br><br>　　　　Defendants. | Case No. 1:18-cv-07918<br><br>Judge Matthew F. Kennelly<br><br>Magistrate Judge Michael T. Mason |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs Gregory Godfrey, Jeffrey Sheldon, and Debra Ann Kopinski, by their undersigned attorneys, on behalf of the McBride & Son Employee Stock Ownership Plan (the "Plan"), and any successor trusts, and similarly situated participants in the Plan, and their beneficiaries, allege upon personal knowledge, the investigation of their counsel, and upon information and belief as to all other matters, as to which allegations they believe substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery, as follows:

1

## BACKGROUND

1.      This suit intends to bring to bring to light, and make right, the systematic and concerted effort by corporate insiders to steal for themselves the retirement benefits of their own employees. Suit was originally brought alleging that the stock of McBride & Son Capital, Inc. was sold from the Plan at below fair market value to, and for the benefit of, corporate insiders in violation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Plaintiffs have only recently learned that the sale was just the final act in a long campaign by corporate insiders to transfer to themselves the income and value created by the McBride & Son conglomerate through secret corporate reorganization efforts and excessive compensation that resulted in tens of millions of dollars in income and value going to the corporate insiders at the expense of the Plan's participants and beneficiaries. Defendants at all pertinent times owed to the Plan and its participants and beneficiaries fiduciary obligations as set forth in ERISA. These obligations are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982); see also *George v. Kraft Foods Glob., Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011). As Justice Cardozo famously put it,

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.

*Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928). Among the duties required of fiduciaries is the duty of loyalty to plan participants and beneficiaries. This duty requires that the fiduciary's decisions "must be made with an eye single to the interest of the participants and beneficiaries." *Donovan*, 680 F.2d at 271 (citing, among other authorities, Restatement (Second) of Trusts § 170 (1959)).

2.     Plaintiffs Gregory Godfrey, Jeffrey Sheldon, and Debra Ann Kopinski ("Plaintiffs") bring this suit against (1) GreatBanc Trust Company ("GreatBanc"), the trustee for the McBride & Son Employee Stock Ownership Plan (the "Plan"), (2) McBride & Son Capital, Inc. ("MS Capital"), (3) McBride & Son Management Company, LLC ("MS Management"), (4) John F. Eilermann, Jr. ("Eilermann"), (5) Michael D. Arri ("Arri"), (6) Andrea Templeton ("Templeton"), (7) the McBride & Son Employee Stock Ownership Plan Administrative Committee ("Plan Admin. Comm."), (8) McBride & Son Companies, LLC ("MS Companies"), (9) John Does 1 through 10, (10) Jeffrey Schindler ("Schindler"), and (11) Jeffrey Todt ("Todt") (hereafter collectively the "Defendants"), when Defendants engaged in a concerted effort to steal the retirement benefits of the Plan's participants and beneficiaries and caused the Plan to sell shares of MS Capital stock (held by the Plan for the benefit of Plan participants and beneficiaries) to MS Capital, the Plan's named fiduciary and plan administrator, at below fair market value, resulting in losses to the Plan. Defendants did so to improperly benefit corporate insiders, including but not limited to, MS Capital, Eilermann, Arri, Schindler, Todt, and MS Companies, who were all fiduciaries and/or parties in interest to the Plan, at the expense of the Plan and its participants and beneficiaries.

3.     Plaintiffs are participants in the Plan, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), who held vested shares of MS Capital in their accounts in the Plan until the shares were sold on or about November 30, 2017.

4.     This action is brought under Sections 404, 405, 406, 409, and 502(a) of ERISA, 29 U.S.C. §§ 1104, 1105, 1106, 1109, and 1132(a), for losses suffered by the Plan and for restoration to the Plan of improper profits received by the Plan's fiduciaries and parties in interest to the detriment of the Plan's participants and beneficiaries and in violation of ERISA.

5.     As alleged below, the Plan has been injured and its participants have been deprived of hard-earned retirement benefits resulting from Defendants' violations of ERISA's fiduciary duties and prohibited transaction rules.

## JURISDICTION AND VENUE

6.     This action arises under Title I of ERISA, 29 U.S.C. §§ 1001–1191c, and is brought by Plaintiffs under ERISA § 502(a), 29 U.S.C. § 1132(a), to require the Defendants to make good to the Plan losses resulting from their violations of ERISA, to restore to the Plan any profits that have been made by breaching fiduciaries and parties in interest through the use of Plan assets, and to obtain other appropriate equitable and legal remedies in order to redress violations and enforce the provisions of ERISA.

7.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the breaches and violations giving rise to the claims occurred in this District and the Plan's trustee, Defendant GreatBanc, is found in this District.

## PARTIES

### McBride & Son Employee Stock Ownership Plan

9.     The McBride & Son Employee Stock Ownership Plan (the "Plan") has been sponsored by McBride & Son Capital, Inc. ("MS Capital") since January 1, 2014.

10.     The Plan was amended and restated as of January 1, 2017 (hereafter the "2017 Plan Document").

11.     The Plan was previously amended and restated as of January 1, 2013 (hereafter the "2013 Plan Document").

12.     Prior to January 1, 2014, the Plan was sponsored by McBride & Son Management Company, LLC ("MS Management").

13.     Prior January 1, 2013, the Plan was amended and restated as of January 1, 2007 (hereafter "2007 Plan Document").

14.     The Plan was originally adopted effective on December 1, 1987, by MS Management Co.

15.     The Plan was operating as a leveraged employee stock ownership plan ("ESOP") from December 30, 1997, to its divestment of company stock, and is and was subject to ERISA.

16.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2).

17.     The Plan is an "individual account plan" or "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

18.     From December 1, 1987, until November 30, 2017, the Plan was intended to be an ESOP under 29 U.S.C. § 1107(d)(6) that was intended to meet the requirements of Sections 401(a) and 4975(e)(7) of the Internal Revenue Code (the "Code") and related regulations.

19.     For the benefit of Plan participants and beneficiaries, from on or around December 31, 2013, the Plan held shares of stock of MS Capital which, upon information and belief, was originally intended to hold 100% of the assets of the McBride & Son home building conglomerate, including all related subsidiaries (generally "MS Homes").

20.     Under the Plan's eligibility requirements nearly all employees of MS Homes, with limited exceptions, were eligible to be participants in the Plan.

21.     The 2017 Plan Document, the 2013 Plan Document, and the 2007 Plan Document required the Plan to be operated for the exclusive benefit of participants and beneficiaries, consistent with ERISA.

22.     Article 2.25 of the 2007 Plan Document and Article 2.26 of the 2013 Plan Document and 2017 Plan Document defined Fair Market Value as the dollar amount determined by an independent appraiser to be the value of Company Stock in accordance with and subject to Code Section 401(a)(28)(C).

23.     Article 17.12 of the 2007 Plan Document, the 2013 Plan Document, and the 2017 Plan Document states [e]xcept as otherwise provided in the remaining provisions of this Plan, any action of the Company or Employer under this Plan may be taken by resolution of its Board of Directors or other governing body or by any person or persons duly authorized to take such action by resolution of said Board of Directors or other governing body or by its by-laws or other governing instrument."

24.     Form 5500s for the Plan filed with the Department of Labor ("DOL") state "[c]ertain administrative functions are performed by officers or employees of [MS Capital]."

25.     The McBride & Son Employee Stock Ownership Trust ("ESOP Trust") was formed as part of the Plan and was amended and restated in its entirety effective December 27, 2013, as documented in the McBride & Son Employee Stock Ownership Trust Agreement ("2013 ESOP Trust Agreement").

26.     Upon information and belief, previous trust agreements existed that were formed as part of the Plan.

27.     The 2013 ESOP Trust Agreement was executed by Patrick J. De Craene ("De Craene") on behalf of GreatBanc and by Eilermann on behalf of MS Management.

28.     The 2013 ESOP Trust Agreement required that no part of the corpus or income of the ESOP Trust shall revert to MS Management, and later MS Capital, or be used for, or diverted to, purposes other than for the exclusive benefit of Plan participants and beneficiaries.

29.     The 2013 ESOP Trust Agreement granted GreatBanc, as the trustee, with the power, right, and duty to begin, maintain, or defend any litigation necessary in connection with the investment, reinvestment, and the holding of the assets of the [ESOP Trust], and the administration of the [ESOP Trust].

30.     The 2013 ESOP Trust Agreement was amended via Amendment Number One to recognize that effective January 1, 2014, MS Capital was to replace MS Management in all respects as signatory to the 2013 ESOP Trust Agreement.

31.     Amendment Number One to the 2013 ESOP Trust Agreement was executed by Eilermann and Arri on behalf of MS Capital.

32.     Effective November 30, 2017, the Defendants caused the Plan to sell its shares of MS Capital at below fair market value.

33.     Amendment Two to the 2017 Plan Document was intended to amend the Plan to convert it from an ESOP to a profit sharing plan under Code Section 401(a) and to change the Plan name to the McBride & Son Profit Sharing Plan.

34.     Effective December 15, 2017, and pursuant to the Second Amendment to the McBride & Son 401(k) Savings Plan, Amended and Restated as of January 1, 2013 (hereafter the "401(k) Plan"), the Plan was merged into the 401(k) Plan, thus effectively terminating it.

**Plaintiffs**

35.     Plaintiff Gregory Godfrey is a participant, as defined in 29 U.S.C. § 1002(7), in the Plan at all relevant times. Plaintiff Godfrey resides in Wildwood, Missouri. He was vested in

his account in the Plan. He was previously employed as Chief Information Officer. He was employed by MS Homes from 2001 to 2008.

36.     Plaintiff Jeffrey Sheldon is a participant, as defined in 29 U.S.C. § 1002(7), in the Plan at all relevant times. Plaintiff Sheldon resides in St. Louis, Missouri. He was vested in his account in the Plan. He was previously employed as an Information Systems Director. He was employed by MS Homes from 1998 until 2008.

37.     Plaintiff Debra Ann Kopinski is a participant, as defined in 29 U.S.C. § 1002(7), in the Plan at all relevant times. Plaintiff Kopinski resides in Cottleville, Missouri. She was vested in her account in the Plan. She was previously employed in an accounts payable capacity. She was employed by MS Homes from 2000 until 2017.

### Defendants

38.     Defendant GreatBanc Trust Company ("GreatBanc") was at all relevant times a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A) because it was the Plan's Trustee, within the meaning of 29 U.S.C. § 1103(a), and because it exercised discretionary authority or discretionary control respecting management of the Plan, and/or exercised authority or control respecting management or distribution of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. GreatBanc was at all relevant times a person providing services to the Plan. GreatBanc was at all relevant times a party in interest to the Plan under 29 U.S.C. § 1002(14)(A). GreatBanc's headquarters is located at 801 Warrenville Road, Suite 500, Lisle, Illinois 60532.

39.     GreatBanc was engaged by MS Capital after January 1, 2014, and by MS Management prior to January 1, 2014, to act as a discretionary trustee to the Plan, including with respect to the Plan's purchase or sale of MS Capital stock, with the sole mission to act at all

times in the best interests of the Plan's participants and beneficiaries in carrying out ERISA's strict fiduciary duties. GreatBanc, as described further below, failed to do so.

40.     GreatBanc, as trustee, was required by the 2013 ESOP Trust Agreement, and upon information and belief by earlier versions of agreements governing the ESOP Trust, to discharge its duties solely in the interest of Plan participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying the reasonable expenses of administering the ESOP Trust. GreatBanc was also required to discharge its duties with the care, skill prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. GreatBanc was also required to discharge its duties in accordance with the documents and instruments governing the ESOP Trust and the Plan insofar as those documents and instruments are consistent with the provisions of ERISA. GreatBanc was also required to not cause the Trust to engage in any prohibited transactions prohibited by either the 2013 ESOP Trust Agreement, ERISA, or the Code.

41.     GreatBanc is a subsidiary of U.S. Fiduciary Services, Inc., which is also headquartered at 801 Warrenville Road, Suite 500, Lisle, Illinois 60532.

42.     Defendant McBride & Son Capital, Inc. ("MS Capital"), a Delaware corporation, is, effective January 1, 2014, the "plan sponsor" to the Plan under 29 U.S.C. § 1002(16)(B) and the "named fiduciary" and "plan administrator" as those terms are defined in 29 U.S.C. § 1102(a) and 29 U.S.C. § 1002(16)(A), respectively, and as defined in the 2017 Plan Document. MS Capital was at all relevant times a party in interest to the Plan under 29 U.S.C. § 1002(14)(A) and (C).

43. MS Capital, and any individual or entity to whom it delegated any of its fiduciary functions, was a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A) when it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

44. MS Capital, as a corporate entity, cannot act on its own without any human counterpart. In this regard, MS Capital relied directly on the other Defendants, named herein known to Plaintiffs and those unknown to Plaintiffs, to carry out its fiduciary responsibilities under the Plan and ERISA, and the acts of MS Capital's board members, officers, and employees alleged herein are the acts of MS Capital.

45. MS Capital, as the successor named fiduciary and plan administrator, had a duty under ERISA to investigate and remedy breaches by previous fiduciaries of the Plan.

46. Defendant McBride & Son Management Company, LLC ("MS Management") was, prior to January 1, 2014, the "plan sponsor" to the Plan under 29 U.S.C. § 1002(16)(B) and "named fiduciary" and "plan administrator" as those terms are defined in 29 U.S.C. § 1102(a) and 29 U.S.C. § 1002(16)(A), respectively, and as defined in the 2013 Plan Document and 2007 Plan Document. MS Management was at all relevant times a party in interest to the Plan under 29 U.S.C. § 1002(14)(A) and (C).

47. MS Management, and any individual or entity to whom it delegated any of its fiduciary functions, was a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A) when it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

48.     MS Management, as a corporate entity, cannot act on its own without any human counterpart. In this regard, MS Management relied directly on the other Defendants, named herein known to Plaintiffs and those unknown to Plaintiffs, to carry out its fiduciary responsibilities under the Plan and ERISA and the acts of MS Management's board members, officers, and employees alleged herein are the acts of MS Management.

49.     Defendant John F. Eilermann, Jr. ("Eilermann") is Chief Executive Officer of MS Capital, MS Management, and MS Companies.

50.     Eilermann also serves as an officer to one or more of the corporate and/or limited liability company entities forming the MS Home conglomerate, including those who are defined as an employer in the Plan's governing documents.

51.     Eilermann was a fiduciary to the Plan at all relevant times.

52.     Eilermann was also a party in interest to the Plan under 29 U.S.C. §§ 1002(14)(A), (H), and/or (I).

53.     Eilermann, has, under penalty of perjury, declared to the DOL that he is the plan administrator to the Plan when he signed a Form 5500 and submitted it to the DOL. As the plan administrator, he was acting as a fiduciary under ERISA.

54.     Eilermann was a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A) when he exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

55.     Defendant Michael D. Arri ("Arri") was Chief Financial Officer of MS Capital, MS Management, and MS Companies.

56. Arri also served as an officer to one or more of the corporate and/or limited liability company entities forming the MS Home conglomerate, including those who are defined as an employer in the Plan's governing documents.

57. Arri was a fiduciary to the Plan at all relevant times.

58. Arri was also a party in interest to the Plan under 29 U.S.C. §§ 1002(14)(A), (H), and/or (I).

59. Arri was a fiduciary under 29 U.S.C. § 1002(21)(A) when he exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

60. Eilermann and Arri were the only members of the board of directors of MS Capital and MS Management. Upon information and belief, Eilermann and Arri were the only members of the board of directors of all other relevant entities associated with the MS Homes conglomerate, including corporations and limited liability companies. Upon information and belief, Eilermann and Arri served as officers to all other relevant entities associated with the MS Homes conglomerate, including corporations and limited liability companies. Upon information and belief, Eilermann and Arri through their board and/or officer positions, exerted effective control over all corporate and limited liability company entities associated with the MS Homes conglomerate.

61. As members of the board of directors, Eilermann and Arri were fiduciaries under 29 U.S.C. § 1002(21)(A) because they had formal authority under the Plan to appoint the Plan's trustee, members of the ESOP Admin. Comm., delegated fiduciaries, and administrators as defined by the Plan, and thus had fiduciary duties with respect to those appointments, duties to

monitor the performance of those they appointed, and duties to remove those they appointed if they failed to fulfill their fiduciary duties.

62.     Andrea Templeton ("Templeton") is Assistant Treasurer and Controller of MS Capital, MS Management, and MS Companies.

63.     Templeton also serves as an officer to one or more of the corporate and/or limited liability company entities forming the MS Homes conglomerate, including those who are defined as an employer in the Plan's governing documents.

64.     Templeton was a fiduciary to the Plan at all relevant times.

65.     Templeton was also a party in interest to the Plan under 29 U.S.C. §§ 1002(14)(A) and/or (H).

66.     Templeton was a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A) when she exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

67.     Templeton, has, under penalty of perjury, declared to the DOL that she is the plan administrator to the Plan when she signed a Form 5500 and submitted it to the DOL. As the plan administrator, she was acting as a fiduciary under ERISA.

68.     The McBride & Son Employee Stock Ownership Plan Administrative Committee ("Plan Admin. Comm."), required to be created when two or more individuals are appointed administrators per Article 17.10 of the 2007 Plan Document, 2013 Plan Document, and 2017 Plan Document, was a fiduciary to the Plan under 29 U.S.C. § 1102(21)(A) when it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had

discretionary authority or discretionary responsibility in the administration of the Plan. Plan Admin. Comm. was also a party in interest to the Plan under 29 U.S.C. §§ 1002(14)(A).

69. McBride & Son Companies, LLC ("MS Companies") was at all relevant times a party in interest to the Plan under 29 U.S.C. §§ 1002(14)(A), (C), (E), (G), and/or (I).

70. The documents governing the Plan at all relevant times listed the defined term Employers as fiduciaries to the Plan. To the extent that MS Companies met the definition of Employer, it was a fiduciary to the Plan under 29 U.S.C. § 1102(21)(A) when it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

71. MS Companies, as a corporate entity, cannot act on its own without any human counterpart. In this regard, MS Companies relied directly on the other Defendants, named herein known to Plaintiffs and those unknown to Plaintiffs, to carry out its fiduciary responsibilities under the Plan and ERISA and the acts of MS Companies' officers and employees alleged herein are the acts of MS Companies.

72. Plaintiffs are currently unaware of the additional identities and capacities of the individuals or entities that have been delegated fiduciary functions by the named Defendants in this case, including MS Capital, MS Management, Eilermann, Arri, Templeton, the Plan Admin. Comm., and MS Companies. As such, those individuals are collectively named as John Does 1 through 10, and upon information and belief, were fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A) when they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the

administration of the Plan. Plaintiffs will substitute the real names of the John Does when they are known to Plaintiffs.

73.     Defendants MS Capital, MS Management, Eilermann, Arri, Templeton, the Plan Admin. Committee, MS Companies, and John Does 1 through 10 are collectively hereafter referred to as the "MS Fiduciaries."

74.     Defendant Jeffrey Schindler ("Schindler") serves as President to one or more of the corporate and/or limited liability company entities forming the MS Home conglomerate, including those who are defined as an employer in the Plan's governing documents.

75.     Schindler is a party in interest to the Plan under 29 U.S.C. §§ 1002(14)(H).

76.     Defendant Jeffrey Todt ("Todt") serves as the current Chief Financial Officer of MS Capital and also serves as an officer to one or more of the corporate and/or limited liability company entities forming the MS Homes conglomerate, including those who are defined as an employer in the Plan's governing documents.

77.     Todt is a party in interest to the Plan under 29 U.S.C. §§ 1002(14)(H).

78.     Eilermann, Arri, Schindler, and Todt exerted effective control over MS Companies as owners of certain Class B and/or Class C units of MS Companies and/or as officers of MS Companies.

## FACTUAL ALLEGATIONS

### McBride & Son Background

79.     Headquartered in Chesterfield, Missouri, the McBride & Son home building conglomerate of companies builds, finances, and sells residential homes in Missouri and Illinois (collectively referred to as "MS Homes").

80. According to its website, MS Homes is the largest home builder in Missouri and has the highest market share of any builder in any top 30 market across the nation.

81. Because the MS Homes conglomerate of corporate entities and subsidiaries is privately held, Plaintiffs do not have insight into its exact corporate structure. However, upon information and belief, at all relevant times since 1987, the entirety of MS Homes has been intended to be owned by the Plan and operated for the benefit of the Plan and its participants and beneficiaries.

**The Plan's Investment in MS Capital**

82. The Plan originally held shares of McBride & Son Enterprises, Inc. stock ("MS Enterprises").

83. According to certain filings made by the MS Fiduciaries with the DOL, the Plan's primary investment was later converted from shares of MS Enterprises stock to shares of MS Capital stock as of January 8, 2010.

84. According to filings made by the MS Fiduciaries with the DOL, as of January 8, 2010 and January 1, 2014, the Plan was the sole shareholder of MS Capital.

85. As further described below, effective December 31, 2013, MS Fiduciaries executed a corporate reorganization that was intended to benefit the corporate insiders and secretly transfer the value of the assets held by MS Capital from the Plan to the corporate insiders, who served as fiduciaries and parties in interest to the Plan, including, but not limited to, Eilermann, Arri, Schindler, and Todt. Also as further described below, this resulted in a substantial reduction in the value of MS Capital stock as the insiders siphoned off cash and value, thus reducing the value of Plan assets. The MS Fiduciaries achieved this improper transfer of value to the insiders by, upon information and belief, reorganizing all of the MS Homes

conglomerate to be held by MS Companies of which MS Capital would then only own Class A units of MS Companies, while insiders, including Eilermann, Arri, Schindler, and Todt, would own the Class B and/or Class C units of MS Companies.

86.     MS Capital stock is not, and was not at the time it was owned by the Plan, readily tradable on an established securities market.

87.     As of December 31, 2014, the Plan held 88,201 shares of MS Capital stock and the Plan Administrator reported a valuation of $14,817,850.

88.     As of December 31, 2015, the Plan held 73,536 shares of MS Capital stock and the Plan Administrator reported a valuation of $12,354,054.

89.     As of December 31, 2016, the Plan held 88,201 shares of MS Capital stock and the Plan Administrator reported a valuation of $13,494,818.

### The 2017 ESOP Transaction

90.     On or around the beginning of October of 2017, Eilermann and Arri approached GreatBanc with a proposal to purchase all of the MS Capital stock held by the ESOP (hereafter "Early October Proposal").

91.     Eilermann and Arri flew to Chicago to meet with GreatBanc to discuss the Early October Proposal and made a presentation (hereafter "Early October Presentation").

92.     The Early October Proposal by Eilermann and Arri offered to buy the MS Capital stock at a 20% premium to the December 31, 2016 valuation. The December 31, 2016, valuation was $153 per share. The Early October Proposal was for $183.20 per share.

93.     The Early October Proposal and Early October Presentation by Eilermann and Arri did not include an updated valuation of MS Capital stock by an independent and qualified valuation expert.

94.     The Early October Proposal and Early October Presentation by Eilermann and Arri did not include detailed financial statements or other appropriate updated relevant information about the performance of MS Capital and the MS Homes conglomerate that an independent and qualified valuation expert would rely on.

95.     On or about October 23, 2017 De Craene, on behalf of GreatBanc, and without additional financial material from Eilermann and Arri, engaged in further negotiations with Eilermann and Arri over their proposal to purchase MS Capital stock from the Plan.

96.     No later than October 23, 2017, De Craene, Eilermann, and Arri arrived at a price of $187 per share (the "Below FMV Sale Price").

97.     On November 30, 2017, the fiduciaries to the Plan allowed MS Capital to purchase all the shares of MS Capital stock held by the Plan, which were transferred to MS Capital at the Below FMV Sale Price of $187 for a total of consideration of $16,493,664, which consisted of 80,094.3643 shares for $14,977,646 in cash and 8,107.0476 shares for loan forgiveness on a October 31, 2017 promissory note of $1,516,018 (discussed further below).

98.     As the trustee for and fiduciary to the Plan, it was GreatBanc's duty to ensure that any transactions between the Plan and MS Capital were fair and reasonable, for the exclusive benefit of the Plan's participants and beneficiaries, consistent with ERISA's fiduciary duties, that the Plan would receive no less than fair market value for the stock, and that no prohibited transaction would occur involving Plan assets.

99.     As fiduciaries to the Plan as described above, it was the MS Fiduciaries' duty to ensure that any transactions between the Plan and MS Capital were fair and reasonable, for the exclusive benefit of the Plan's participants and beneficiaries, consistent with ERISA's fiduciary

duties, that the Plan would receive no less than fair market value for the stock, and that no prohibited transaction would occur involving Plan assets.

100. Approving the Below FMV Sale Price was inconsistent with GreatBanc and MS Fiduciaries' duties. The Below FMV Sale Price for MS Capital stock was below fair market value based upon what an unrelated party would pay in an arm's length negotiated transaction as measured by comparison to sales and valuation data on other similarly situated companies in the same industry.

101. It was inconsistent with GreatBanc and MS Fiduciaries' duties to rely on the December 31, 2016, valuation report which was not prepared for purposes of a sale of MS Capital stock from the ESOP. As an example, the December 31, 2016, valuation report included a 15% discount for lack of marketability, which is inapplicable to a situation where a proposal has been made to buy all the outstanding shares of MS Capital stock.

102. The December 31, 2016, valuation report stated "[t]he conclusion of value arrived at herein is valid only for the stated purpose as of the date of the valuation."

103. The December 31, 2016, valuation report also stated "[t]his report and the conclusion of value arrived at herein are for the exclusive use of our client for the sole and specific purpose as noted herein. They may not be used for any other purpose or by any other party for any purpose."

104. The stated purpose of the December 31, 2016, valuation was not to value the MS Capital stock held in the Plan for sale.

105. It was inconsistent with GreatBanc and MS Fiduciaries' duties to rely on the Early October Proposal and Early October Presentation.

106.    It was inconsistent with GreatBanc and MS Fiduciaries' duties to not independently investigate the information provided by Eilermann and Arri in the Early October Proposal and Early October Presentation.

107.    It was inconsistent with GreatBanc and MS Fiduciaries' duties to agree on a sale price with Eilermann and Arri in mere weeks, demonstrating a severe lack of due diligence.

108.    It was inconsistent with GreatBanc and MS Fiduciaries' duties to allow Eilermann and Arri to push a timetable for purchase that did not allow proper due diligence to occur for the benefit of the Plan's participants and beneficiaries.

109.    It was inconsistent with GreatBanc and MS Fiduciaries' duties to not engage in a thorough level of due diligence prior to arriving at a sale price.

110.    De Craene of GreatBanc in a published article wrote "[a] thorough due diligence review includes a review and discussion of the year-end financial statements, the projected financial statements, the overall industry, the competitors, the suppliers, the customers, key personnel changes, management succession, new product or service offerings, the backlog, the pipeline, litigation, and any other relevant items."

111.    It was inconsistent with GreatBanc and MS Fiduciaries' duties to not document in writing the negotiation process.

112.    It was inconsistent with GreatBanc and MS Fiduciaries' duties not to obtain an updated valuation report from an independent and qualified valuation expert.

113.    It was inconsistent with GreatBanc and MS Fiduciaries' duties to agree on a sale price without first obtaining an updated valuation report from an independent and qualified valuation expert.

114.    It was inconsistent with GreatBanc and MS Fiduciaries' duties to fail to consider alternative purchasers of MS Capital stock including, but not limited to, publicly traded competitors, privately held competitors, or other potential buyers such as private equity firms.

115.    It was inconsistent with GreatBanc and MS Fiduciaries' duties to not hire an independent investment banker that would act on behalf of the Plan to explore alternative purchasers.

116.    It was inconsistent with GreatBanc and MS Fiduciaries' duties to not have independent members of the board of directors of MS Capital appointed to operate in the best interest of the Plan's participants and beneficiaries given that the Plan was the largest shareholder of MS Capital and had the largest ownership stake in MS Companies (as further described below).

117.    De Craene in a published article wrote: "A board of directors consisting solely of insiders is also an area of concern for a trustee. Best practices dictate that an ESOP company has at least one or two outside, independent board members. The implementation of outside board members removes conflicts of interest that may otherwise exist. This adds a level of protection to the decisions made by the board and protects the trustee in monitoring the board. In addition, outside board members add a different perspective and bring different experiences to bear that are often helpful in the boardroom."

118.    It was inconsistent with GreatBanc and MS Fiduciaries' duties to approve a Below FMV Sale Price of $187 when projections called for increased revenues in 2017 and beyond.

119. It was inconsistent with GreatBanc and MS Fiduciaries' duties to approve a Below FMV Sale Price of $187 when the liquidation value of MS Capital had a higher per share value.

120. It was inconsistent with GreatBanc and MS Fiduciaries' duties to approve a Below FMV Sale Price of $187 when Eilermann stated publicly in June 2017 that "[w]e currently have 4,000 homesites under development in St. Louis and that's the most we've ever had at one time. The 2017–2018 outlook is positive which means the St. Louis region will increasingly thrive while we continue to deliver homes in all price points."

121. It was inconsistent with MS Fiduciaries' duties to not remove GreatBanc as trustee for its breaches of duty between the Early October Proposal and the sale of MS Capital stock as the Below FMV Sale Price.

122. It was inconsistent with MS Fiduciaries' duties to not remove the board of directors of MS Capital.

123. It was inconsistent with MS Fiduciaries' duties to not remove those fiduciaries acting against the best interests of the Plan as described herein.

124. It was inconsistent with GreatBanc's duties to not remove the MS Fiduciaries.

125. It was inconsistent with GreatBanc's duties to not remove the board of directors of MS Capital.

126. It was inconsistent with GreatBanc's duties to not remove those fiduciaries acting against the best interests of the Plan as described herein.

127. GreatBanc and the MS Fiduciaries had a dual obligation to first properly determine whether a sale of the MS Capital stock from the Plan was in the best interests of the Plan's participants and beneficiaries and second, assuming such a determination could be made,

to ensure that the Plan received fair market value for the MS Capital stock to protect the interests of the Plan's participants and beneficiaries. They failed in both respects.

128.    The purpose of the 2017 ESOP Transaction was instead to benefit corporate insiders, including, but not limited to, Eilermann, Arri, Schindlet, and Todt, by allowing them to take control over MS Capital and thus the MS Homes conglomerate at the expense of the Plan's participants and beneficiaries.

129.    Defendants have never explained to the Plan participants and beneficiaries the fiduciary process they engaged in to determine that selling the entirety of MS Capital stock from the Plan was exclusively beneficial to the Plan's participants and beneficiaries and how the Defendants met the stringent requirements of ERISA's fiduciary duty and prohibited transaction rules in doing so.

130.    Arri testified under oath that he and Eilermann controlled shares of MS Capital outside the Plan, a statement inconsistent with statements made in Form 5500s, under penalty of perjury, that the Plan was the sole shareholder of MS Capital stock.

131.    Arri testified under oath that after MS Capital purchased MS Capital stock from the Plan, he and Eilermann became sole the owners of MS Capital.

132.    Arri testified under oath that he and Eilermann sold a certain amount of MS Capital stock to Schindler and Todt after the MS Capital stock was purchased from the Plan.

**Account Balances of Inactive Participants**

133.    On October 31, 2017, Amendment Number One to the 2017 Plan Document was executed by Arri. Amendment Number One purports to provide that a former participant's "ESOP Account" and "Matching Contribution Account" (as defined in the 2017 Plan document) may be converted into cash after the former participant terminated employment with MS Capital.

134. On October 31, 2017, a promissory note was executed between the Plan and MS Capital for $1,516,017.90 and this amount was later deposited into the Plan.

135. Arri has filed a declaration under penalty of perjury alleging that this loan was for the purpose of converting the shares to cash held in the Plan accounts of inactive participants, including Godfrey and Sheldon.

136. An Account Statement for the Plan shows that the loan proceeds were received on November 1, 2017. An Account Statement for the Plan shows that the liability for the loan note was entered as of November 1, 2017.

137. An Account Statement for the Plan shows that GreatBanc purchased $1,516,017.90 in a Goldman Sachs money market fund on November 1, 2017.

138. The same Account Statement does not show the MS Capital shares held by inactive participants being liquidated for cash on November 1, 2017, nor any other day thereafter.

139. The same Account Statement instead shows that on November 30, 2017, 8,107.0476 shares of MS Capital were transferred to MS Capital in satisfaction of the $1,516,017.90 loan at a share price of $187.

140. The same Account Statement also shows that on November 30, 2017, the trust recognized the difference between the loan payment price of $1,516,017.90 and, upon information and belief, the book value of the 8,107.0476 shares at $987,438.40, demonstrating the shares remained in the accounts of the inactive ESOP participants, including Godfrey and Sheldon, until November 30, 2017, the same day the shares were sold to MS Capital for active participants.

141.    Arri declared under penalty of perjury on February 5, 2019 that "[b]ased upon my review of relevant ESOP records and conversations with GreatBanc, neither Mr. Godfrey nor Mr. Sheldon held any shares of [MS Capital Stock] in their respective ESOP accounts after [November 1, 2017]." Arri produced no records demonstrating this statement to be true, either voluntarily as part of the limited discovery allowed by the Court nor under Court order as a result of Godfrey and Sheldon's Motion to Compel. In fact, during his deposition, Arri admitted Participant Valuation Summaries dated December 11, 2017, regarding Godfrey's and Sheldon's Plan accounts did not show any investment other than an investment in MS Capital stock and that the statements also did not show the date upon which their MS Capital stock was sold. Upon information and belief, Participant Valuation Summaries dated December 11, 2017 for all other active and inactive participants will show the same as Godfrey's and Sheldon's.

142.    De Craene declared under penalty of perjury on February 5, 2019, that "GreatBanc records indicate that neither Mr. Godfrey nor Mr. Sheldon held any shares of [MS Capital stock] in their ESOP accounts after November 1, 2017." GreatBanc produced no records demonstrating this statement to be true, either voluntarily as part of the limited discovery allowed by the Court nor under Court order as a result of Godfrey and Sheldon's Motion to Compel.

143.    Inconsistent with Amendment Number One to the 2017 Plan Document, no documents were produced to Godfrey and Sheldon demonstrating that the Administrator for the Plan determined the total amount of cash and liquid assets held within the Plan that should be retained for the purposes of funding current and future benefit distributions, implementing Participants' current and future diversification elections, paying legitimate expenses of Plan administration, and satisfying any other reasonable and proper obligations of the Plan.

144.    Inconsistent with Amendment Number One to the 2017 Plan Document, no documents were produced to Godfrey and Sheldon demonstrating that the Administrator determined that in 2017 the amount of cash and liquid assets held within the Plan exceeds the amount reasonably necessary to satisfy the obligations described in paragraph 143 of this First Amended Complaint.

145.    Inconsistent with Amendment Number One to the 2017 Plan Document, no documents were produced to Godfrey and Sheldon demonstrating that if a conversion had been successfully done, then the cash transferred to the inactive participants was allocated to Company Stock Proceeds Accounts established on their behalf.

146.    The decision to convert at $187 was done after the Below FMV Sale Price was agreed to on October 23, 2017.

147.    Arri testified under oath that Amendment Number One to the 2017 Plan Document was not conceived until after the Early October Proposal.

148.    Arri testified under oath that he was acting as an administrator on behalf of MS Capital, the plan administrator, and thus Arri was acting as a fiduciary to the Plan under ERISA.

149.    ERISA, the 2017 Plan Document, and the ESOP Trust required documentation of any conversion that could have been performed under Amendment Number One to the 2017 Plan Document.

150.    Upon information and belief, the Summary of Material Modifications describing Amendment Number One to the 2017 Plan Document was never sent to Plan participants.

151.    The Plan's 2017 Form 5500 makes no mention of inactive Plan participants having their shares allegedly converted on November 1, 2017.

152.    Godfrey and Sheldon received a letter signed by Eilermann and dated December 18, 2017, stating:

> As a former participant who still has an account under the McBride & Son Employee Stock Ownership ("ESOP"), you are being notified of some recent changes to the ESOP. McBride & Son Capital, Inc. ("Company"), which sponsors the ESOP, has recapitalized its corporate structure. As part of this recapitalization process, the Company, with the prior approval of the ESOP trustee, GreatBanc Trust Company, purchased all of the Company stock held in your Company stock account and any Company stock held in your matching contribution account.

153.    Amendment Number One to the 2017 Plan Document required that that any cash used to convert the MS Capital stock of inactive participants must come from the excess cash or other liquid assets already credited to and held in the ESOP Cash Accounts of Participants who are actively employed by MS Capital.

154.    The 2017 Plan Document in Article 2.19 defines the Employer Contribution Account to include ESOP Cash Accounts.

155.    The Plan's 2017 Form 5500 only shows $117,432 in employer contributions.

156.    Amendment Number One to the 2017 Plan Document does not provide authority to borrow cash to convert the MS Capital stock of inactive participants.

**The Siphoning of Value of Plan Assets by Corporate Insiders at the Expense of the Plan**

157.    Any payment of excessive compensation and perquisites or the transfer of equity or ownership of a subsidiary held by either MS Capital or MS Enterprises would adversely impact MS Capital's or MS Enterprise's equity value and therefore the value of Plan assets.

158.    As noted above, the 2017 ESOP Transaction was the final chapter in a secret and concerted year's long campaign to take the value of the assets held by the ESOP away from the Plan participant and beneficiaries and instead give it to corporate insiders including, but not limited to, Eilermann, Arri, Schindler, and Todt.

159.     The 2013 Form 5500 for the Plan, filed on October 10, 2014, with the DOL by Templeton as the delegated plan administrator by MS Management (the named fiduciary and plan administrator before December 31, 2013), states "On January 8, 2010, the shares held by McBride & Son Enterprises Inc. were transferred to McBride & Son Companies, Inc., resulting in the ESOP being the sole shareholder of McBride & Son Companies, Inc. All shares were allocated to eligible participants' accounts as of December 31, 2010."

160.     The 2014 Form 5500 for the Plan, filed on October 12, 2015 with the DOL by Templeton as the delegated plan administrator by MS Capital (the named fiduciary and plan administrator after January 1, 2014), states "On January 8, 2010, the shares held by McBride & Son Enterprises Inc. were transferred to McBride & Son Capital, Inc., resulting in the ESOP being the sole shareholder of McBride & Son Capital, Inc. All shares were allocated to eligible participants' accounts as of December 31, 2010." This statement in the 2014 Form 5500 is inconsistent with the Delaware Secretary of State's website which states that MS Capital was not incorporated until December 31, 2013. The statement found in the 2014 Form 5500 is repeated in the 2015 Form 5500, the 2016 Form 5500, and the 2017 Form 5500, all filed with the DOL. There is no mention at all of a January 8, 2010 transaction in the 2010 Form 5500, the 2011 Form 5500, and the 2012 Form 5500.

161.     The 2013 Form 5500 for the Plan, filed on October 10, 2014 with the DOL by Templeton as the delegated plan administrator by MS Management (the named fiduciary and plan administrator before December 31, 2013), states "McBride & Son Companies, Inc. executed a conversion to a limited liability company on December 31, 2013…On January 1, 2014, the units of McBride & Son Companies, LLC were transferred to McBride & Son Capital, Inc., resulting in the ESOP being the sole shareholder of McBride and Son Capital, Inc." The same

statement also appears in the 2014 Form 5500, the 2015 Form 5500, the 2016 Form 5500, and the 2017 Form 5500.

162. Amendment Number Two to the 2013 Plan Document simply describes changes in later 2013/early 2014 as a "corporate reorganization."

163. However, a very different explanation for these changes appears in the December 31, 2016 valuation report, which states:

> On December 31, 2013, the Company [McBride & Son Companies, Inc.] filed a Certificate of Conversion with the Missouri Secretary of State, thereby (i) effecting a conversion of the Company from a corporation to a limited liability company and (ii) changing the Company's name from McBride & Son Companies, Inc. to McBride & Son Companies, LLC. Similar conversions were implemented for two of the Company's wholly-owned subsidiaries, McBride & Son Properties, Inc. (now known as McBride & Son Properties, LLC) and McBride & Son Enterprises, Inc. (now known as McBride & Son Enterprises, LLC). In conjunction with the conversion of the Company to a limited liability company, all of the Company's outstanding shares of common stock were converted to Class A limited liability company units, and were issued to a new corporation, McBride & Son Capital, Inc. In exchange, all of the outstanding common stock of McBride & Son Capital, Inc. was issued to the ESOP. Consequently, since December 31, 2013, the ESOP has owned all the outstanding shares of common stock of McBride & Son Capital, Inc. [], which in turn owned all of the outstanding Class A units of McBride & Son Companies, LLC [].
>
> At December 31, 2016, [McBride & Son Companies, LLC] had three classes of membership units outstanding. Class A units having voting rights and certain preferential rights to distributions based upon ESOP repurchase liabilities payable by the Class unit holder. Class B units have voting rights and certain preferential rights to distributions based upon income tax liabilities payable by the Class B unit holders with respect to their proportionate shares of [McBride & Son Companies, LLC's] income. Class C units do not have voting rights. Both Class B units and Class C units have certain preferential rights to distributions based upon income tax liabilities payable by the Class B and Class C unit holders with respect to their proportionate shares of [McBride & Son Companies, LLC] income.
>
> …
>
> At December 31, 2016, [McBride & Son Capital, Inc.] owned 57.24% of the total Class A, B, and C outstanding units of [McBride & Son Companies, LLC].

164. Plaintiffs are not in possession of information describing the specific ownership of MS Companies' Class B and Class C units from the time period of December 31, 2013 through the date the shares of MS Capital stock were sold from the Plan.

165. The December 31, 2016 valuation report further states that in 2015 there was a $6,703,949 cost associated with the conversion of phantom stock into true equity.

166. The Early October Presentation states that as of August 2017, the Plan owned 56.2% of MS Companies (down from the 57.24% reported in the December 31, 2016 valuation report), Eilermann owned 25.6% of MS Companies, Arri owned 10.5% of MS Companies, Schindler owned 5.0% of MS Companies, and Todt owned 2.7% of MS Companies. It also states that the purpose of the late 2013/early 2014 reorganization was to incentivize management.

167. Corporate insiders paid themselves excessive compensation, deferred compensation, and perquisites which resulted in the reduced value of the stock held by the Plan.

168. Upon information and belief and as noted in the Early October Presentation, the 2012 audited financials for MS Companies will show that approximately $5,993,000 was incurred on what is described as ESOP/Incentive Compensation, yet the 2012 Form 5500 for the Plan only shows $655,446 in employer contributions (assuming such contributions are captured in that category of expense). Additionally, approximately $2,806,000 was incurred on what is described as Deferred Compensation.

169. Upon information and belief and as noted in the Early October Presentation, the 2013 audited financials for MS Companies will show that approximately $6,734,000 was incurred on what is described as ESOP/Incentive Compensation, yet the 2013 Form 5500 for the Plan only shows $8,455 in employer contributions (assuming such contributions are captured in

that category of expense). Additionally, approximately $2,715,000 was incurred on what is described as Deferred Compensation.

170.    Upon information and belief and as noted in the Early October Presentation, the 2014 audited financials for MS Companies will show that approximately $14,190,000 was incurred on what is described as ESOP/Incentive Compensation, yet the 2014 Form 5500 for the Plan only shows $1,874,595 in employer contributions (assuming such contributions are captured in that category of expense). Additionally, approximately $2,759,000 was incurred on what is described as Deferred Compensation.

171.    Upon information and belief and as noted in the Early October Presentation, the 2015 audited financials for MS Companies will show that approximately $5,499,000 was incurred on what is described as ESOP/Incentive Compensation, yet the 2015 Form 5500 for the Plan only shows $1,513,318 in employer contributions (assuming such contributions are captured in that category of expense).

172.    Upon information and belief and as noted in the Early October Presentation, the 2016 audited financials for MS Companies will show that approximately $9,362,000 was incurred on what is described as ESOP/Incentive Compensation, yet the 2016 Form 5500 for the Plan only shows $1,218,183 in employer contributions (assuming such contributions are captured in that category of expense).

173.    The December 31, 2016 valuation report recognized that the value of the MS Capital stock by the ESOP was limited due to reduced earnings that would not change significantly due to "excessive owner's compensation and other perquisites."

31

174.    It would have been obvious to a competent and independent board of directors of MS Capital that the value of the Plan's investment in MS Capital was being depleted and stolen at the expense of the Plan's participants and beneficiaries.

175.    It would have been obvious to a prudent trustee that the value of the Plan's investment in MS Capital was being depleted and stolen at the expense of the Plan's participants and beneficiaries.

176.    It would have been obvious to prudent and unconflicted fiduciaries that the value of the Plan's investment in MS Capital was being depleted and stolen at the expense of the Plan's participants and beneficiaries.

177.    The GreatBanc and MS Fiduciaries failed to protect the Plan from the resulting reduction in value of the stock held by the Plan.

178.    The conflicted board of directors of MS Capital failed to protect the Plan from the resulting reduction in value of the stock held by the Plan.

179.    GreatBanc and MS Fiduciaries failed to protect the Plan by having independent members appointed to the board of directors of MS Capital and McBride & Son Companies, Inc., and MS Enterprises.

180.    GreatBanc and MS Fiduciaries failed to protect the Plan by having independent officers appointed to MS Capital, McBride & Son Companies, Inc., MS Companies, and MS Enterprises.

181.    GreatBanc and MS Fiduciaries failed to protect the Plan by having prudent and loyal fiduciaries appointed.

182.    GreatBanc and MS Fiduciaries failed to file suit in their capacity representing the Plan's shareholder rights in MS Capital, McBride & Son Companies, Inc., MS Companies, and

McBride & Son Enterprises, Inc. A prudent and loyal fiduciary to the Plan in similar circumstances would have brought one or more derivative actions against the board of directors of MS Capital, McBride & Son Companies, Inc., and MS Enterprises and the officers and/or management of MS Capital, McBride & Son Companies, Inc., MS Companies, and MS Enterprises to remedy the failures as outlined above and would not have concluded that such derivative actions were likely to harm MS Capital, McBride & Son Companies, Inc., MS Companies, MS Enterprises, and the Plan. Such derivative actions would have been successful, as demonstrated by the allegations herein. Such derivative actions would have recovered the substantial losses to the Plans caused by the allegations described above.

183. Upon information and belief, Plan participants and beneficiaries were never informed of the true reason for the corporate reorganization in late 2013/early 2014, namely, to create a vehicle for the transfer of value of the assets held by MS Capital from the Plan to Eilermann, Arri, Schindler, and Todt that resulted in the reduced share price of MS Capital.

184. Upon information and belief, Plan participants and beneficiaries were never informed that Eilermann, Arri, Schindler, and Todt were owners of Class B and/or C units of MS Companies, thus diluting the value of the Class A units of MS Companies held by MS Capital, thus resulting in the diminished value of the MS Capital stock held by the Plan.

185. Upon information and belief, Plan participants and beneficiaries were never informed that insiders were paying themselves excessive compensation and perquisites.

186. Upon information and belief, Plan participants and beneficiaries were never informed that the December 31, 2016, valuation report stated excessive owner's compensation and other perquisites were being paid to insiders.

187.    Upon information and belief, Plan participants and beneficiaries were never informed of the excessive ESOP/Employer Incentives and Deferred Compensation being paid to insiders.

**Failure to Remove GreatBanc as Trustee**

188.    GreatBanc has been sued numerous times in federal court by plan participants and the DOL over its failures as an ESOP trustee.

189.    The DOL has instituted a number of lawsuits against GreatBanc, at least as far back as 2006 in *Chao v. Hagemeyer North America, Inc.*, No. 06-cv-01173 (D.S.C.), alleging that GreatBanc breached its fiduciary duties or otherwise violated ERISA in connection with transactions involving employee stock ownership plans owning privately held or closely held employer stock.

190.    In 2012, the DOL filed litigation against GreatBanc concerning its role in the purchase of Sierra Aluminum Company stock by the Sierra Aluminum Company Employee Stock Ownership Plan, entitled *Perez v. GreatBanc Trust Company*, No. 5:12-cv-01648-R-DTB (C.D. Cal.). In the lawsuit, the DOL alleged that GreatBanc (a) failed to adequately inquire into an appraisal that presented unrealistic and aggressively optimistic projections of Sierra Aluminum's future earnings and profitability; (b) failed to investigate the credibility of the assumptions, factual bases and adjustments to financial statements that went into the appraisal; and (c) asked for a revised valuation opinion in order to reconcile the ESOP's higher purchase price with the lower fair market value of the company stock.

191.    In a settlement agreement filed June 6, 2014 in *Perez v. GreatBanc Trust Company*, No. 5:12-cv-01648-R-DTB (C.D. Cal.) (Dkt No. 166-1), GreatBanc agreed to pay over $4.7 million to the Sierra ESOP plus $477,273 in fines to the DOL. Most significantly, and

as many in the ESOP "industry" have noted, as part of the settlement agreement, GreatBanc was required to implement very specific policies and procedures whenever it serves as a trustee or other fiduciary of an ESOP in connection with transactions in which the ESOP is purchasing or selling, is contemplating purchasing or selling, or receives an offer to purchase or sell employer securities that are not publicly traded.

192.    As then U.S. Secretary of Labor Thomas E. Perez observed in the DOL press release announcing the settlement, the "more important[]" part of the settlement was to ensure "safeguards will be put in place to protect ESOPs involved in any future GreatBanc transactions."

193.    Attachment A to the Settlement in *Perez v. GreatBanc Trust Co.*, entitled "AGREEMENT CONCERNING FIDUCIARY ENGAGEMENTS AND PROCESS REQUIREMENTS FOR EMPLOYER STOCK TRANSACTIONS" consists of a 10-page set of very detailed and highly proscriptive policies that GreatBanc is required to implement whenever it serves as a trustee of an ESOP and is considering the purchase or sale of employer securities that are not publicly traded. These policies and procedures are summarized as follows:

**a. Selection and Use of Valuation Advisor.**

i. GreatBanc is required to hire a qualified valuation advisor, investigate the advisor's qualifications, and prudently determine that it can rely on the advisor *before* entering into the transaction.

ii. GreatBanc cannot use an advisor for a transaction which has previously performed work for the ESOP sponsor (distinguished from the ESOP), any counterparty to the ESOP involved in the transaction, or any other entity that is structuring the transaction (such as an investment bank).

iii. GreatBanc is prohibited from using an advisor that has a familial or corporate relationship to itself and other transaction parties.

iv. In selecting an advisor for a transaction involving the purchase or sale of employer securities, GreatBanc has to prepare a *written* analysis addressing specified topics such as the reason for selecting the particular advisor.

v. GreatBanc has to oversee the valuation process and make sure the advisor documents certain required items; if the advisor does not do so, GreatBanc then has to prepare supplemental documentation addressing a number of matters relating to the analysis.

**b. Financial Statements.**

i. GreatBanc must request that the company provide GreatBanc and its valuation advisor with audited unqualified financial statements prepared by a CPA for the preceding five fiscal years, unless financial statements extending back five years are unavailable.

ii. In the absence of such audited financial statements, GreatBanc is required to take certain steps before proceeding with the transaction, including additional documentation of why it has chosen to proceed.

**c. Fiduciary Review Process.**

i. GreatBanc must follow a specified process and document the valuation analysis that includes (a) determine the prudence of relying on the financial statements, (b) critically assess the reasonableness of any projections, and (c) document the basis for its conclusion that the information provided was current, complete and accurate.

ii. GreatBanc must document its analysis of the valuation report in writing by assessing 16 specific items.

iii. GreatBanc must document that its personnel have (a) read and understand the report, (b) identify and question the reports assumptions, (c) make reasonable inquiry about whether the information is consistent with information in the GreatBanc's possession, (d) analyze whether the report's conclusions are consistent with the data and analysis, and (e) analyze whether the report is internally consistent.

iv. If the valuation report does not meet these criteria, then GreatBanc must not proceed with the transaction.

**d. Fair Market Value.**

GreatBanc specifically agreed that it would not cause an ESOP to purchase employer securities for more than their fair market value or sell employer securities for less than their fair market value.

194. Given the publicity of the GreatBanc-DOL Settlement Agreement at least within the ESOP community, the MS Fiduciaries should have known about this Settlement. In addition, GreatBanc would have had a fiduciary duty as the trustee to provide this information, if not the settlement agreement itself, to the MS Fiduciaries.

<u>**ERISA's Fiduciary Standards and Prohibited Transactions**</u>

195. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

…

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

196.    The fiduciary duties under 29 U.S.C. § 1104(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose, and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). They entail, among other things:

(a) A duty to conduct an independent, intensive and thorough investigation into, and continually monitor, matters as to which the fiduciaries have decision-making authority;

(b) A duty to make good faith, reasoned and objectively reasonable analyses and decisions concerning matters as to which the fiduciaries have decision-making authority;

(c) A duty to administer and manage a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(d) These duties are applicable, among other instances, where fiduciaries exercise stock voting rights;

(e) These duties also apply, among other instances, where fiduciaries decide whether or not to bring one or more derivative actions to remedy corporate action or inaction giving rise to such a claim; and

(f) A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

197.    Under 29 U.S.C. § 1103(c)(1), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

198.    To satisfy 29 U.S.C. § 1104 "when facilitating a transaction involving the sale of plan assets, the fiduciary must conduct an 'adequate inquiry into the proper valuation of shares.'" *Hurtado v. Rainbow Disposal Co.*, 2018 WL 3372752, at *6 (C.D. Cal. July 9, 2018) (in which similar claims have been made against GreatBanc as trustee as in this First Amended Complaint) (*citing Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678–79 (7th Cir. 2016)).

199.    ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participants knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

200. The general duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106, and are considered "*per se*" violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

[A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

Section 1106(b) provides, in pertinent part, that:

[A] fiduciary with respect to the plan shall not –

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or

> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

201.    ERISA's fiduciary duty and prohibited transaction provisions prohibit fiduciaries, such as the Defendants here, from causing plans to engage in transactions with fiduciaries and parties in interest that result in benefits to the fiduciaries and parties in interest at the expense of the plan and its participants and beneficiaries.

202.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

203.    29 U.S.C. § 1132(a)(3) provides a cause of action against a non-fiduciary "party in interest" who knowingly participates in prohibited transactions or knowingly receives payments made in breach of a fiduciary's duty, and authorizes "appropriate equitable relief" such as restitution or disgorgement to recover ill-gotten proceeds from the non-fiduciary.

204.    Non-fiduciaries, acting with actual or constructive knowledge, may be held liable under ERISA in two ways: (1) as parties in interest, for participating in a 29 U.S.C. § 1106 prohibited transaction, and (2) as non-fiduciaries, for participating in a transaction that violates ERISA. 29 U.S.C. § 1132(a)(3); *Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000).

## CLAIMS FOR RELIEF

### COUNT I

**Causing and Engaging in Prohibited Transactions Forbidden by
29 U.S.C. §§ 1106(a)–(b) for the 2017 ESOP Transaction
Against GreatBanc and the MS Fiduciaries**

205.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

206.    29 U.S.C. § 1106(a)(1)(A) prohibits a plan fiduciary, here GreatBanc and the MS Fiduciaries (collectively hereafter "Count I Defendants"), from causing a plan, here the Plan, to engage in a sale or exchange of any property, here MS Capital stock, with a party in interest, here MS Capital, as took place in the 2017 ESOP Transaction.

207.    29 U.S.C. § 1106(a)(1)(D) prohibits Count I Defendants from causing the Plan to engage in a transaction that constitutes a direct or indirect transfer of Plan assets to, or use by or for the benefit of, a party in interest, here MS Capital and corporate insiders of the MS Homes conglomerate including, but not limited to, MS Fiduciaries, Schindler, and Todt, who were parties in interest as described above, as took place in and after the 2017 ESOP Transaction with the purchase of MS Capital stock by MS Capital.

208.    The stock transactions between the Plan and the parties in interest were authorized by the Count I Defendants in their capacities as fiduciaries to the Plan.

209.    The Count I Defendants caused the Plan to engage in prohibited transactions in violation of 29 U.S.C. § 1106(a) in the 2017 ESOP Transaction.

210.    29 U.S.C. § 1106(b), *inter alia*, mandates that a plan fiduciary shall not "deal with the assets of the plan in his own interest or for his own account", "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants," or "receive any consideration for his own

personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

211.    The MS Fiduciaries dealt with the assets of the Plan in their own interest and on their own account when they caused the Plan to sell MS Capital stock in the 2017 ESOP Transaction to MS Capital, the named fiduciary of the Plan. As described above, the true purpose of selling the stock at a price below fair market value was to benefit corporate insiders including the MS Fiduciaries. This was in violation of 29 U.S.C. § 1106(b)(1).

212.    The Count I Defendants acted on behalf of MS Capital and corporate insiders including the MS Fiduciaries in connection with the 2017 ESOP Transaction by causing the Plan to sell MS Capital stock to MS Capital at a price below fair market value. This greatly benefited MS Capital and the corporate insiders including the MS Fiduciaries, Schindler, and Todt to the substantial detriment of the Plan, even though the Count I Defendants were required to serve the interests of the Plan in connection with any such transaction. This was in violation of 29 U.S.C. § 1106(b)(2).

213.    GreatBanc received compensation from the Plan and/or MS Capital as Trustee for the Plan in the 2017 ESOP Transaction, in the form of trustee fees, in violation of 29 U.S.C. § 1106(b)(3).

214.    The Count I Defendants caused and engaged in prohibited transactions in violation of 29 U.S.C. § 1106(b) in the 2017 ESOP Transaction.

215.    29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits which have been

made through use of assets of the plan, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

216.    The Count I Defendants are personally liable, and the Count I Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3) to make good to the Plan the losses to the Plan resulting from the aforementioned breaches.

217.    The Count I Defendants are personally liable, and the Count I Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3) to restore to the Plan any profits made through the use of Plan assets or through their control of the Plan, and are subject to other equitable or remedial relief as appropriate.

218.    Each Count I Defendant also knowingly participated in the breach of the other Count I Defendants, knowing that such acts were a breach, enabled the other Count I Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, and knew of the breach by the other Count I Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Count I Defendant is liable for the losses caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a).

219.    The Count I Defendants have caused losses to the Plan and have profited for themselves by the prohibited transactions in an amount to be proved specifically at trial.

220.    The losses suffered by the participants in the Plan and the profits to the fiduciaries are coterminous with those of the Plan, and each Plaintiff's individual loss is proportional to the losses of fellow participants.

## COUNT II

**Violation of 29 U.S.C. § 1104(a)(1) for the 2017 ESOP Transaction Against GreatBanc and the MS Fiduciaries**

221.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

44

222.    29 U.S.C. § 1104(a)(1) requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administration of the plan, (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA. 29 U.S.C. § 1103(c)(1) requires, with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

223.    The documents governing the Plan required that the Plan's fiduciaries comply with ERISA stringent fiduciary standards, that the Plan receive no less than fair market value for any assets sold, and that Plan assets never benefit the Defendants.

224.    Fair market value means the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well informed about the asset and the market for such asset.

225.    The duties of loyalty under 29 U.S.C. § 1104(a)(1)(A) and the duty of prudence under 29 U.S.C. § 1104(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determination that the Plan and its participants receive adequate consideration for the assets of the Plan and the participants' accounts in the Plan.

226.    Pursuant to 29 U.S.C. § 1002(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in

good faith by the trustee or the named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations. In order for the trustee or other named fiduciary to make a good faith determination of fair market value relying on an independent appraiser consistent with its duties under 29 U.S.C. §§ 1104(a)(1)(A) and (B), a fiduciary responsible for engaging in the good faith determination must investigate the expert's qualifications, provide the expert with complete and accurate information, and make certain that reliance on the expert's advice is reasonably justified under the circumstances. A fiduciary must arrive at a determination of fair market value by way of a prudent investigation of circumstances prevailing at the time of the valuation, and the application of sound business principles of evaluation.

227.    GreatBanc and the MS Fiduciaries (hereafter collectively the "Count II Defendants") breached their fiduciary duties under 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D) when they did not make a good faith determination of value in the 2017 ESOP Transaction and caused the Plan to sell MS Capital stock to MS Capital at a price below fair market value. Count II Defendants further breached their fiduciary duties when they failed to monitor and to remove fiduciaries, officers, managers, and officers to protect the Plan. This caused losses to the Plan and the Count II Defendants profited by their violations of ERISA.

228.    29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits which have been made through use of assets of the plan, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

229.    Each Count II Defendant is personally liable, and the Count II Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), to make good to the Plan the losses to the Plan resulting from the aforementioned breaches.

230.    Each Count II Defendant is personally liable, and the Count II Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), to restore to the Plan any profits made through the use of Plan assets or through their control of the Plan, and is subject to other equitable or remedial relief as appropriate.

231.    Each Count II Defendant also knowingly participated in the breach of other Count II Defendants, knowing that such acts were a breach, enabled the other Count II Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, and knew of the breach by the other Count II Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Count II Defendant is liable for the losses caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a).

232.    The Count II Defendants have caused losses to the Plan and have profited for themselves by the breaches of fiduciary duty in an amount to be proved specifically at trial.

233.    The losses suffered by the participants in the Plan are coterminous with those of the Plan, and each Plaintiff's individual loss is proportional to the losses of fellow participants.

**COUNT III**

**Knowing Participation in Breaches of Fiduciary Duties & Prohibited Transactions Pursuant to 29 U.S.C. § 1132(a)(3) for the 2017 ESOP Transaction, Against MS Capital, MS Companies, Eilermann, Arri, Schindler, and Todt**

234.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

235.    29 U.S.C. § 1132(a)(3) permits a plan participant to bring a civil action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

236. The Supreme Court has held that anyone, including a non-fiduciary, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under 29 U.S.C. § 1132(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Trust & Sav. Bank v. Soloman Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

237. As a result of the fiduciary breaches and prohibited transactions described in Count I and Count II, Defendants MS Capital, MS Companies, Eilermann, Arri, Schindler, and Todt (collectively hereafter "Count III Defendants") received MS Capital stock and/or consideration that otherwise would have been Plan assets to be used exclusively for the benefit of the Plan participants and beneficiaries.

238. The Count III Defendants were all parties in interest to the Plan under 29 U.S.C. § 1002(14) as described above.

239. The Count III Defendants knew (1) about the existence of the Plan, (2) about the purchase of MS Capital stock in the 2017 ESOP Transaction, (3) that the Count I Defendants and Count II Defendants were fiduciaries to the Plan, (4) that the 2017 ESOP Transaction was for below fair market value, (5) that Count I Defendants engaged in transactions prohibited under 29 U.S.C. §§ 1106(a) and (b), (6) that Count II Defendants breached their fiduciary duties under ERISA, and (7) that the true purpose of the 2017 ESOP Transaction was to benefit MS Home corporate insiders.

240. Despite knowledge of these breaches and violations, the Count III Defendants proceeded to knowingly participate in the breaches described in Count I and Count II.

241. The Count III Defendants have profited from the fiduciary breaches described in Count I and Count II in an amount to be proven at trial, and upon information and belief, they

remain in possession of some or all of the MS Capital stock and consideration that belong to the Plan.

242. By knowingly participating in these breaches and violations, the Count III Defendants as parties in interest to the Plan are subject to appropriate equitable relief including disgorgement of any profits, having a constructive trust placed on any proceeds received (or which are traceable thereto), having the transactions rescinded, requiring all or part of the MS Capital stock and consideration to be restored to the Plan, or to be subject to other appropriate equitable relief.

## COUNT IV

**Violation of 29 U.S.C. § 1104(a)(1) for Allowing Siphoning of Value of Plan Assets by Corporate Insiders at the Expense of the Plan Against GreatBanc and the MS Fiduciaries**

243. Plaintiffs incorporate the preceding paragraphs as though set forth herein.

244. 29 U.S.C. § 1104(a)(1) requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administration of the plan, (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA. 29 U.S.C. § 1103(c)(1) requires, with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

245. The documents governing the Plan required that the Plan's fiduciaries comply with ERISA stringent fiduciary standards and that Plan assets never benefit the Defendants.

246.     GreatBanc and the MS Fiduciaries (hereafter collectively the "Count IV Defendants") breached their fiduciary duties under 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D) when they failed to protect the Plan from the theft of value of Plan assets as described above, including through the payment excessive compensation, perquisites, and a corporate reorganization intended to benefit insiders at the expense of the Plan. Count IV Defendants further breached their fiduciary duties when they failed to exercise their authority to bring derivative actions against management, officers, and directors of MS Capital, McBride & Son Companies, Inc., MS Companies, MS Enterprise, including, but not limited to, Eilermann, Arri, Schindler, and Todt. Such derivative claims would have been successful and would have recovered damages on behalf of the Plan. Count IV Defendants further breached their fiduciary duties when they failed to monitor and to remove fiduciaries, officers, and managers to protect the Plan.

247.     29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits which have been made through use of assets of the plan, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

248.     Each Count IV Defendant is personally liable, and the Count IV Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), to make good to the Plan the losses to the Plan resulting from the aforementioned breaches.

249.     Each Count IV Defendant is personally liable, and the Count IV Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), to restore to the

Plan any profits made through the use of Plan assets or through their control of the Plan, and is subject to other equitable or remedial relief as appropriate.

250.    Each Count IV Defendant also knowingly participated in the breach of other Count IV Defendants, knowing that such acts were a breach, enabled the other Count IV Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, and knew of the breach by the other Count IV Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Count IV Defendant is liable for the losses caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a).

251.    The Count IV Defendants have caused losses to the Plan and have profited for themselves by the breaches of fiduciary duty in an amount to be proved specifically at trial.

252.    The losses suffered by the participants in the Plan are coterminous with those of the Plan, and each Plaintiff's individual loss is proportional to the losses of fellow participants.

## COUNT V

**Knowing Participation in Breaches of Fiduciary Duties Pursuant to 29 U.S.C. § 1132(a)(3) for Siphoning of Value of Plan Assets by Corporate Insiders at the Expense of the Plan Against MS Companies, Eilermann, Arri, Schindler, and Todt**

253.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

254.    29 U.S.C. § 1132(a)(3) permits a plan participant to bring a civil action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

255.    The Supreme Court has held that anyone, including a non-fiduciary, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under 29 U.S.C. § 1132(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered

the transaction unlawful." *Harris Trust & Sav. Bank v. Soloman Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

256.    As a result of the fiduciary breaches and prohibited transactions described in Count IV, Defendants MS Companies, Eilermann, Arri, Schindler, and Todt (collectively hereafter "Count V Defendants") received cash and/or consideration that otherwise would have been Plan assets to be used exclusively for the benefit of the Plan participants and beneficiaries.

257.    The Count V Defendants were all parties in interest to the Plan under 29 U.S.C. § 1002(14) as described above.

258.    The Count V Defendants knew (1) about the existence of the Plan, (2) about the payment of excessive compensation and perquisites, the corporate reorganization that benefited insiders, and the failure to bring derivative action to protect the Plan, and the failure to remove fiduciaries, directors, managers, and officers, (3) that the Count IV Defendants were fiduciaries to the Plan, (4) that failing to protect the Plan was a breach of fiduciary duty under 29 U.S.C. § 1104(a)(1), and (5) that the benefit they received as corporate insiders was at the expense of the Plan and in violation of ERISA.

259.    Despite knowledge of these breaches and violations, the Count V Defendants proceeded to knowingly participate in the breaches described in Count IV.

260.    The Count V Defendants have profited from the fiduciary breaches described in Count IV in an amount to be proven at trial, and upon information and belief, they remain in possession of some or all of the value and consideration that belongs to the Plan.

261.    By knowingly participating in these breaches and violations, the Count V Defendants as parties in interest to the Plan are subject to appropriate equitable relief including disgorgement of any profits, having a constructive trust placed on any proceeds received (or

which are traceable thereto), having the transactions rescinded, requiring all or part of the consideration to be restored to the Plan, or to be subject to other appropriate equitable relief.

## COUNT VI

### Violation of 29 U.S.C. § 1104(a)(1) for Failure to Monitor and Terminate GreatBanc as Trustee to the Plan Against the MS Fiduciaries

262.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

263.    29 U.S.C. § 1104(a)(1) requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administration of the plan, (B) with "care, skill, prudence, and diligence" and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA. 29 U.S.C. § 1103(c)(1) requires, with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

264.    The documents governing the Plan required that the Plan's fiduciaries comply with ERISA stringent fiduciary standards and that Plan assets never benefit the Defendants.

265.    The duties of loyalty under 29 U.S.C. § 1104(a)(1)(A) and the duty of prudence under 29 U.S.C. § 1104(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determination that the Plan and its participants receive adequate consideration for the assets of the Plan and the participants' accounts in the Plan.

266.    The MS Fiduciaries (hereafter collectively the "Count VI Defendants") breached their fiduciary duties under 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D) when they failed to monitor

and failed to terminate GreatBanc as trustee for the conduct described herein. This failure caused losses to the Plan.

267.    29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits which have been made through use of assets of the plan, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary.

268.    Each Count VI Defendant is personally liable, and the Count VI Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), to make good to the Plan the losses to the Plan resulting from the aforementioned breaches.

269.    Each Count VI Defendant is personally liable, and the Count VI Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), to restore to the Plan any profits made through the use of Plan assets or through their control of the Plan, and is subject to other equitable or remedial relief as appropriate.

270.    Each Count VI Defendant also knowingly participated in the breach of other Count VI Defendants, knowing that such acts were a breach, enabled the other Count VI Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, and knew of the breach by the other Count VI Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Count VI Defendant is liable for the losses caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a).

271.    The Count VI Defendants have caused losses to the Plan and have profited for themselves by the breaches of fiduciary duty in an amount to be proved specifically at trial.

272.   The losses suffered by the participants in the Plan are coterminous with those of the Plan, and each Plaintiff's individual loss is proportional to the losses of fellow participants.

## CLASS ACTION ALLEGATIONS

273.   Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b), on behalf of the following class:

> All participants in the McBride & Son Employee Stock Ownership Plan, and the beneficiaries of such participants, at any time between March 30, 2013 (or earlier as permitted by the applicable statute of limitation) and December 15, 2017. Excluded from the Class are the shareholders who bought shares in MS Capital in the sales, and their immediate families; the directors and officers of MS Capital; and legal representatives, successors, and assigns of any such excluded persons.

274.   The Class is so numerous that joinder of all members is impracticable. Although the exact number and identities of Class members are unknown to Plaintiffs at this time, the Plan's Form 5500 filings indicate that as of December 31, 2015, there were 171 participants and deceased participants whose beneficiaries were receiving or entitled to receive benefits in the Plan and, as of December 31, 2016, there were 169 such individuals.

275.   Questions of law and fact common within the Class as a whole include, but are not limited to, the following:

A.   Whether GreatBanc served as Trustee in the Plan's sale of MS Capital stock;

B.   Whether GreatBanc and the MS Fiduciaries were ERISA fiduciaries of the Plan;

C.   Whether GreatBanc and the MS Fiduciaries caused the Plan to engage in prohibited transactions under ERISA by permitting the Plan to sell MS Capital stock to MS Capital, a party in interest, in the 2017 ESOP Transaction;

D.   Whether GreatBanc and the MS Fiduciaries engaged in good faith valuations of the MS Capital stock in connection with the 2017 ESOP Transaction;

E.  Whether GreatBanc and the MS Fiduciaries caused the Plan to receive less than fair market value for MS Capital stock in the 2017 ESOP Transaction;

F.  Whether GreatBanc and the MS Fiduciaries engaged in a prohibited transaction under ERISA by acting on behalf of a party adverse to the Plan and its participants in the 2017 ESOP Transaction;

G.  Whether GreatBanc and the MS Fiduciaries engaged in a prohibited transaction under ERISA by receiving consideration for their own account in the 2017 ESOP Transaction;

H.  Whether GreatBanc and the MS Fiduciaries breached their fiduciary duties under ERISA in the 2017 ESOP Transaction;

I.  Whether MS Capital, MS Companies, Eilermann, Arri, Schindler, and Todt, as parties in interest, knowingly participated in the prohibited transactions and fiduciary breaches of GreatBanc and the MS Fiduciaries in Count I and Count II;

J.  Whether GreatBanc and the MS Fiduciaries caused the Plan to engage in prohibited transactions under ERISA by permitting corporate insiders to siphon off value from assets held by the Plan;

K.  Whether GreatBanc and the MS Fiduciaries breached their fiduciary duties under ERISA by permitting corporate insiders to siphon off value from assets held by the Plan;

L.  Whether MS Companies, Eilermann, Arri, Schindler, and Todt, as parties in interest, knowingly participated in the prohibited transactions and fiduciary breaches of GreatBanc and the MS Fiduciaries in Count IV;

M. Whether MS Fiduciaries breached their fiduciary duties in failing to remove GreatBanc as trustee;

N. The proper valuation of the Plan's holdings in MS Capital stock for the 2017 ESOP Transaction;

O. The amount of losses suffered by the Plan and its participants as a result of GreatBanc and the MS Fiduciaries' ERISA violations;

P. The amount of profits gained by the Plan's fiduciaries and parties in interest as a result of GreatBanc and the MS Fiduciaries' ERISA violations; and

Q. The appropriate relief for Defendants' violations of ERISA.

276. Plaintiffs' claims are typical of those of the Class. For example, Plaintiffs, like other Plan participants in the Class, suffered a diminution in the value of their Plan accounts because the Plan received a reduced price for MS Capital stock, resulting in them suffering a loss in the present because GreatBanc and the MS Fiduciaries failed to correct the underpayments to the Plan.

277. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex class actions, ERISA, and employee benefits litigation.

278. Class certification of Plaintiffs' Claims for Relief for the alleged violations of ERISA is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

279. In the alternative, class certification of Plaintiff's Claims for Relief for the alleged violations of ERISA is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to each member of the Class, making appropriate declaratory and injunctive relief with respect to the Class as a whole. The members of the Class are entitled to declaratory and injunctive relief to remedy Defendants' violations of ERISA.

280. The names and addresses of the Class members are available from Defendants and the Plan. Notice will be provided to all members of the Class to the extent required by Fed. R. Civ. P. 23.

## ENTITLEMENT TO RELIEF

281. By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the Class are entitled to sue each of the Defendants who are fiduciaries and/or parties in interest pursuant to 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plan as provided in 29 U.S.C. § 1109, including for recovery of any losses to the Plan, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable relief as the Court may deem appropriate.

282. By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the Class are entitled pursuant to 29 U.S.C. § 1132(a)(3) to sue any of the Defendants for appropriate equitable relief to redress the wrongs described herein.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants and for the following relief:

A.    Declare that Defendants GreatBanc and the MS Fiduciaries breached his, her, or its fiduciary duties under ERISA;

B.     Declare that Defendants GreatBanc and the MS Fiduciaries caused the Plan to engage in and themselves engaged in prohibited transactions and thereby breached their duties under ERISA;

C.     Declare that Defendants MS Capital, MS Companies, Eilermann, Arri, Schindler, and Todt knowingly participated in the breaches of ERISA by Defendants GreatBanc and the MS Fiduciaries;

D.     Order each Defendant found to have violated ERISA to jointly and severally make good to the Plan those losses resulting from the breaches of ERISA and restore any profits it has made through use of assets of the Plan;

E.     Declare the 2017 ESOP Transaction to be a prohibited transaction and (1) require any fiduciary or party in interest who engaged in a prohibited transaction to disgorge any profits made, (2) declare a constructive trust over the proceeds of any such transaction, and (3) provide any other appropriate equitable relief, whichever is in the best interest of the Plan;

F.     Order Defendants to provide other appropriate equitable relief to the Plan, and any successor trust, and its participants and beneficiaries, including but not limited to surcharge, providing an accounting for profits, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

G.     Order the proceeds of any recovery for the Plan, and any successor trust, to be allocated to the accounts of the class members to make them whole for any injury that they suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

H.   Order the removal of any of the breaching fiduciaries from their position as fiduciaries for the Plan and enjoin any of the breaching fiduciaries from acting as fiduciaries for any plan that covers any MS Homes employees or any members of the Class;

I.   Appoint an Independent Fiduciary to manage the Plan to the extent necessary and the costs of such Independent Fiduciary to be paid for by any Defendants found to have breached their fiduciary duties or otherwise violated ERISA;

J.   Order (1) a constructive trust be placed on any proceeds resulting from the breaches in Count I through Count VI, (2) disgorgement of profits made by a breaching fiduciary or party in interest resulting from the breaches in Count I through Count VI, (3) any rescission as necessary resulting from the breaches in Count I through Count VI, and/or (4) any other appropriate equitable relief against a breaching fiduciary or party in interest resulting from the breaches in Count I through Count VI, whichever is in the best interest of the Plan;

K.   Order pursuant to 29 U.S.C. § 1056(d)(4) that any amount to be paid to the Plan accounts of the class can be satisfied by using or transferring any breaching fiduciary's ESOP account in the Plan (or the proceeds of that account) to the extent of that fiduciary's liability;

L.   Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

M.   Order Defendant GreatBanc to disgorge any fees it received in conjunction with its services as trustee for the Plan as well as any earnings and profits thereon;

N.  Order Defendants to pay pre-judgment and post-judgment interest;

O.  Certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiffs as class representatives and their counsel as class counsel; and

P.  Award such other and further relief as the Court deems equitable and just.

Dated:  March 29, 2019                  Respectfully submitted,

                                        **BAILEY & GLASSER LLP**

                                        By: /s/ Mark G. Boyko
                                            Mark G. Boyko (IL #6288036)
                                            mboyko@baileyglasser.com
                                            8012 Bonhomme Avenue, Suite 300
                                            Clayton, MO 63105
                                            Telephone: (314) 863-5446
                                            Facsimile: (314)-863-5483

                                            Patrick O. Muench (IL #6290298)
                                            pmuench@baileyglasser.com
                                            3930 N. Lowell Ave.
                                            Chicago, IL 60641
                                            Telephone: (847) 899-1646
                                            Facsimile: (202) 463-2103

                                            Gregory Y. Porter (*pro hac vice to be filed*)
                                            gporter@baileyglasser.com
                                            Ryan T. Jenny
                                            rjenny@baileyglasser.com
                                            Bailey & Glasser LLP
                                            1055 Thomas Jefferson Street, NW, Suite 540
                                            Washington, DC 20007
                                            Telephone: (202) 463-2101
                                            Facsimile: (202) 463-2103

                                            *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 29, 2019, I caused a true and correct copy of the foregoing to be filed electronically using the Court's CM/ECF system and to be thereby be served upon all registered participants identified in the Notice of Electronic Filing in this matter on this date.

/s/*Mark G. Boyko*
Mark G. Boyko