UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY GODFREY, et al.,

               Plaintiffs,

v.

GREATBANC TRUST COMPANY, et al.,

               Defendants.

Case No. 1:18-cv-07918

Judge Matthew F. Kennelly

Magistrate Judge Michael T. Mason

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. v

I.     INTRODUCTION ........................................................................................................ 1

II.    LEGAL STANDARDS ................................................................................................ 3

     A.     Summary Judgment Standards ................................................................... 3

     B.     ERISA ........................................................................................................ 4

            1.     ERISA's Primary Purpose is to Protect Plan Assets and Participants. ............. 4

            2.     Fiduciary Status ................................................................................. 8

            3.     Liability of Non-Fiduciaries .............................................................. 8

            4.     The IRC's ESOP Anti-Abuse Rules .................................................. 8

            5.     Burden Shifting and Damages Under ERISA .................................. 10

            6.     Causation .......................................................................................... 11

III.    ON THE 2013 RECAPITALIZATION, THE COURT SHOULD ENTER PARTIAL SUMMARY JUDGMENT FOR PLAINTIFFS AND DENY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT. ........................................... 12

     A.     The Court Should Enter Partial Summary Judgment for Plaintiffs and against GreatBanc (Counts I and III). ........................................................................ 12

            1.     The Court Should Grant Partial Summary Judgment on Count III's Breach of Loyalty Claim Against GreatBanc. .................................... 12

            2.     The Court Should Grant Partial Summary Judgment on Count I, Section 406(a)(1)(A) and (D) Claims Against GreatBanc. ............... 17

     B.     The Court Should Grant Partial Summary Judgment for Plaintiffs and against Eilermann and Arri (Count VI). ...................................................................... 19

     C.     The Court Should Grant Partial Summary Judgment on the Fiduciary Status of MS Management, Eilermann, and Arri as to Counts I through VI. ......................... 19

     D.     The Court Should Deny GreatBanc Summary Judgment on the 2013 Recapitalization Claims (Counts I, III, and V). .............................................. 20

1. The Court Should Deny GreatBanc Summary Judgment on Counts I, III, and V Because the Plan Lost Governance Control in the 2013 Recapitalization. ...................................................................20

2. The Court Should Deny GreatBanc Summary Judgment on Count I Because it Caused a Prohibited Transaction and Cannot Prove Its Defenses. ..........................................................................22

3. The Court Should Deny GreatBanc Summary Judgment on Counts III and V Breach of Fiduciary Duty Claims ....................................24

E. The Court Should Deny McBride Defendants Summary Judgment on the 2013 Recapitalization Claims (Counts II, IV, V, and VI). ..........................30

  1. MS Management, Eilermann, and Arri Were Fiduciaries for the 2013 Recapitalization (Counts II, IV, and V). ....................................30

  2. McBride Defendants Breached Fiduciary Duties in the 2013 Recapitalization (Count IV) ..............................................................32

  3. McBride Defendants Failed to Plead ERISA § 408(e) as an Affirmative Defense (Count II). ...........................................................35

  4. McBride Defendants Dealt with Plan Assets for Their Own Benefit in Violation of ERISA § 406(b)(1) (Count II). ..................................35

  5. There are Genuine Disputed Material Fact Over GreatBanc's Violation of Section 406(b)(2) ..............................................................35

  6. There are Genuine Disputed Material Facts Over McBride Defendants' Violation of Section 406(b)(3). ......................................36

  7. There are Genuine Disputed Material Facts with Respect to Count V (co-fiduciary liability) and Count VI (knowing participation). .....................36

IV. ON THE LOSS OF VALUE CLAIMS BETWEEN 2013 AND 2017, THE COURT SHOULD ENTER PARTIAL SUMMARY JUDGMENT FOR PLAINTIFFS AND DENY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT. .................................................................................................36

A. The Court Should Grant Partial Summary Judgment on the Fiduciary Status of Eilermann and Arri as to Counts VIII, IX, and X ...................................37

B. The Court Should Deny GreatBanc and McBride Defendants Summary Judgment on the Loss of Value Claims (Counts VII, VIII, IX, and X). ....................38

  1. Defendants' Plan Asset Arguments Are Without Merit (Counts VII, VIII, IX, and X). .......................................................................38

2.      GreatBanc, Eilermann, and Arri Had a Fiduciary Duty to Protect the Plan from the Excessive Compensation (Counts VII, VIII, IX, and X)......................................................................................................39

3.      There are Genuine Disputed Material Facts as to Whether GreatBanc, Eilermann, and Arri Breached Their Fiduciary Duties (Counts VII, VIII, IX, and X)................................................41

4.      Citing an Expert Creates Disputed Materials Facts (Counts VII and IX)....................................................................................................42

5.      GreatBanc Breached ERISA § 405 (Count IX)....................................43

6.      McBride Defendants Breached ERISA § 405 by Knowingly Participating in GreatBanc's and each other's Breaches (Counts IX and X)...........................................................................................44

7.      The Plan Suffered Losses (Counts VII, VIII, IX, and X).....................44

8.      The ESOP's Equity was Diluted (Counts VII, VIII, IX, and X)............45

V.     ON THE 2017 TRANSACTION, THE COURT SHOULD ENTER PARTIAL SUMMARY JUDGMENT FOR PLAINTIFFS AND DENY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT................................................46

     A.    The Court Should Grant Partial Summary Judgment for Plaintiffs and against GreatBanc (Count XI). ...........................................................................46

          1.      GreatBanc was a fiduciary to the Plan with authority over its 2017 Transactions...........................................................................47

          2.      MS Capital, Eilermann, and Arri were Parties in Interest.....................47

          3.      GreatBanc caused the Plan to sell its stock to MS Capital. .............47

          4.      GreatBanc caused the Plan to transfer assets to MS Capital and caused Plan assets to be used for the benefit of Eilermann, and Arri. ...........48

     B.    The Court Should Grant Partial Summary Judgment for Plaintiffs and against MS Capital, Eilermann, and Arri (Count XVI). ...............................................48

     C.    The Court Should Deny GreatBanc Summary Judgment on the 2017 Transaction Claims (Counts XI, XIII, and XV). ...............................................48

          1.      There are Genuine Disputed Material Facts Over the § 408(e) Adequate Consideration Affirmative Defense (Count XI).............................48

          2.      There are Genuine Disputed Material Facts Over GreatBanc's § 406(b) Violations....................................................................52

3.      GreatBanc Breached ERISA §§ 404 and 405 (Counts XIII and XV)............52

4.      Citing an Expert Creates Disputed Materials Facts (Counts XI, XIII, and XV). ..................................................................................................53

D.      The Court Should Deny McBride Defendants Summary Judgment on the 2017 Transaction Claims (Counts XII, XIV, XV, and XVI). .........................................54

1.      MS Capital was a Fiduciary with Respect to the 2017 Redemption (Counts XII, XIV, and XV). .......................................................................54

2.      MS Capital Breached ERISA §§ 404 and 405 and Committed Prohibited Transactions in Violation of ERISA § 406 (Counts XII, XIV, and XV). .......................................................................................54

3.      There are Genuine Disputed Material Facts regarding whether MS Capital, Eilermann, and Arri Knowingly Participated in ERISA Violations with Respect to the 2017 Transaction (Count XVI) .......................55

VI.     ON THE FAILURE TO MONITOR GREATBANC, THE COURT SHOULD ENTER PARTIAL SUMMARY JUDGMENT FOR PLAINTIFFS AND DENY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT. ...............................................57

VII.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON CERTAIN OF DEFENDANTS' AFFIRMATIVE DEFENSES. ................................................................59

A.      The Court Should Grant Summary Judgment on Putative Affirmative Defenses Based upon the Participants' Vote on the 2017 Transaction. .....................59

B.      The Court Should Grant Summary Judgment on the McBride Defendants' Eighth Affirmative Defense (Waiver & Release). ..........................................................61

VIII.   CONCLUSION ..............................................................................................................62

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acosta v. Reliance Tr. Co.,*
No. 17-4540, 2019 WL 3766379 (D. Minn. Aug. 9, 2019) ...................................................31

*Acosta v. Saakvitne,*
355 F. Supp. 3d 908 (D. Haw. 2019) ..............................................................................31

*Akers v. Palmer,*
71 F.3d 226 (6th Cir. 1995) ...........................................................................................39

*Anderson v. City of Rockford,*
932 F.3d 494 (7th Cir. 2019) ...........................................................................................4

*Armstrong v. Amsted Indus.,*
No. 01-2963, 2004 U.S. Dist. LEXIS 14776 (N.D. Il. July 30, 2004) ..............................39

*Armstrong v. LaSalle Bank Nat. Ass'n,*
446 F.3d 728 (7th Cir. 2006). ...........................................................................6, 28, 39

*Atwood v. Burlington Industries Equity, Inc.,*
No. 92-716, 1994 WL 698314 (M.D. N.C. Aug. 3, 1994) ................................................40

*BBL, Inc. v. City of Angola,*
809 F.3d 317 (7th Cir. 2015) ............................................................................................3

*Blankenship v. Chamberlain,*
695 F. Supp. 2d 966 (E.D. Mo. 2010) .............................................................................40

*Bowles v. Reade,*
198 F.3d 752 (9th Cir. 1999) ...........................................................................................60

*Braden v. Wal-Mart Stores, Inc.,*
588 F.3d 585 (8th Cir. 2009) .............................................................................................7

*Brundle on behalf of Constellis Emp. Stock Ownership Plan v. Wilmington Tr. N.A.,*
241 F. Supp. 3d (E.D. Va. 2017) .....................................................................................17

*Brundle v. Wilmington Tr., N.A.,*
919 F.3d 763 (4th Cir. 2019) ................................................................................*passim*

*Brundle v. Wilmington Tr., N.A.,*
No. 1:15–1494, 2016 WL 6542718 (E.D. Va. Nov. 3, 2016) .................................3, 59, 62

v

*Burton v. Kohn L. Firm, S.C.*
    934 F.3d 572 (7th Cir. 2019) ................................................................................ 4

*Caracci v. Comm'r,*
    456 F.3d 444 (5th Cir. 2006) ............................................................................. 27

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................................. 3

*Chao v. Hall Holding Co., Inc.,*
    285 F.3d 415 (6th Cir. 2002) ................................................... 23, 25, 26, 28

*Chao v. Linder,*
    No. 05-3812, 2007 WL 1655254 (N.D. Il. May 31, 2007) ...................... 30

*Chao v. Unique Mfg. Co.,*
    649 F. Supp. 2d 827 (N.D. Il. 2009) ......................................................... 30, 54

*Chesemore v. All. Holdings, Inc.,*
    886 F. Supp. 2d 1007 (W.D. Wis. 2012) ....................................... 6, 7, 36, 61

*Chesemore v. Fenkell,*
    829 F.3d 803 (7th Cir. 2016) ........................................................................ 7, 29

*Coleman v. C.I.R.,*
    791 F.2d 68 (7th Cir. 1986) ............................................................................... 1

*Commissioner v. Keystone Consol. Industries, Inc.,*
    508 U.S. 152 (1993) ............................................................................................. 7

*Delta Star, Inc. v. Patton,*
    76 F. Supp. 2d 617 (W.D. Pa. 1999) ...................................................... 15, 40, 43

*Donovan v. Bierwirth,*
    680 F.2d 263 (2d Cir. 1982) ......................................................................... 4, 5

*Donovan v. Bierwirth,*
    754 F.2d 1049 (2d Cir. 1985) ........................................................................ 10

*Donovan v. Cunningham,*
    716 F.2d 1455 (5th Cir. 1983) ............................................................... 25, 27

*Ellis v. Rycenga Homes, Inc.,*
    484 F. Supp. 2d 694 (W.D. Mich. 2007) .................................................. 28

*Eyler v. Comm'r,*
    88 F.3d 445 (7th Cir. 1996) ........................................................ 6, 25, 27, 30

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014) .................................................................................................6, 60

*Fish v. GreatBanc Tr. Co.*,
    749 F.3d 671 (7th Cir. 2014) ......................................................................*passim*

*Fish v. Greatbanc Tr. Co.*,
    No. 09-1668, 2016 WL 5923448 (N.D. Il. Sept. 1, 2016) .................35, 45, 57, 58

*Godinez v. City of Chicago*,
    No. 16-7344, 2019 WL 5597190 (N.D. Il. Oct. 30, 2019) .............26, 34, 42, 53

*Haley v. TIAA*,
    377 F. Supp. 2d 250 (S.D.N.Y. 2019) ........................................................................55

*Halperin v. Richards*,
    7 F.4th 534 (7th Cir. 2021) ................................................................................4, 6

*Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.*,
    530 U.S. 238 (2000) ......................................................................................*passim*

*Henry v. Champlain Enters., Inc.*,
    445 F.3d 610 (2d Cir. 2006) .....................................................................................7

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*,
    751 F.3d 740 (6th Cir. 2014) ....................................................................................7

*Horn v. McQueen*,
    215 F. Supp. 2d 867 (W.D. Ky. 2002) ...................................................................26

*Howard v. Shay*,
    100 F.3d 1484 (9th Cir. 1996) .............................................................7, 23, 25, 26

*Howell v. Motorola, Inc.*,
    633 F.3d 552 (7th Cir. 2011) .............................................................5, 45, 59, 61

*Hurtado v. Rainbow Disposal, Co.*
    No. 17-1605, 2018 WL 3372752 (C.D. Cal. July 9, 2018) ....................................40

*Jenkins v. Yager*,
    444 F.3d 916 (7th Cir. 2006) ...................................................................................25

*Johnson v. Courtier*,
    572 F.3d 1067 (9th Cir. 2009) .................................................................11, 37, 38

*Katsaros v. Cody*,
    744 F.2d 270 (2d Cir. 1984) ...................................................................................25

*Keach v. U.S. Tr. Co.*,
  234 F. Supp. 2d 872 (C.D. Il. 2002) ................................................................31

*Keach v. U.S. Tr. Co.*,
  419 F.3d 626 (7th Cir. 2005).................................................................23, 25, 27, 31

*Krueger v. Ameriprise Fin., Inc.*,
  No. 11-2781 (D. Minn. Nov. 20, 2012) ...........................................................32

*Lawrence v. Potter*,
  No. 17-1239, 2018 WL 3625329 (D. Utah July 30, 2018)..............................8

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
  323 F.R.D. 145 (S.D.N.Y. 2017)......................................................................60

*Lecat's Ventriloscope v. MT Tool & Mfg.*,
  351 F. Supp. 3d 1100 (N.D. Il. 2018)................................................................4

*Leigh v. Engle*,
  727 F.2d 113 (7th Cir. 1984).....................................................................*passim*

*Lingis v. Motorola, Inc.*,
  649 F. Supp. 2d 861 (N.D. Il. 2009) ................................................................59

*Loomis v. Exelon Corp.*,
  No. 06-4900, 2007 WL 2060799 (N.D. Il. June 26, 2007) .............................60

*Martin v. Feilen*,
  965 F.2d 660 (8th Cir. 1992)......................................................................11, 40

*Mass. Mut. Life Ins. Co. v. Russell*,
  473 U.S. 134 (1985)........................................................................................5, 29

*McMaken v. GreatBanc Tr. Co.*,
  No. 17-4983, 2019 WL 1468157 (N.D. Il. Apr. 3, 2019) ............................7, 39

*Mira v. Nuclear Measurements Corp.*,
  107 F.3d 466 (7th Cir.1997)........................................................................30, 45

*Modrowski v. Pigatto*,
  712 F.3d 1166 (7th Cir. 2013) ..........................................................................62

*Montgomery v. Aetna Plywood, Inc.*,
  39 F. Supp. 2d 915 (N.D. Il. 1998) ..................................................................53

*Neil v. Zell*,
  677 F. Supp. 2d 1010 (N.D. Il. 2009)............................................................6, 19

*Neil v. Zell*,
    753 F. Supp. 2d 724 (N.D. Il. 2010) ............................................................3, 11, 55, 57

*Neil v. Zell*,
    767 F. Supp. 2d 933 (N.D. Il. 2011) ............................................................10

*Newton v. Van Otterloo*,
    756 F. Supp. 1121 (N.D. Ind. 1991) ............................................................59

*O'Shea v. OMi Holdings, Inc.*,
    No. 20-1616, 2021 WL 4290803 (N.D. Ala. Sept. 21, 2021) ............................................................34

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
    629 F.3d 697 (7th Cir. 2011) ............................................................4

*Pegram v. Herdrich*,
    530 U.S. 211 (2000) ............................................................5

*Perez v. Bruister*,
    54 F. Supp. 3d 629 (S.D. Miss. 2014) ............................................................27, 42, 43, 53

*Perez v. Bruister*,
    823 F.3d 250 (5th Cir. 2016) ............................................................*passim*

*Perez v. Wallis*,
    77 F. Supp. 3d 730 (N.D. Il. 2014) ............................................................19, 48

*Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*,
    65 F.3d 562 (7th Cir. 1995) ............................................................61

*Pizzella v. Vinoskey*,
    409 F. Supp. 3d 473 (W.D. Va. 2019) ............................................................14, 20, 21

*Reich v. Valley Nat. Bank of Arizona*,
    837 F. Supp. 1259 (S.D.N.Y. 1993) ............................................................6

*Scalia v. Reliance Tr. Co.*,
    No. 17-4540, 2021 WL 795270 (D. Minn. Mar. 2, 2021) ............................................................28, 48

*Schlaf v. Safeguard Prop., LLC*,
    899 F.3d 459 (7th Cir. 2018) ............................................................4

*Spear v. Fenkell*,
    No. 13-2391, 2016 WL 5661720 (E.D. Pa. Sept. 30, 2016) ............................................................38, 57

*Spence v. Dart*,
    No. 18-4258, 2020 WL 4677053 (N.D. Il. Aug. 12, 2020) ............................................................3

*Spires v. Schools,*
  271 F. Supp. 3d 795 (D.S.C. 2017) ......................................................................37, 39, 40

*Standard: Perez v. Commodity Control Corp.,*
  No. 16-20245, 2017 WL 1293619 (S.D. Fla. Mar. 7, 2017) ..........................................22

*Svigos v. Wheaton Secs., Inc.,*
  No. 17-4777, 2018 WL 587190 (N.D. Il. Jan. 29, 2018) ..........................................37, 38

*Tatum v. R.J.R. Pen. Inv. Committee,*
  761 F.3d 346 (4th Cir. 2014).....................................................................................10, 11

*Tibble v. Edison Intl.,*
  575 U.S. 523 (2015)............................................................................................................4

*Valenti v. Qualex, Inc.,*
  970 F.2d 363 (7th Cir.1992).............................................................................................4

*Varity Corp. v. Howe,*
  516 U.S. 489 (1996)..........................................................................................................4

*Walker v. Sheahan*
  526 F.3d 973 (7th Cir. 2008)..............................................................................35, 38, 55

*Weekend Warrior Trailers, Inc. v. Comm'r,*
  101 T.C.M. (CCH) 1506 (T.C. 2011)..............................................................................9

*Wood v. Commissioner,*
  955 F.2d 908 (4th Cir. 1992)..........................................................................................61

**Statutes**

26 U.S.C. § 409(l) ......................................................................................................................8

26 U.S.C. § 409(l)(2)..................................................................................................................8

26 U.S.C. § 4975(e)(7)(A)..........................................................................................................8

29 U.S.C. § 1001(a) ..................................................................................................................4

29 U.S.C. § 1001, *et seq.*.....................................................................................................*passim*

29 U.S.C. § 1002(14)..........................................................................................................18, 19

29 U.S.C. § 1002(14)(A) ...............................................................................................18, 22, 47

29 U.S.C. § 1002(14)(C) ...............................................................................................18, 22, 47

29 U.S.C. § 1002(14)(G)..................................................................................................18, 22

29 U.S.C. § 1002(14)(H) ........................................................................................................ 18, 19, 47

29 U.S.C. § 1002(16) ........................................................................................................................ 31

29 U.S.C. § 1002(18)(B) .................................................................................................................. 22

29 U.S.C. § 1002(21)(A) .................................................................................................................... 8

29 U.S.C. § 1002(21)(A)(i) .............................................................................................................. 31

29 U.S.C. § 1002(21)(A)(iii) ............................................................................................................ 31

29 U.S.C. § 1102(a)(1) ........................................................................................................... 8, 31, 60

29 U.S.C. § 1102(a)(2) ........................................................................................................................ 8

29 U.S.C. § 1102(b)(4) ...................................................................................................................... 60

29 U.S.C. § 1103(c)(1) ........................................................................................................................ 5

29 U.S.C. § 1104 ........................................................................................................................ passim

29 U.S.C. § 1104(a)(1)(A) .................................................................................................................. 5

29 U.S.C. § 1104(a)(1)(B) .................................................................................................................. 6

29 U.S.C. § 1104(a)(1)(D) ................................................................................................................ 60

29 U.S.C. § 1105 ........................................................................................................................ passim

29 U.S.C. § 1106 .......................................................................................................................... 7, 54

29 U.S.C. § 1106(a) ........................................................................................................ 7, 19, 22, 48

29 U.S.C. § 1106(a)(1) ...................................................................................................................... 17

29 U.S.C. § 1106(a)(1)(A) .......................................................................................................... passim

29 U.S.C. § 1106(a)(1)(D) .......................................................................................................... passim

29 U.S.C. § 1106(b) ........................................................................................................ 7, 24, 49, 52

29 U.S.C. § 1106(b)(1) ...................................................................................................................... 35

29 U.S.C. § 1106(b)(2) ........................................................................................................ 24, 35, 52

29 U.S.C. § 1107(d)(6)(B) .................................................................................................................. 8

29 U.S.C. § 1108 ...................................................................................................................... 7, 60, 61

29 U.S.C. § 1108(e) .......................................................................................................... *passim*

29 U.S.C. § 1109 ...................................................................................................................... 29

29 U.S.C. § 1109(a) ...................................................................................................... 11, 29, 44, 45

29 U.S.C. § 1132(a)(1)(B) ........................................................................................................ 60

29 U.S.C. § 1132(a)(2) ................................................................................................... 29, 44, 60

29 U.S.C. § 1132(a)(3) ............................................................................................. 8, 29, 44, 60

IRC § 409(e)(3) .......................................................................................................................... 16

IRC § 409(l)(2) .................................................................................................................. 2, 9, 16

IRC § 409(p) .......................................................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 26 ...................................................................................................................... 32

Fed. R. Civ. P. 30(b)(6) ...................................................................................................... 31, 54

Fed. R. Civ. P. 56(a) .................................................................................................................... 3

**Regulations**

29 C.F.R. pt. 2510 ...................................................................................................................... 23

29 C.F.R. § 2509.75-8 D-3 ...................................................................................................... 30

29 C.F.R. § 2509.75-8 FR-17 .................................................................................................... 7

29 C.F.R. § 2510.3-101(c)(1) .................................................................................................. 38

26 CFR § 1.409-1T(g)(3) .......................................................................................................... 10

26 CFR § 1.409-1T(g)(3)(i) ...................................................................................................... 10

26 CFR § 1.409(p)-1T ........................................................................................................... 9, 10

51 Fed. Reg. *41271, 1986 ...................................................................................................... 38

51 Fed. Reg. 41262-01 .............................................................................................................. 38

53 Fed. Reg. 17,632 .................................................................................................................. 23

53 Fed. Reg. 17,633 .................................................................................................................. 23

I.R.S. Priv. Ltr. Rul. 201538021 (Sept. 18, 2015)...........................................................................9

Rev. Rul. 2004-4.............................................................................................................................9, 10

## I.    INTRODUCTION

> **Some people believe with great fervor preposterous things**
> **that just happen to coincide with their self-interest.**
>
> *Coleman v. C.I.R.*, 791 F.2d 68, 69 (7th Cir. 1986).

Eilermann and Arri[1] orchestrated a series of self-dealing prohibited transactions designed to skirt IRS anti-abuse rules, harvest tax benefits intended for McBride's employee shareholders, and enrich themselves at the expense of the people primarily responsible for the success of the company.[2] GreatBanc, the trustee of the McBride & Son Employee Stock Ownership Plan (the "Plan"), blessed the self-dealing scheme instead of acting solely in the interest of McBride's employee owners.

Convinced they single handedly saved McBride from the 2007–2011 housing crisis, notwithstanding massive tax subsidies and loan forgiveness because the company was owned by an employee stock ownership plan ("ESOP"), Eilermann and Arri, with GreatBanc's blessing, awarded themselves loads of synthetic equity and cash through 2013 (deserved or not). Unsatisfied with the amount and form of the synthetic equity grants they received and having pushed McBride to the edge of plan tax-disqualification, they engineered a Recapitalization in late 2013 of MS Companies, Inc. to a partnership (the "2013 Recapitalization").[3] This was an end-run around Internal Revenue Code ("IRC") § 409(p), an anti-abuse statute enacted for the express purpose of preventing executives from

---

[1] The Defendants in this case are McBride & Son Capital, Inc. ("**MS Capital**"), McBride & Son Management Company, LLC ("**MS Management**"), John F. Eilermann, Jr. ("**Eilermann**"), Michael D. Arri ("**Arri**") (collectively the "**McBride Defendants**"), and GreatBanc Trust Company ("**GreatBanc**"). Eilermann, Arri, Jeffrey Schindler ("**Schindler**"), Jeffrey Berger ("**Berger**"), and Jeffrey Todt ("**Todt**") collectively will be referred to as the "**Five Executives**." "**McBride**" or "**Company**" refers to the McBride & Son conglomerate of subsidiaries and assets that for the time-period at issue in this case were owned by McBride & Son Companies, Inc. ("**MS Companies, Inc.**") and then through a combination of MS Capital and McBride & Son Companies, LLC ("**MS Companies, LLC**"). References to Defendants' Joint Statement of Material Facts (Dkt. 258-4) will be noted as "**DSOF ¶ [#]**." Plaintiffs' responses to Defendants' Joint Statement of Material Facts (filed concurrently) will be noted as "**PRF ¶ [#]**." Plaintiffs' Combined Statement of Additional Material Facts and Statement of Material Facts (filed concurrently) will be noted as "**PAF ¶ [#]**."

[2] *See* PRF ¶ 17; PAF ¶¶ 1–2 (McBride's employees in the ESOP were "primarily responsible for the success of the Company").

[3] While Defendants may refer to this transaction as the "2013 Reorganization" for purposes of this briefing, the undisputed facts show it was a recapitalization of MS Companies, Inc. into a partnership. *See* PRF ¶ 41.

1

taking too much equity from tax-subsidized ESOP-owned S corps. It was also an end-run around IRC § 409(l)(2), mandating the highest voting and distribution rights for ESOP-owned shares in S corps.

The 2013 Recapitalization also caused the ESOP to lose control over McBride, and the Five Executives' (Eilermann, Arri, and, to a much smaller degree, three others) synthetic equity became real equity in the form of Class B and Class C Units of MS Companies, LLC. Defendants' assertion that the end-run around §§ 409(p) and 409(l) was in the best interests of the Plan and its participants collapses in the face of the evidence. GreatBanc, the trustee of the Plan, blessed the self-dealing scheme instead of acting as loyal and prudent trustee. Eilermann and Arri, the only people at McBride who acted for MS Management, the Plan's "named fiduciary," orchestrated the takeover. The Plan and employee shareholders were left with no one to protect them and they received no compensation for loss of control, loss of dividend rights, and equity dilution.

Next, from 2013 until 2017, Eilermann and Arri paid themselves and the three other executives ███████ in total compensation, including █████ in preferential distributions as owners of the Class B and Class C Units, such distributions were illegal under IRC § 409(l)(2) under the pre-2013 Recapitalization corporate structure. PRF ¶¶ 43, 106; PAF ¶¶ 115–118. The compensation paid to the Five Executives between 2013 and 2017 was ██ times the appreciation of the value of the Plan's stock during the period. PAF ¶ 105. Eilermann's and Arri's unfettered control over MS Companies, LLC combined with GreatBanc's abdication of oversight, allowed this gross self-enrichment scheme. These money transfers to the executives meant the Plan, the majority owner, received no dividends or distributions for four years whereas the executives collected $████████

Adding insult to injury, sucking all the profits out of the company greatly depressed the value of McBride up to 2017, when Eilermann and Arri bought the company from the Plan at a depressed price in a sweetheart insider deal. The historic and projected free cash flows driving the valuation were greatly depressed by the monies Eilermann and Arri took from the company and projected they would

2

take indefinitely. Essentially, they projected the company wasn't worth much because they had looted it and would continue to loot it into the foreseeable future. There was no attempt by GreatBanc or Eilermann and Arri to market the company to solicit interest through arm's length negotiations with independent, and unconflicted buyers who would have seen how the excessive compensation depressed the company's value and would have offered a fair price. No independent directors existed to ameliorate the conflicts inherent in the management buy-out. Eilermann and Arri falsely claimed the stock price had peaked, while at the same time they built housing lot inventory to McBride's historic highs, showing their expectation of McBride's prosperity. For its part, GreatBanc did what it usually does: rubber-stamp the deal and cause the Plan to lose tens of millions of dollars by selling below fair market value. In sum, Eilermann and Arri took the ESOP tax subsidies for themselves, leaving little or nothing for the Plan and its participants. But the Plan was "designed to provide a beneficial ownership interest in Company Stock for employees—the people who are primarily responsible for the success of the Company." PAF ¶ 1.

## II. LEGAL STANDARDS

### A. Summary Judgment Standards

A party may move for summary judgment on a single claim or defense or a "part of each claim or defense." Fed. R. Civ. P. 56(a). A court will grant the motion if the plaintiff shows "there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex*, 477 U.S. at 327; *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015); *accord Spence v. Dart*, No. 18-4258, 2020 WL 4677053, at *2 (N.D. Il. Aug. 12, 2020) (Kennelly, J.). Courts often grant partial summary judgment to plaintiffs in ESOP cases to narrow the issues for trial. *See Neil v. Zell*, 753 F. Supp. 2d 724, 734 (N.D. Il. 2010); *Brundle v. Wilmington Tr., N.A.*, No. 1:15–1494,

2016 WL 6542718, at *12, 16 (E.D. Va. Nov. 3, 2016) ("*Brundle I*").

Courts "construe all inferences in favor of the party against whom the motion under consideration is made." *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018). The non-movant need not "match the movant witness for witness, nor persuade the court that his case is convincing; he need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Burton v. Kohn L. Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019). A court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir.1992).

Courts cannot award summary judgment on disputed issues of fact or make credibility determinations. *See Lecat's Ventriloscope v. MT Tool & Mfg.*, 351 F. Supp. 3d 1100, 1108 (N.D. Il. 2018); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Instead, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. City of Rockford*, 932 F.3d 494, 504 (7th Cir. 2019).

### B.    ERISA

#### 1.    ERISA's Primary Purpose is to Protect Plan Assets and Participants.

Congress enacted ERISA to establish "minimum standards ... assuring the equitable character of [benefit] plans and their financial soundness." 29 U.S.C. § 1001(a). ERISA's sets fiduciary duties protect plan participants. *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996). The duties are drawn "from the common law of trusts" and also "reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection." *Id.* at 496–97; *Tibble v. Edison Intl.*, 575 U.S. 523, 528–29 (2015).

The main fiduciary duties are the duty of loyalty and the duty of prudence; they are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). These fiduciary duties safeguard "ERISA's core purpose": preventing misuse of plan assets. *Halperin v. Richards*, 7 F.4th 534,

543 (7th Cir. 2021). ERISA is construed broadly, recognizing Congress's intent to protect plan participants. *See Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984) ("The entire statutory scheme of ERISA demonstrates Congress' overriding concern with the protection of plan beneficiaries, and we would be reluctant to construe narrowly any protective provisions of the Act."); *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985) (in enacting ERISA, "the crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators").

### a. Duty of Loyalty

ERISA requires those who control employee benefit plans to act solely in the interests of the plan beneficiaries. *Leigh*, 727 F.2d at 122. Fiduciaries must act with an "eye single" to the interests of the participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a trustee is that he must display throughout the administration of the trust complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224. "Self-dealing, conflicts of interest, or even divided loyalties are inconsistent with fiduciary responsibilities." *Howell v. Motorola, Inc.*, 633 F.3d 552, 566 (7th Cir. 2011).

"Where it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to ensure that they act in the best interests of the plan beneficiaries." *Leigh*, 727 F.2d at 125–26. Loyalty "requires that fiduciaries keep the interests of beneficiaries foremost in their minds, taking all steps necessary to prevent conflicting interests from entering into the decision-making process." *Perez v. Bruister*, 823 F.3d 250, 259 (5th Cir. 2016). Fiduciaries must "avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Bierwirth*, 680 F.2d at 271.

The assets of a plan can never inure to the benefit of the employer and shall be held for the "exclusive purpose" of providing benefits to plan participants. 29 U.S.C. §§ 1103(c)(1) and

1104(a)(1)(A). Congress enacted this "exclusive benefit rule" to prevent misuse of pension assets by corporate insiders. *See Halperin,* 7 F.4th at 546.

### b. Duty of Prudence

ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014). ERISA fiduciaries must discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). The duty of an ERISA trustee to behave prudently in managing trust assets is fundamental. *Armstrong v. LaSalle Bank Nat. Ass'n,* 446 F.3d 728, 732 (7th Cir. 2006). Case law imposes on an ESOP fiduciary a still more demanding duty of prudence than a typical ERISA fiduciary because of an ESOP's lack of diversification. *Neil v. Zell*, 677 F. Supp. 2d 1010, 1019 (N.D. Il. 2009), as amended (Mar. 11, 2010), citing *LaSalle Bank Nat. Ass'n,* 446 F.3d at 732. To comply with its duty of prudence in an ESOP transaction, a trustee must conduct an independent investigation and not passively accept information. *See e.g., Reich v. Valley Nat. Bank of Arizona*, 837 F. Supp. 1259, 1274 (S.D.N.Y. 1993), citing *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (a "trustee must make reasonable investigation into the representations of interested parties and where that investigation would have revealed evidence that the investment was unsound"). The duty of prudence also requires a trustee to use "appropriate methods" in conducting its investigation. *Eyler v. Comm'r*, 88 F.3d 445, 454–55 (7th Cir. 1996), citing *Katsaros,* 744 F.2d at 279. Under this objective prudent person standard, courts examine both the process used by the fiduciaries to reach their decision as well as an evaluation of the merits. *Id.*, citing *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

### c. Duty to Monitor

A person who appoints ERISA fiduciaries has a duty to select, retain and monitor those whom they appoint as would a reasonably prudent businessperson. *Chesemore v. All. Holdings, Inc.*, 886 F. Supp.

2d 1007, 1049 (W.D. Wis. 2012), aff'd sub nom. *Chesemore v. Fenkell*, 829 F.3d 803 (7th Cir. 2016) citing *Leigh*, 727 F.2d at 135. The Department of Labor ("DOL") explains: "at reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan." *Chesemore*, 886 F. Supp. 2d at 1049 quoting ERISA Interpretive Bulletin 75-8, 29 C.F.R. § 2509.75-8 at FR-17.

### d.    Prohibited Transactions

ERISA § 406 categorically bars certain transactions likely to injure retirement plans. *See Commissioner v. Keystone Consol. Industries, Inc.*, 508 U.S. 152, 160 (1993); *Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241–42 (2000). Courts strictly enforce the prohibited transaction provisions. *McMaken v. GreatBanc Tr. Co.*, No. 17-4983, 2019 WL 1468157, at *4 (N.D. Il. Apr. 3, 2019) ("ERISA § 406 . . . creates *per se* liability for 'transactions in which the potential for misuse of plan assets is particularly great.'").

ERISA includes limited carve-outs from the prohibited transaction rules. The "exemptions" set out in § 408, including § 408(e), requiring the ESOP pay no more than adequate consideration (or receive no less than adequate consideration), are affirmative defenses to § 406(a) claims that defendants must plead and prove. 29 U.S.C. § 1108(e), *Allen*, 835 F.3d at 675–77; *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 685 (7th Cir. 2014).[4] But § 408 does not exempt § 406(b) prohibited transactions. *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 750 (6th Cir. 2014) ("the majority of courts that have examined this statutory interpretation issue have held that § 1108 applies only to transactions under § 1106(a), not § 1106(b)") (collecting cases, including from the Seventh Circuit).

---

[4] *See also*, *Brundle v. Wilmington Tr., N.A.*, 919 F.3d 763, 770 (4th Cir. 2019) ("*Brundle III*"); *Bruister*, 823 F.3d at 262; *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601–02 (8th Cir. 2009); *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 619 (2d Cir. 2006); *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996).

### 2. Fiduciary Status

A person is a fiduciary when they exercise any discretion over "management or disposition of [the plan's] assets" or administration of the plan. Dkt. 154 at 9–10 citing *Leimkuehler v. Am. United Life Ins. Co.,* 713 F.3d 905, 913 (7th Cir. 2013); 29 U.S.C. § 1002(21)(A). A person also is a fiduciary when: they are named as such in the instrument establishing the plan, 29 U.S.C. §§ 1102(a)(1)–(2); they are named as such pursuant to a procedure specified in the plan instrument, 29 U.S.C. § 1102(a)(2); or they "function" as a fiduciary under ERISA § 3(21)(A). 29 U.S.C. § 1002(21)(A). *Bruister*, 823 F.3d at 259 citing *Jordan v. Fed. Express Corp.*, 116 F.3d 1005, 1014 n.16 (3d Cir. 1997).

### 3. Liability of Non-Fiduciaries

ERISA provides a claim for relief against a non-fiduciary "party in interest" who knowingly participates in prohibited transactions or knowingly receives payments made in breach of a fiduciary's duties, and authorizes "appropriate equitable relief," such as restitution or disgorgement from them to recover ill-gotten proceeds. 29 U.S.C. § 1132(a)(3); *Harris Trust*, 530 U.S. at 253. Non-fiduciaries with actual or constructive knowledge are liable. 29 U.S.C. § 1132(a)(3); *Harris Trust*, 530 U.S. at 251.

### 4. The IRC's ESOP Anti-Abuse Rules

Stock owned by an ESOP must have equal or superior voting and dividend rights than other employer stock. 26 U.S.C. § 409(l)(2).[5] Similar rules apply to ESOP-owned LLCs. The Internal Revenue Service ("IRS") conditions the treatment of LLC units as "qualifying employer securities" on whether: (1) the LLC is taxed as a corporation, (2) the LLC issues ownership interests in the form of unit shares, (3) the ESOP's unit shares have the greatest voting and dividend rights of any class of unit

---

[5] A plan qualifies as an ESOP if it meets the requirements of Secretary of Treasury. 29 U.S.C. § 1107(d)(6)(B); *Lawrence v. Potter*, No. 17-1239, 2018 WL 3625329, at *11 (D. Utah July 30, 2018). Treasury regulations (and the Plan here) require an ESOP to satisfy the requirements of 26 U.S.C. § 4975(e)(7)(A). 26 C.F.R. § 54.4975-11(a)(1). Section 4975(e)(7)(A), in turn, says an ESOP invests in "qualifying employer securities", and Section 4975(e)(8) says qualifying employer securities must meet the requirements of 26 U.S.C. § 409(l). The *Lawrence* case cited above lays out the intricacies of these interlaced provisions in detail.

shares issued by the LLC, (4) dividends on the ESOP's unit shares are distributed in proportion to the outstanding unit shares, and (5) profits and losses are allocated in proportion to the number of shares held by each shareholder. I.R.S. Priv. Ltr. Rul. 201538021 (Sept. 18, 2015). Thus, shares of an ESOP-owned S corp and units of an ESOP-owned LLC must comply with IRC § 409(l)(2).

IRC § 409(p) addresses equity in ESOP-owned S corps allocated to "disqualified" persons. 26 U.S.C. § 409(p). Congress enacted IRC § 409(p) to cure the use of ESOP-owned S corps as abusive tax shelters and "to ensure that such plans are maintained primarily for the benefit of employees." PAF ¶ 184; *Weekend Warrior Trailers, Inc. v. Comm'r*, 101 T.C.M. (CCH) 1506 (T.C. 2011) citing S. Rpt. 107–30, at 123–124 (2001) (Congress was concerned because ESOPs were "used by S corporation owners to obtain inappropriate tax deferral or avoidance" and wanted tax deferral opportunities only when "there is broad-based employee coverage under the ESOP and the ESOP benefits rank-and-file employees as well as highly compensated employees and historical owners."). Section 409(p) caps the amount of equity ownership, actual and synthetic, by executives and directors ("disqualified" persons) in ESOP-owned S corps to ensure tax subsidies benefit rank-and-file employees.

As one commentator explained, Congress was concerned with abusive equity structures that allowed an owner to sell his stock to an ESOP while retaining warrants that allow him to exercise a buy-back of the company after it has grown tax-free for many years. PAF ¶ 184. Under this scenario, the tax-free growth would be captured by the owner even though the tax subsidies are designed to encourage employee ownership. Section 409(p) provides disqualified persons cannot own more than 50% of the total equity of an ESOP-owned S corp, which includes stock, phantom stock units, stock appreciation rights, and other forms of synthetic equity. 26 U.S.C. § 409(p).

The IRS addressed abusive structures involving ESOP-owned S corps and "qualified S subsidiary corporations," or QSUBS. Rev. Rul. 2004-4, 26 CFR 1.409(p)-1T. When a tax election is made, the QSUB is a disregarded entity for income and expense purposes, which are attributed to the parent S

corp. *See* PAF ¶ 184. Notably, "[a] similar result is achieved where an S corporation becomes the sole owner of a limited liability company." *Id.* The IRS identified an abusive situation where a QSUB was formed to operate a professional services company and the principal provider of those services had an option to re-acquire a majority of the QSUB and the QSUB's earnings were retained in a separate account of the QSUB instead of distributed to the S corp parent. Rev. Rul. 2004-4, 26 CFR 1.409(p)-1T; PAF ¶ 184. This structure "was designed to avoid or evade the operation of Code § 409(p)." PAF ¶ 184. The Treasury regulations also describe certain scenarios viewed as avoidance or evasion of 409(p) because they dilute the ESOP's interests in future profits and diminish actual distributions of profits to the ESOP. *See* 26 CFR § 1.409-1T(g)(3); PAF ¶ 184. One such example is where profits never flow to the S corp shareholders via dividends or distributions. *See* 26 CFR § 1.409-1T(g)(3)(i). These abusive structures are on all fours with the 2013 Recapitalization.

### 5. <u>Burden Shifting and Damages Under ERISA</u>

Once a plaintiff proves his prima facie prohibited transaction claim, the burden shifts to the defendant to prove by a preponderance of the evidence the affirmative defense that the plan received no less than fair market value. *See Allen*, 835 F.3d at 675–77; *Brundle v. Wilmington Trust, N.A.*, 919 F.3d 763, 770 (4th Cir. 2019) ("*Brundle III*"). Similarly, once a plaintiff proves breach of duty under ERISA § 404 and loss to the plan, the burden shifts to the fiduciary to show the losses were not caused by the breach. *Tatum v. R.J.R. Pen. Inv. Committee*, 761 F.3d 346, 362–63 (4th Cir. 2014) ("[O]ne who acts in violation of his fiduciary duty bears the burden of showing that he acted fairly and reasonably."); *see also Leigh*, 727 F.2d at 138–39 (burden on breaching fiduciary to show profits not attributable to breach). Uncertainties as to the amount and calculation of losses are resolved against the fiduciary. *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985); *Neil v. Zell*, 767 F. Supp. 2d 933, 939 (N.D. Il. 2011); *see also Leigh*, 727 F.2d at 138–39 (doubts about approximation of profits earned by fiduciaries should be resolved in favor of plaintiffs).

10

A breaching fiduciary is "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a). An ESOP's losses are the difference between the fair market value and what the plan paid for the securities (or alternatively the difference between the price the ESOP received and fair market value where the ESOP was the seller). *See Brundle III*, 919 F.3d at 781 (affirming district court order awarding participants the difference between purchase price and fair market value); *Neil*, 767 F. Supp. 2d at 944–45 (same).

Further, ESOPs suffer losses when persons at the ESOP-owned company have discretion over their own compensation and use that discretion to enrich themselves at the expense of the ESOP. Under ERISA § 409(a), the court may "impose a constructive trust over any assets in Defendants' possession it concludes rightfully belong to the ESOP," and order other "equitable or remedial relief." *Johnson v. Courtier*, 572 F.3d 1067, 1084 (9th Cir. 2009); 29 U.S.C. § 1109(a). "The legislative history of ERISA shows that Congress intended disgorgement of profits to be one remedy available for breach of fiduciary duty." *Leigh*, 727 F.2d at 122 n.17.

### 6. Causation

To establish breach of duty for economic recoveries, a plaintiff must prove the breach caused economic harms. Dkt. 154 at 15 citing *Allen,* 835 F.3d at 678. Once a plaintiff proves the fiduciary's breach and loss to the plan, the fiduciary must prove, by a preponderance of the evidence, that a prudent fiduciary would have made the same decision. *Tatum*, 761 F.3d at 364.

Losses may be traced to overlapping fiduciary breaches. *Id*; *Martin v. Feilen*, 965 F.2d 660, 672 (8th Cir. 1992) ("[D]amages can result from a financial loss to the plan…a profit wrongfully made … or from a combination of the two, which may result from the manipulation of stock prices").

III.   **ON THE 2013 RECAPITALIZATION, THE COURT SHOULD ENTER PARTIAL SUMMARY JUDGMENT FOR PLAINTIFFS AND DENY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT.**

Plaintiffs' Second Amended Complaint ("SAC") (Dkt. 127) alleges several ERISA violations arising from the 2013 Recapitalization: Count I (prohibited transactions against GreatBanc); Count II (Prohibited Transactions against MS Management, Eilermann, and Arri); Count III (breaches of fiduciary duty against GreatBanc); Count IV (breaches of fiduciary duty against MS Management, Eilermann, and Arri); Count V (co-fiduciary liability against GreatBanc, MS Management, Eilermann, and Arri); and Count VI (knowing participation against Eilermann, and Arri[6]). Plaintiffs move for Partial Summary Judgment on Counts I, III, and VI, while Defendants have separately moved for Summary Judgment on Counts I through VI.

A.   **The Court Should Enter Partial Summary Judgment for Plaintiffs and against GreatBanc (Counts I and III).**

Plaintiffs move for partial summary judgment to narrow the issues, so trial will focus on affirmative defenses for which GreatBanc has the burden of proof. Plaintiffs move for partial summary judgment that GreatBanc breached its duty of loyalty in approving the 2013 Recapitalization (Count III) and on prohibited transaction claims against GreatBanc in Count I under ERISA §§ 406(a)(1)(A) and (D). 29 U.S.C. § 1106(a)(1)(A) and (D). The undisputed material facts prove GreatBanc approved the 2013 Recapitalization primarily for the benefit of the Five Executives.

1.   **The Court Should Grant Partial Summary Judgment on Count III's Breach of Loyalty Claim Against GreatBanc.**

GreatBanc worked hand in glove with Eilermann and Arri to adopt a corporate recapitalization designed to enrich the executives and avoid ERISA's anti-abuse provisions at the expense of the Plan and its participants. The undisputed material facts show GreatBanc was a Plan fiduciary responsible for approving the 2013 Recapitalization on behalf of the Plan. *See* § III.A.2.a. at p. 18, *infra*. Below,

---

[6] The Court previously dismissed MS Capital from Count VI. Dkt. 154 at 13.

12

Plaintiffs detail 16 ways in which GreatBanc breached its duty of loyalty.

**(1)** GreatBanc approved the 2013 Recapitalization knowing it was designed to circumvent anti-abuse provisions, specifically IRC § 409(p) caps on executive compensation, which were there to protect the Plan and its participants. PAF ¶¶ 55, 184.

**(2)** GreatBanc created any § 409(p) problem by authorizing excessive synthetic equity grants before the 2013 Recapitalization. PAF ¶¶ 38–39. Incredibly, the day before GreatBanc closed the recapitalization to avoid tax-disqualifying executive ownership, it approved ▮▮▮ in phantom stock units for Eilermann and Arri. PAF ¶ 46, PRF ¶¶ 79–80. A loyal trustee would have prevented equity grants that threatened § 409(p) failure.

**(3)** When evaluating the 2013 Recapitalization, GreatBanc ignored escape clauses in the synthetic equity grants that would avoid a § 409(p) violation. PAF ¶ 40. Each synthetic equity agreement from 2010 to 2013 provided flexibility to avoid § 409(p) problems, including accelerating payments to decrease ownership of synthetic equity by the disqualified person. *Id.* The governing plan document also allowed action to address an IRC § 409(p). PAF ¶ 41. The evidentiary record is bare of GreatBanc's consideration of these provisions in the "diligence" materials. PAF ¶¶ 40–41.

**(4)** GreatBanc did not consider that § 409(p) would have resolved in the ordinary course without recapitalization because the synthetic equity agreements from 2010 to 2013 included payout schedules reducing the number of shares owned by disqualified persons over the upcoming years. PAF ¶¶ 42–46. The evidentiary record is bare of GreatBanc considering the payout schedule. PAF ¶ 42.

**(5)** GreatBanc approved the 2013 Recapitalization knowing its structure and intent was to increase executives' equity stake in the company and decrease the Plan's equity stake. PAF ¶ 56.

**(6)** GreatBanc approved the 2013 Recapitalization knowing it would give the Five Executives economic benefits and control rights, as detailed below, they did not have under the existing corporate structure. PAF ¶¶ 53–54, 57–58, 71.

13

**(7)** GreatBanc gave up key components of governance that had allowed it to exercise oversight (effective or not) over the Five Executives on behalf of the Plan. As a result, the Plan gave up control without having been paid for it. PAF ¶ 59. Prior to December 31, 2013, GreatBanc could appoint and remove members of the Board of Directors of MS Management for any reason. PAF ¶ 60. After December 31, 2013, GreatBanc could only remove members of the Board of Directors of MS Capital for cause. PAF ¶ 61.[7] These provisions protected Eilermann and Arri and erected significant corporate oversight and governance barriers because it is extremely difficult to remove a person for cause. PSF ¶ 62. GreatBanc knew that after the 2013 Recapitalization Eilermann and Arri would control MS Capital (which owned the Class A Units in MS Companies, LLC) and MS Companies, LLC because they were the only members of MS Capital's Board of Directors. PAF ¶ 63. GreatBanc knew Eilermann and Arri would appoint themselves the sole members of the Board of Managers of MS Companies, LLC. PAF ¶ 64. The MS Companies, LLC Operating Agreement barred the removal of Eilermann and Arri from the Board of Managers except for cause and prevented them from being terminated as employees except with their consent. PAF ¶¶ 65–66. The MS Companies, LLC Agreement could not be changed or amended without Eilermann and Arri consenting. PAF ¶ 67.[8]

**(8)** GreatBanc allowed Eilermann and Arri to include a "right of first refusal" clause in the LLC Agreement that did not exist under the prior S corp structure. PAF ¶ 68. This allowed Eilermann and Arri to match any "bona fide" offer, which exclusively benefited them, not the Plan. *Id.* Indeed, the requirement of a "bona fide" offer negatively impacted the marketability of the Plan's stock because

---

[7] Requiring an ESOP to remove directors through the extreme action of filing a lawsuit indicates a lack of control. *Brundle III*, 919 F.3d at 777 (ESOP did not have control because "ESOP could only contravene the plan documents and exercise its independent voting authority by filing a lawsuit — the same limited relief available to a minority shareholder"); *Pizzella v. Vinoskey*, 409 F. Supp. 3d 473, 515 (W.D. Va. 2019) *y*, (ESOP lacked control because it "essentially had no meaningful ability" to remove the two directors).

[8] GreatBanc is wrong that it had ███████████████ to restrict the Board of Managers from taking the actions listed in § 5.5 of the MS Companies, LLC Operating Agreement. GB Br. at 3. Had there even been an independent Board of Managers, Eilermann and Arri as the owners of Class B Units also had the right to restrict, thus demonstrating that control was ceded to them by GreatBanc. PAF ¶ 70.

a prospective buyer would be discouraged from spending time and money on diligence to present a bona fide offer knowing its offer could be matched by Eilermann and Arri. *Id.*

**(9)** The 2013 Recapitalization gave Eilermann and Arri unfettered control over their own compensation. Prior to the 2013 Recapitalization, GreatBanc reviewed executive compensation (however lackadaisically). PAF ¶ 108. As Defendants' expert Brown counsels, ██████████████ ████████████████████████████████████████████████████████████████████ including executive compensation. PAF ¶ 185. Courts agree. *See e.g., Delta Star, Inc. v. Patton*, 76 F. Supp. 2d 617, 636 (W.D. Pa. 1999) (An ESOP trustee has a duty to bring a derivative action to breaches of fiduciary duties, including the receipt of excessive compensation). GreatBanc concluded, however, the 2013 Recapitalization relieved it of executive compensation oversight (other than approving new equity grants, which Plaintiffs dispute), (*see* PAF ¶¶ 110–111) which was now under the LLC structure, not the S corp owned by the Plan. PAF ¶ 109. Additionally, GreatBanc did not require independent persons on MS Capital's board of directors or MS Companies' board of managers or an independent compensation committee (and no independent persons served), despite it being widely regarded as a best practice and required under the terms of the MS Capital Bylaws. PAF ¶ 142.

**(10)** The 2013 Recapitalization deprived the Plan of valuable dividend rights. The MS Companies, LLC Operating Agreement provided that Class B and C Units owners (the Five Executives) would receive preferential distributions (including tax reimbursements) before the Plan's Class A Units received any distributions. PAF ¶¶ 115–122. Prior to the 2013 Recapitalization, the Five Executives had no rights to McBride's income as owners of synthetic equity, only the value of the stock when the synthetic equity terminated. PAF ¶ 115. Even if the executives had owned stock with distribution rights like the Plan, distributions must be proportional as a matter of law, that is, the Plan should have received distributions proportionate to its stake in the company. *See* § II.B.4. at p. 8, supra; PAF ¶ 118. During 2013–2017, the Five Executives received ████████ dollars in preferential distributions. PAF

¶ 121. Under a non-abusive structure, § 409(l)(2) mandates the Plan receive distributions in proportion to what the executives received: ███████, assuming the Plan owned ██ of the equity (DSOF ¶ 87), and based on the distributions paid to executives during 2014–2017, ████████ (PAF 121). The Plan received no distributions for its Class A Units. PAF ¶ 119.

**(11)** Additionally, GreatBanc knew the Five Executives would receive tax payments from McBride due to the termination of the synthetic equity, and that these were calculated incorrectly to the benefit of the Five Executives and the detriment of the Plan. PAF ¶¶ 96–100. These tax payment liabilities did not exist before the 2013 Recapitalization.

**(12)** Although one of the supposed justifications for the 2013 Recapitalization was to ensure the Five Executives would stay with the company (supposedly benefiting the Plan) (GB Br. at 4–5 and MB Br. at 4–5),[9] GreatBanc took no steps to bind the Five Executives through employment agreements and non-competes. PAF ¶ 72. To the contrary, GreatBanc allowed Eilermann and Arri to compete against McBride, as well as resign at any time. *Id.* A loyal trustee does not allow executives to compete against an ESOP-owned company.

**(13)** GreatBanc failed to insist Plan participants vote on the transaction, although corporate recapitalization is one of the corporate actions for which participant voting is required by law and the plan document. *See* PAF ¶¶ 82–84 (a participant is entitled to vote if required by IRC § 409(e)(3)); 26 U.S.C. § 409(e)(3) (requiring a vote when a recapitalization occurs).

**(14)** GreatBanc failed to ensure the Plan participants were informed about the 2013 Recapitalization. PAF ¶¶ 85–89.

**(15)** GreatBanc failed to consider more favorable proposals by Butcher Joseph. PAF ¶¶ 47–49.

**(16)** GreatBanc's conduct in this case is emblematic of an ESOP industry rife with conflicts and neglect. Just months after the 2013 Recapitalization, GreatBanc executed a "Process Agreement," as

---

[9] GreatBanc's brief will be noted as "GB Br." McBride Defendants' brief will be noted as "MB Br."

part of a settlement of a lawsuit filed against GreatBanc by the DOL, with the DOL. PAF ¶¶ 171–72. The Process Agreement sets out numerous practices and procedures GreatBanc was required to follow when serving as trustee for ESOPs. PAF ¶¶ 171–76. GreatBanc has been sued at least 18 times over ESOP transactions by the DOL, plan participants and beneficiaries, and plan fiduciaries. PAF ¶ 170. The "ESOP world ... [is] a very incestuous community…[a]lthough this reality may make it more difficult for a fiduciary to maintain its independence from its counterparts, it also makes that duty all the more important. The dangers of excessive familiarity are readily apparent." *Brundle on behalf of Constellis Emp. Stock Ownership Plan v. Wilmington Tr. N.A.*, 241 F. Supp. 3d at 610, 643 (E.D. Va. 2017) ("*Brundle II*"). GreatBanc's process in this case was conflicted and flawed. *See* PAF ¶¶ 73–81

ERISA requires transactions to be primarily for the benefit of the plan and its participants, not primarily for the benefit of others. In virtually every way, the 2013 Recapitalization was primarily for the benefit of Eilermann and Arri. An ESOP trustee's simultaneous consideration of benefits flowing to the leadership of the plan sponsor and the ESOP is a breach of loyalty. *See e.g.*, *Bruister*, 823 F.3d at 261 (trustee decisions that determined "what was best for everyone" including the controlling director of the sponsor constituted trustee's breach of duty of loyalty). By placing the interests of Eilermann and Arri on at least an equal, if not greater, footing than the Plan, GreatBanc failed to "place the interests of participants and beneficiaries first and foremost." *Id.* at 262.

### 2. The Court Should Grant Partial Summary Judgment on Count I, Section 406(a)(1)(A) and (D) Claims Against GreatBanc.

Plaintiffs move for partial summary judgment on GreatBanc's violations of ERISA § 406(a)(1). As outlined above (*see* § II.B.1.d. at p. 7, *supra*) to prevail on Count I, Plaintiffs must prove: (1) GreatBanc was a fiduciary with authority to cause the Plan to engage in the 2013 Recapitalization; (2) MS Capital, Arri and Eilermann were parties in interest to the Plan; (3) GreatBanc caused the Plan to exchange stock with MS Capital as to § 406(a)(1)(A); and (4) GreatBanc caused a transaction which resulted in the use of Plan assets for the benefit of Eilermann and Arri as to § 406(a)(1)(D). *See*

29 U.S.C. § 1106(a)(1)(A) & (D). Because these elements are met, the Court should grant summary judgment on Plaintiffs' prima facie case under ERISA § 406(a)(1)(A) & (D) in Count I.

### a. GreatBanc was a fiduciary to the Plan with authority over its 2013 Recapitalization.

GreatBanc admits it was Trustee for the Plan at the time of the 2013 Recapitalization and discovery proves their fiduciary status to be undisputed. *See* PAF ¶¶ 3–4, 36. Arri retained GreatBanc to serve as trustee to evaluate and authorize the 2013 Recapitalization. *See* PAF ¶ 31. GreatBanc had authority and control over the Plan's stock when it entered into the agreements that exchanged the Plan's shares of McBride & Son Companies for shares of MS Capital. PRF ¶ 70.

### b. MS Capital, Eilermann, and Arri were Parties in Interest.

Defendants MS Capital, Eilermann, and Arri were parties in interest to the Plan at the time of the 2013 Recapitalization. A "party in interest" includes employees, officers, and directors of the plan sponsor. 29 U.S.C. § 1002(14). Eilermann and Arri, therefore, were parties in interest because they were employees, officers, and the only directors of MS Management and MS Capital. 29 U.S.C. § 1002(14)(H); PRF ¶¶ 9–10; PAF ¶¶ 20, 23. Eilermann and Arri were also parties in interest because they were fiduciaries as the only people who could and did act on behalf of MS Management and MS Capital, named fiduciaries of the Plan. 29 U.S.C. § 1002(14)(A); PAF ¶¶ 5–8, 12–14, 20–21, 23–24. MS Capital too was a party in interest to the Plan at the time of the 2013 Recapitalization because it was a fiduciary and employer. 29 U.S.C. § 1002(14)(A) & (C) PAF ¶¶ 9–14. Any legal existence MS Capital had prior to the 2013 Recapitalization closing made it a party in interest because it was created by GreatBanc and incorporated by Arri.[10] 29 U.S.C. § 1002(14)(G). PAF ¶ 9.

---

[10] GreatBanc claims MS Capital was not a party in interest covered by ERISA § 3(14) because parties in interest are limited to "entities that a fiduciary might be inclined to favor at the expenses of the plan's beneficiary." *See* GB Br. at 8 citing *Harris Trust*, 530 U.S. . 238 at 242 (2000). *Harris Trust*, however does not say this. The Supreme Court only relayed in *Harris Trust* that Congress' *intent* in passing ERIS§ 3(14) was to include in the definition those entities "that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries" it did not

18

c.    *GreatBanc caused the 2013 Recapitalization between the Plan and MS Capital.*

GreatBanc caused the Plan to engage in the 2013 Recapitalization when it signed, with Arri, the Contribution Agreement that exchanged MS Companies, Inc. stock for MS Capital stock. PRF ¶ 70. Plaintiffs therefore meet the third and fourth elements of their Section 406(a)(1)(A) claim.

d.    *GreatBanc caused Plan assets to be used for the benefit of Eilermann and Arri.*

GreatBanc caused the Plan to engage in the 2013 Recapitalization to the great benefit of Eilermann and Arri as discussed in detail above in addressing Plaintiffs' breach of loyalty claim. *See* § III.A.1. (5)–(12) at p. 12, *supra*; PAF ¶ 109 ("We can really do anything we want at this point."); *see Perez v. Wallis*, 77 F. Supp. 3d 730, 745 (N.D. Il. 2014) (fiduciary violated Section 406(a)(1)(D) by directing that plan assets be used for the benefit of party in interest rather than for plan participants).

**B.    The Court Should Grant Partial Summary Judgment for Plaintiffs and against Eilermann and Arri (Count VI).**

As detailed immediately above, Plaintiffs proved two elements of the Count VI knowing participation claim: (1) a § 406(a)(1)(D) prohibited transaction occurred (*see* § III.A.2. at p. 17, *supra*) and (2) the party in interest status of Eilermann and Arri with respect to the 2013 Recapitalization (*see* § III.A.2.b. at p. 18, *supra*). The Court should grant partial summary judgment as to those elements.

**C.    The Court Should Grant Partial Summary Judgment on the Fiduciary Status of MS Management, Eilermann, and Arri as to Counts I through VI.**

Plaintiffs move for partial summary judgment as to the fiduciary status of MS Management, Eilermann, and Arri for Counts I through VI. It is undisputed that MS Management was the named

---

comment on the elements of the party in interest definition. *Id.* GreatBanc's argument ignores the unambiguous text of ERISA § 3(14) and is contrary to the strong judicial precedent interpreting the party in interest definition broadly. *See Neil v. Zell*, 677 F. Supp. 2d 1010, 1027 (N.D. Il. 2009), as amended (Mar. 11, 2010) (purchase of stock by third party that would "eventually be transferred to the ESOP" was subject to ERISA § 406(a) because it was covered by ERISA § 3(14)(H)) citing *Brock v. Citizens Bank of Clovis*, 841 F.2d 344, 347 (10th Cir.1988).

fiduciary and plan administrator prior to and including December 31, 2013. PAF ¶¶ 5–8. It is also undisputed that as the only members of the Board of Directors of MS Management, Eilermann and Arri were the only individuals who could and did act on behalf of MS Management with regard to the Plan prior to and including December 31, 2013, and therefore were fiduciaries to the Plan. PAF ¶¶ 20–21; *see also* PAF ¶¶ 15–16, 19. Accordingly, Plaintiffs' Motion should be granted as the fiduciary status of MS Management, Eilermann, and Arri.

> **D.  The Court Should Deny GreatBanc Summary Judgment on the 2013 Recapitalization Claims (Counts I, III, and V).**

Despite their assertions otherwise (GB Br. at 2), the majority of the DSOF related to the 2013 Recapitalization are disputed. *See* PRF ¶¶ 14–85.

> **1.  The Court Should Deny GreatBanc Summary Judgment on Counts I, III, and V Because the Plan Lost Governance Control in the 2013 Recapitalization.**

GreatBanc argues it should be awarded summary judgment on Counts I, III, and V because the Plan (through GreatBanc as Trustee) retained control over McBride through certain rights related to MS Capital and MS Companies, LLC following the 2013 Recapitalization. *See* GB Br. at 2–3. Control alone does not dictate the outcome. Even if, against all the evidence, there was no material loss of control, the 2013 Recapitalization favored the Five Executives at the expense of the Plan.

GreatBanc is wrong as a matter of law that "control" can be so simplistically defined and is wrong as a matter of fact that the Plan had the powers to do what it says it could. Legally, "there is no hard and fast rule for determining who 'controls' a company." *Vinoskey*, 409 F. Supp. at 514 citing *Brundle II*, 241 F. Supp. 3d at 638. But some elements of control in the Plan context are: "an interest which allows the shareholder to unilaterally direct corporate action, select management, decide the amount of distribution, rearrange the corporation's capital structure, and decide whether to liquidate, merge, or sell assets." *Id.* citing *Brundle III,* 919 F.3d. at 777. In applying these factors, the Fourth Circuit, in *Brundle III*, affirmed the trial court's determination that the plan fiduciaries breached their fiduciary

duty in failing to question Stout Risius Ross's application of a control premium in a transaction in which the Plan purchased 100% of the sponsor's shares. *Brundle III,* 919 F.3d at 777. Although the plan was the sole shareholder and had elements of control, it did not have the power to appoint a majority of the company's Board and could only "exercise its independent voting authority by filing a lawsuit," the "same limited relief available to a minority shareholder." *Id.*

Determining who controls an ESOP-owned company requires analysis not just of the powers the plan has on paper, but also the de facto powers the plan exercises in practice. For example, in *Vinoskey,* the court found that although the plan gained some powers on paper, including the right to direct corporate action as the sole shareholder of the company, the corporate structure and dominating leadership of the company's two directors did not change, so the two directors, "would retain a firm grip over the levers of power." *Vinoskey*, 409 F. Supp. 3d at 515. The same is true here. Following the 2013 Recapitalization, Eilermann and Arri's powers were not diminished. To the contrary, their "firm grip" over McBride tightened as the Plan gave up effective control, as detailed in § III.A.1. (7), (9), at p. 12, *supra*, showing GreatBanc ceded control and oversight in numerous ways.[11]

GreatBanc also claims it obtained control rights under the 2013 Recapitalization, specifically its supposed ability to approve future equity awards. GB Br. at 3. GreatBanc's contention is disputed. *See* PRF ¶¶ 54–55; PAF ¶ 109. As explained above, this was nothing new—historically GreatBanc approved the synthetic equity grants. *See* § III.A.1. (2) at p. 12, *supra*. That aside, trading away numerous elements of control and valuable economic rights, § III.A.1. (10) at p. 12, *supra*, for something the

---

[11] ███████████████ The so-called McBride "Advisory Board" had no power or governance role. PRF ¶ 11.

trustee already controlled proves nothing but incompetence.[12]

### 2.   The Court Should Deny GreatBanc Summary Judgment on Count I Because it Caused a Prohibited Transaction and Cannot Prove Its Defenses.

#### a.   The 2013 Recapitalization Benefitted MS Capital, Eilermann, and Arri as Parties in Interest.

Plaintiffs prove all the elements of their Count I § 406(a)(1)(A) and 406(a)(1)(D) claims. *See* § III.A.1. at p. 12, *supra*. GreatBanc contests only one of those elements: the status of MS Capital as a party in interest. GB Br. at 7–8. As demonstrated above (*see* § III.A.2.b. at p. 18, *supra*), MS Capital was a party in interest under ERISA § 3(14)(A), (C), and (G). PAF ¶¶ 9–14. Further, GreatBanc does not address Plaintiffs' claim in Count I that the 2013 Recapitalization benefited Eilermann and Arri as parties in interest, in violation of ERISA § 406(a)(1)(D). *See* § III.A.2.b. at p. 18, *supra*.[13]

#### b.   There are Genuine Disputed Material Facts Over the § 408(e) Adequate Consideration Affirmative Defense.

GreatBanc argues that regardless of whether a violation of ERISA § 406(a) occurred, the "adequate consideration" exemption in § 408(e) applies. GB Br. at 8–11. To prove adequate consideration, a defendant may not simply claim good faith: "a pure heart and an empty head are not enough." *Standard: Perez v. Commodity Control Corp.*, No. 16-20245, 2017 WL 1293619, at *10 (S.D. Fla. Mar. 7, 2017) (collecting cases). Instead, adequate consideration is the "fair market value of the asset as determined in good faith by the trustee or named fiduciary." 29 U.S.C. § 1002(18)(B). This definition has two parts, both of which must be proved for § 408(e) to apply: (1) "fair market value"

---

[12] GreatBanc's argument that "all parties understood and intended for the ESOP to not only maintain governance control after the 2013 Recapitalization, but also for the ESOP to gain additional control over management's future equity ownership interests" (GB Br. at 3 citing DSOF ¶¶ 54–57) is entirely unsupported in the evidentiary record they cite. *See* PRF ¶¶ 54–57. "Understanding" is beside the point. The written documents control, not some unwritten and unenforceable understanding.

[13] Once again, GreatBanc's assertion of alleged undisputed facts related to the 2013 Recapitalization is wrong. *See* GB Br. at 8 citing DSOF ¶¶ 16–17, 30–36, 49, 66; *cf.* PRF ¶¶ 16–17, 30–36, 49, 66.

and (2) "good faith."[14] *See e.g., Fish,* 749 F.3d at 680 (collecting cases). GreatBanc and Stern Brothers **failed** to do a fair market value analysis of MS Capital stock for the 2013 Recapitalization. PRF ¶ 62; PAF ¶ 79. Now, they recycle their nonsensical argument the price increased because of the transaction (GB Br. at 9–10), which this Court rejected. *See* Dkt. 154 at 15.

GreatBanc's undisputed facts are anything but. Its due diligence was flawed and conflicted. PRF ¶¶ 45–66. The Plan lost important governance controls over McBride. *See* § III.A.1. (7), (9), at p. 12, *supra*; PRF ¶¶ 56–57. These controls were worth approximately ███████, but the Plan wasn't paid for them. PAF ¶¶ 177–78. GreatBanc's determination that MS Capital stock was worth more than MS Companies, Inc. stock was based on the specious premise McBride's stock price would increase due to management's magic powers, with no increase in sales, no increase in house prices, and no increase in margins. PRF ¶ 62; PAF ¶ 79. The Plan's ownership of real equity in McBride decreased from ███████ ███████. PRF ¶¶ 80, 85, 87–88. Eilermann and Arri approved equity grants, not GreatBanc. PRF ¶¶ 54–55; PAF ¶ 109. The IRC § 409(p) risk upon which the transaction was premised was caused by GreatBanc agreeing to excessive synthetic equity grants before the 2013 Recapitalization. *See* § III.A.1. (2) at p. 12, *supra*; PRF ¶¶ 30–36. And the proposition that the Five Executives needed additional equity to align their interests with the Plan is belied by the fact they already had ███████ dollars in synthetic equity as well as equity as participants of the Plan. PRF ¶¶ 30–36. GreatBanc ignored the supposed need to align interests when it failed to insist on retention or non-compete provisions, instead explicitly allowing executives to compete against McBride. See § III.A.1. (12), at p. 12, *supra*; PAF ¶ 72. Stated simply, GreatBanc's take on the factual record is implausible and disputed. *See* PRF ¶¶ 16–17, 30–36, 43, 45–66.

---

[14] Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17,632, 17,633 (proposed May 17, 1988) (to be codified at 29 C.F.R. pt. 2510) ("Proposed Regulation"); *Keach v. U.S. Tr. Co.,* 419 F.3d 626, 636 n. 5 (7th Cir. 2005) citing *Eyler,* 88 F.3d at 454–55); *Fish,* 749 F.3d at 680–81; *see also Chao v. Hall Holding Co., Inc.,* 285 F.3d 415, 436 (6th Cir. 2002); *Shay,* 100 F.3d at 1488.

23

    c. *There are Genuine Disputed Material Facts Over GreatBanc's Violation of Section 406(b)(2).*

GreatBanc makes a *pro forma* argument against Plaintiffs' ERISA § 406(b)(2) claim without citing any facts. GB Br. at 11. But there are ample facts showing GreatBanc acted for the benefit of Eilermann, Arri, MS Management, and MS Capital in the 2013 Recapitalization to the detriment of the Plan. *See* PAF ¶¶ 49–72; *see also* § III.A. at p. 12, *supra*. Further, § 408(e) does not exempt claims under ERISA § 406(b) in any event. *See* § II.B.1.d. at p. 7, *supra*.

    **3.** **The Court Should Deny GreatBanc Summary Judgment on Counts III and V Breach of Fiduciary Duty Claims.**

GreatBanc seeks summary judgment on Plaintiffs' breach of fiduciary claims on the 2013 Recapitalization on four grounds: (1) the Plan did not lose governance control (GB Br. at 2–3), which Plaintiffs address above (*see* § III.D.1. at p. 20, *supra*); (2) GreatBanc did not breach any fiduciary duty because it consulted with and relied upon experienced professionals Stern Brothers and Moore & Van Allen ("MVA") (GB Br. at 4–5); (3) GreatBanc had no conflict of interest as required for a duty of loyalty breach (GB. Br. at 6); and (4) the Plan suffered no damages (GB Br. at 7).

    a. *There Are Disputed Material Facts (Counts III and V).*

GreatBanc cannot win summary judgment on Plaintiffs' breach of loyalty claim because, at the very least, Plaintiffs' arguments in favor of summary judgment on the loyalty claim create genuine issues of disputed material fact. *See* § III.A.1. at p. 12, *supra*. Similarly, because GreatBanc cannot prove its adequate consideration defense to Count I on the good faith prong (*see* § III.D.2.b. at p. 22, *supra*), it cannot win on the Count III breach of the duty of prudence claim because: "In reviewing the acts of Plan fiduciaries under the objective prudent person standard, courts examine both the process used by the fiduciaries to reach their decision as well as an evaluation of the merits. This is true when determining whether an act was prudent under the general standard of [29 U.S.C.] § 1104 and whether an otherwise prohibited transaction under § 1106 is saved by 'adequate consideration' under §

24

1108(e)." *Fish*, 749 F.3d at 680 *quoting Eyler*, 88 F.3d at 455. There is a myriad of disputed material facts as to the § 408(e) defense and Count III. GreatBanc cannot carry its burden.[15]

       **b.**    *GreatBanc's Deficient Investigation Cannot be "Whitewashed" By Hiring Stern Brothers and MVA (Counts III and V).*

The mere fact GreatBanc hired professionals to assist it (GB Br. at 4) does not defeat Plaintiffs' claims. An ESOP trustee's retention of qualified professionals is not a "whitewash" or "magic wand" absolving the trustee from its duties to the ESOP. *See e.g., Chao*, 285 F.3d at 430; *Shay*, 100 F.3d at 1489; *Bruister*, 823 F.3d at 263–64. Even when a fiduciary retains a qualified professional, ERISA requires a fiduciary to exercise its own judgment. *Jenkins v. Yager*, 444 F.3d 916, 927–28 (7th Cir. 2006) (citation omitted). An ESOP trustee must make certain that reliance on the professional's advice is reasonably justified under the circumstances. *Shay*, 100 F.3d at 1489; *see also Eyler*, 88 F.3d at 454. A prudent and diligent fiduciary is required to evaluate, investigate, and question a valuation professional's assumptions and methodologies. *Shay*, 100 F.3d at 1489; *Bruister*, 823 F.3d at 263–64 (trustee failed to "double-check or significantly review" valuation).

Here, the evidentiary record demonstrates GreatBanc's "due diligence" was deeply flawed. PRF ¶¶ 47–55, 58–63, 65–66. For example, (1) Stern Brothers had not previously worked on a transaction with this structure, (2) the day before the close of the transaction, Stern Brothers had not seen final versions of key documents, yet had issued its opinion, (3) there is no discussion anywhere of the many effects of the MS Companies, LLC Operating Agreement (detailed in § III.A.1. at p. 12, *supra*), which Stern Brothers did not see until sometime after December 17, 2013, (4) Stern Brothers blindly

---

[15] GreatBanc is wrong to suggest that a relaxed standard applies to its fiduciary responsibilities because ERISA § 404 requires "prudence not prescience." *See* GB Br. at 5 citing *Keach*, 419 F.3d at 635). In *Keach*, the Seventh Circuit distinguished the facts from several other decisions in which the trustee did not perform a thorough investigation that would have uncovered the proposed ESOP transaction to be unsound. *Id.* at 638 distinguishing *Eyler*, 88 F.3d 445, *Cunningham*, 716 F.2d 1455, *Chao*, 285 F.3d at 429–31, and *Katsaros v. Cody*, 744 F.2d 270, 275 (2d Cir.1984). The Court ruled there was no fiduciary breach because the trustee's investigation was exhaustive and thorough and even if the plaintiffs' allegations of breach were correct, it would have had no effect on the valuation of the ESOP transaction. *See Keach,* 419 F. 3d at 637.

followed the conflicted assertions of Butcher Joseph, which worked for the interests of the Five Executives,[16] and (5) Stern Brothers failed to prepare a fair market value analysis of MS Capital stock. *See e.g.*, PRF ¶ 62; *see also* § III.D.2.b. at p. 22, *supra* (identifying additional substantive reasons GreatBanc's due diligence and decision making was flawed and conflicted).[17]

Further, GreatBanc failed to adequately assess the implications of the 2013 Recapitalization. It was instead presented with Stern Brothers' "draft fairness opinion" less than 48 hours before Eilermann and Arri dictated the transaction closing date. PRF ¶ 65.[18] Despite having less than 24 hours to assess and investigate, GreatBanc authorized the deal in reliance on Stern Brothers' draft opinion, violating its own internal rule on timing and breaching its fiduciary duties. *Id.*; *see e.g., Horn v. McQueen,* 215 F. Supp. 2d 867, 889 (W.D. Ky. 2002) (breach of fiduciary duty where compressed timetable did not allow for sufficient negotiation of price).

### c. *Citing to Experts Creates Disputed Materials Facts (Counts III and V).*

GreatBanc cites the testimony of its experts Risius and Brown (GB Br. at 4–5), but their testimony and opinions were rebutted by Plaintiffs' experts, creating disputed material facts. PAF ¶ 183. *See Godinez v. City of Chicago*, No. 16-7344, 2019 WL 5597190, at *2 (N.D. Il. Oct. 30, 2019) (a "battle of the experts" creates disputed issue of material fact).

Further, Brown's opinions regarding the 2013 Recapitalization relate to his observations of "usual and customary" practice of ESOP trustees. But the standard of care is not supine to ESOP trustees operating in an industry rife with conflicts. Rather, the standard is one of a prudent and well-informed

---

[16] *See* PRF ¶ 37; PAF ¶ 49.

[17] GreatBanc's discussion of sales and increased growth (GB Br. at 5–6) is also disputed. *See* PAF ¶ 79.

[18] GreatBanc's lack of involvement with the negotiation and performance of the 2013 Recapitalization shows that it breached its fiduciary duties to the ESOP—the sole entity it was bound to protect and defend. *See e.g., Chao*, 285 F.3d at 432 (ESOP trustees breached their fiduciary duty because "even though defendant Ahearn and defendant Shields were the trustees of the Hall Chemical ESOP, they had very little to do with the major decisions that concerned it"); *Shay*, 100 F.3d at 1489 (fiduciary breach arose from fiduciary's lack of negotiation of purchase price).

person familiar with buying, selling, and operating private companies for the benefit of investors. *See* Proposed Regulation at 17634 & 17637 at Proposed § 2510.3-18(b)(3)(ii) (a fiduciary must "apply *sound business principles of evaluation* and to conduct a prudent investigation of the circumstances prevailing at the time of the valuation") (emphasis added);[19] *Cunningham*, 716 F.2d at 1467–68 (failure to apply sound business principles of evaluation may result in a valuation that does not reflect fair market value); *Eyler*, 88 F.3d at 456 (fiduciary breaches duty where not well-informed and knowledgeable). The identity of a transaction participant as an ESOP trustee should have no effect on process, as it is well-established that the determination of "fair market value" commands a hypothetical willing buyer or seller, not an ESOP trustee as such. *See Eyler*, 88 F.3d at 451; *Perez v. Bruister*, 54 F. Supp. 3d 629, 675 (S.D. Miss. 2014), *aff'd as modified*, 823 F.3d 250 (5th. Cir. 2016); *Caracci v. Comm'r*, 456 F.3d 444, 456 (5th Cir. 2006); Proposed Regulation at 17634 & 17637 at Proposed § 2510.3-18(b)(2)(i). Even if admissible, Brown's testimony does not prove prudence because "testimony about community norms does not necessarily link to findings of prudence." *Bruister,* 54 F. Supp. at 641 (declining to give much weight to the expert testimony of a "highly experienced and knowledgeable" ESOP lawyer regarding his personal experiences of usual practice in the ESOP industry because an opinion that "most fiduciaries do something wrong does not mean that they satisfy the standard of care").

Finally, GreatBanc claims that Brown has "decades" of experience with similar transactions. GB Br. 5. In fact, Brown testified at deposition that he was only aware of ███████████ transactions similar to the 2013 Recapitalization, ███████████████████████ PAF ¶ 189.

### d. *GreatBanc Breached Its Duty of Loyalty (Count III).*

GreatBanc argues it acted with undivided loyalty and without conflicts. GB Br. at 6. But when a fiduciary favors a party in interest over the plan or even attempts to broker a fair deal to both, the

---

[19] Although the Proposed Regulation was not finalized, the Seventh Circuit has adopted its two-part investigatory and fair market value standard for evaluating the adequacy of consideration in an ESOP transaction. *See Keach*, 419 F.3d at 636 n.5; *Fish*, 749 F.3d at 680–81.

fiduciary breaches the duty of loyalty regardless of a conflict. *See LaSalle Bank Nat. Ass'n,* 446 F.3d at 733–34 (reversing and remanding summary judgment in favor of ESOP trustee because the Court could not find any indication ESOP trustee considered how best to balance the interests of ESOP participants in corporate transaction); *Scalia v. Reliance Tr. Co.,* No. 17-4540, 2021 WL 795270, at *28 (D. Minn. Mar. 2, 2021) (DOL could show independent ESOP trustee breached duty of loyalty by seeking a deal "fair to both" the seller and the ESOP) citing *Vinoskey,* 409 F. Supp. 3d at 522–24 (ESOP fiduciary breached its duty of loyalty by seeking a deal "fair to both" the seller and the ESOP); *Chao,* 285 F.3d at 434 (ESOP fiduciary's admission that she was concerned about a party with interests adverse to the ESOP was a breach of the duty of loyalty). As discussed above, there is ample evidence (*see* § III.A.1. at p. 12, *supra*) GreatBanc favored Eilermann and Arri over the Plan.

### e. *GreatBanc Breached ERISA § 405 (Count V).*

GreatBanc claims, without evidence, it is not liable as a co-fiduciary in the 2013 Recapitalization. GB Brief at 6–7. The evidence supports Plaintiffs' claims that GreatBanc knowingly participated and enabled the breaches of MS Management, Eilermann, and Arri in Count II and Count IV when it, for example, conducted a flawed diligence process (PRF ¶¶ 45–66), failed to appoint independent members to the MS Management Board (PAF ¶ 22), and repeatedly favored the interests of Eilermann, and Arri, as detailed above. GreatBanc also knew of the breaches of MS Management, Eilermann, and Arri in Count II and Count IV and failed to make any efforts to remedy those breaches when it failed to take steps against Eilermann and Arri. PAF ¶¶ 36–37.[20]

---

[20] If GreatBanc could point to circumstantial evidence supporting its co-fiduciary arguments (it does not), its own cited authority holds that circumstantial evidence of the existence (or lack thereof) of a co-fiduciary breach does not result in summary judgment. *See Ellis v. Rycenga Homes, Inc.,* 484 F. Supp. 2d 694, 712–13 (W.D. Mich. 2007) (purely circumstantial evidence of whether a co-fiduciary breach occurred was insufficient to award summary judgment).

f. *The Plan Suffered Damages From GreatBanc's Fiduciary Breaches (Counts III and V).*

GreatBanc moves for summary judgment on Counts III and V, arguing there is no evidence the Plan had damages because "there was no loss of governance control, and loss-of-control-damages are the only economic loss that Plaintiffs have claimed arising from the 2013 Reorganization. Nothing else." GB Br. at 7.

First, GreatBanc's factual assertions are disputed. The Plan lost governance control. *See* § III.D.1. at p. 20, *supra*. And Plaintiffs' expert Van Vleet opines that the Plan incurred a loss of at least $██████ as a result. PAF ¶¶ 177–78.

Second, Plaintiffs allege additional damages in Count III, for example, in the form of ill-gotten profits by Eilermann and Arri post-2013 that flow directly from the 2013 Recapitalization. Dkt. 127 at ¶ 381. ERISA § 409(a) allows recovery of such profits as a remedy. 29 U.S.C. § 1109(a) (allowing recovery of "profits of such fiduciary which have been made through use of assets of the plan by the fiduciary"). That would include recovery of (1) Eilermann and Arri's Class B Units of MS Companies, LLC (Dkt. 127 at ¶ 380(l)), (2) the excessive compensation paid to Eilermann and Arri from 2013 to 2017 (Dkt. 127 at ¶ 380(q)), and (3) the December 30, 2013 synthetic equity grants to Eilermann and Arri (Dkt. 127 at ¶ 380(r)). All these economic harms flow directly from the 2013 Recapitalization.

Third, GreatBanc's theory would turn ERISA remedies on its head. To remedy fiduciary breaches Plaintiffs are entitled to equitable relief—not simply economic "damages." *See Chesemore*, 829 F.3d at 811 (a district court's remedial authority under ERISA includes the power of courts under the law of trusts, which vests in them the authority to fashion "traditional equitable remedies") (internal citation omitted). ERISA § 409 broadly authorizes "such other equitable or remedial relief as the court may deem appropriate." *Russell*, 473 U.S. at 149. Here, Plaintiffs expressly seek equitable relief, not just economic loss, from GreatBanc pursuant to U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3). *See* Dkt. 127 at ¶

29

383; *see also* ¶¶ 606–07, at pp. 148–51 (Prayer For Relief).[21]

    **E.    The Court Should Deny McBride Defendants Summary Judgment on the 2013 Recapitalization Claims (Counts II, IV, V, and VI).**

        **1.    MS Management, Eilermann, and Arri Were Fiduciaries for the 2013 Recapitalization (Counts II, IV, and V).**

It is undisputed that at the time of the 2013 Recapitalization, MS Management was the "named fiduciary" and "plan administrator" of the Plan. PAF ¶¶ 5–8. It is also undisputed that Eilermann and Arri were the only persons at McBride who could act on behalf of MS Management in its named fiduciary capacity as the only two members of the Board of Directors. PAF ¶¶ 20–21; *see also* PAF ¶¶ 15–16, 19. McBride Defendants are wrong that MS Management, Eilermann, and Arri were not fiduciaries as to the 2013 Recapitalization.

First, a named fiduciary and plan administrator is at all times obligated to "exercise discretionary authority or control with respect to management of the plan." *Eyler*, 88 F.3d at 454 (ESOP plan sponsor was fiduciary with respect to ESOP transaction since it was named fiduciary and administrator according to plan documents); *see also Chao v. Unique Mfg. Co.*, 649 F. Supp. 2d 827, 836 (N.D. Il. 2009); *Bruister,* 823 F.3d at 259–60 (named fiduciary of ESOP was fiduciary with respect to ESOP Transaction even though he *abstained* from all votes relating to the approval of the subject transactions); 29 C.F.R. § 2509.75-8 D-3 (by the nature of the position they have discretionary authority or discretionary responsibly and therefore are fiduciaries). Therefore, MS Management, Eilermann, and Arri, acting as the named fiduciary and plan administrator of the Plan, had a fiduciary responsibility to ensure the 2013 Recapitalization did not violate ERISA. In fact, Eilermann and Arri previously recognized their fiduciary role as the plan administrator due to them being members of the

---

[21] *Mira v. Nuclear Measurements Corp.*, 107 F.3d 466 (7th Cir.1997), is factually inapposite to the allegations here and has been rejected where a plausible claim of fiduciary breach exists. *See Chao v. Linder,* No. 05-3812, 2007 WL 1655254*,* at *8 (N.D. Il. May 31, 2007) (distinguishing *Mira* as a case where no evidence existed of a fiduciary breach and therefore, there was no opportunity for equitable relief).

MS Management Board of Directors. PAF ¶¶ 28–29.

Second, the undisputed material facts prove MS Management, Eilermann, and Arri exercised some discretion over the 2013 Recapitalization, satisfying ERISA § 3(21)(A)(i) & (iii). 29 U.S.C. § 1002(21)(A)(i) & (iii). Arri, as the Rule 30(b)(b) witness for MS Management, testified he and Eilermann had the power and authority to stop the 2013 Recapitalization. PAF ¶ 30. Arri signed the Contribution Agreement. PAF ¶ 32. Eilermann and Arri were the only persons with authority to engage GreatBanc for the 2013 Recapitalization, and did so. PAF ¶¶ 31, 164. Eilermann and Arri had the duty to monitor GreatBanc. PAF ¶¶ 31, 164. Arri signed the agreements of MVA and Stern Brothers. PAF ¶¶ 33–34.

McBride Defendants cite no evidence GreatBanc, in addition to being the trustee, also took on the role of named fiduciary and plan administrator to the Plan, positions mandated by ERISA. 29 U.S.C. § 1102(a)(1); 29 U.S.C. § 1002(16).[22] Consequently, hiring GreatBanc did not absolve MS Management, Eilermann, and Arri from their fiduciary obligations to the Plan. *Leigh*, 727 F.2d at 135 (fiduciaries cannot "abdicate their duties under ERISA merely through the device of giving… lieutenants primary responsibility for the day to day management of the trust."); *Acosta v. Reliance Tr. Co.*, No. 17-4540, 2019 WL 3766379, at *8 (D. Minn. Aug. 9, 2019) (ERISA instead requires persons responsible for appointing and removing plan fiduciaries (often the sponsoring company's board of

---

[22] McBride Defendants cite to Defendant GreatBanc's memorandum of law (MB Br. at 3), but it says GreatBanc had exclusive fiduciary responsibility with respect to the 2013 Recapitalization. At bottom, McBride Defendants' motion seeks to promote form over substance to render ERISA's fiduciary protections meaningless. As the court reasoned in *Keach*: "While Defendants' invitation to look simplistically at the power to appoint as the end of the story is attractive, to do so would be elevating form over substance and ignore the Court's obligation to "look beyond" formal authority to the realities of the fiduciary relationship at issue. To hold otherwise would be to render the protections of ERISA meaningless, as ERISA's fiduciary liability provisions would have no meaning in the real world unless they are flexible enough to take cognizance of the different dynamics in which these transactions can occur." *Keach v. U.S. Tr. Co.*, 234 F. Supp. 2d 872, 883 (C.D. Il. 2002); *see also Acosta v. Saakvitne*, 355 F. Supp. 3d 908, 920–23 (D. Haw. 2019) (declining to dismiss company directors from ERISA suit for their role in orchestrating improper ESOP transaction where the directors had appointed a different party to be the ESOP's fiduciary for purposes of the transaction).

directors) to "monitor the activities of their appointees" "at reasonable intervals") citing *Howell v. Motorola, Inc.*, 633 F.3d at 572–73 (citing 29 C.F.R. § 2509.75-8 FR-17); accord *Krueger v. Ameriprise Fin., Inc.*, No. 11-2781, at *17–18 (D. Minn. Nov. 20, 2012).

**2.  McBride Defendants Breached Fiduciary Duties in the 2013 Recapitalization (Count IV).**

McBride Defendants move for summary judgment on Count IV, claiming they followed a prudent process and the 2013 Recapitalization was in the best interests of the Plan participants. MB Br. at 4–10. They are wrong. Eilermann and Arri were highly conflicted as to the 2013 Recapitalization, given that they had both a fiduciary role to the Plan and were primary beneficiaries of the recapitalization. PAF ¶¶ 15–16; § III.A.1. at p. 12. In situations of divided loyalties like this, intensive and scrupulous investigation is required. *Lehigh*, 727 F.2d at 127. Here, the process was anything but intensive and scrupulous. And, as detailed above, the 2013 Recapitalization was primarily for the benefit of Eilermann and Arri, not the Plan.

**a.  *There is a Material Dispute of Fact Regarding McBride Defendants' Process***

The 2013 Recapitalization was entirely for the benefit of Eilermann, Arri. The problems they claim needed fixing were entirely of their making or entirely made up:

**(1)** The employees were responsible for McBride's success during the Great Recession, not management alone. PRF ¶ 17; *see also* PRF ¶¶ 18–29, 36; PAF ¶¶ 1–2.

**(2)** It is counter-factual speculation that Eilermann and Arri would have left McBride if the 2013 Recapitalization had not occurred.[23] PRF ¶¶ 33–35; PAF ¶¶ 50–52.

**(3)** The Five Executives were well-incentivized; there was little risk of departure. PRF ¶¶ 33–35.

**(4)** The interests of the Five Executives and the Plan were aligned as both benefited from

---

[23] The evidence cited regarding former executives is inadmissible hearsay. McBride Defendants also failed to even list these witnesses in their Rule 26 disclosures. PRF ¶ 15.

increased stock price given the Plan's ownership of MS Companies, Inc. stock and the Five Executives' synthetic equity also based on the price of the same stock. PRF ¶ 80.

**(5)** The risk of triggering IRC § 409(p) was due to excessive amounts of synthetic equity Eilermann and Arri paid themselves and the other executives. PRF ¶ 31.

**(6)** Most of the synthetic equity agreements issued to the Five Executives contained a clause that allowed accelerated payment to avoid a § 409(p) violation, belying the claimed need for the 2013 Recapitalization. PRF ¶ 31.

**(7)** The Plan's governing plan document provided mechanisms to address a potential § 409(p) violation, belying the claimed need for the 2013 Recapitalization. PRF ¶ 31.

**(8)** Any § 409(p) caps would have resolved naturally because the synthetic equity agreements from 2010 to 2013 included payout schedules reducing synthetic equity in the near-term. PRF ¶ 31.

**(9)** TRS, the compensation consultant hired by Eilermann and Arri, was not independent and did not make recommendations. PRF ¶ 91.

**(10)** McBride Defendants misrepresent the role played by the Outside Individuals, which they incorrectly refer to as an advisory board. PRF ¶¶ 11, 95–96.

**(11)** The synthetic equity that had been granted through 2012 was excessive. PRF ¶ 97.

The process engaged in by McBride Defendants was both procedurally and substantively flawed:

**(12)** MS Management, Eilermann, and Arri failed to hold any meetings and keep any minutes as a board regarding whether the 2013 Recapitalization was in the best interest of the Plan, even though both they knew this was basic to a prudent process PAF ¶¶ 26–28.

**(13)** Butcher Joseph was hired for the benefit of the Five Executives, not the Plan. PRF ¶ 37; PAF ¶ 49.

**(14)** The 2013 Recapitalization should have been voted on by Plan participants. PRF ¶ 58; PAF ¶¶ 82–84.

33

**(15)** The synthetic equity held by the executives was inferior to the stock held by the Plan.[24] PRF ¶ 43; PAF ¶¶ 53–54. The Plan's stock was superior to synthetic equity in that it gave control, voting rights, and dividend rights to the Plan. PRF ¶ 43; PAF ¶¶ 53–54.

**(16)** The 2013 Recapitalization resulted in the Plan' loss of control, voting rights, and dividend rights to McBride, Eilermann and Arri, who had their synthetic equity converted to real equity. PRF ¶¶ 49, 56–57; PAF ¶¶ 54, 57–59.

**(17)** Even if real and synthetic equity were equivalent, the intent was for the Plan's ownership to decrease, and it did. PRF ¶¶ 43, 80, 87–88; PAF ¶ 69.

**(18)** GreatBanc should not have been hired given its history of being sued for failing to protect Plan participants. PAF ¶ 170.

**(19)** MS Management, Eilermann, and Arri failed to monitor the GreatBanc's lackluster diligence. PRF ¶¶ 45–66; *see also* § III.D.2.b. at p. 22, *supra* (describing in great details GreatBanc's poor process).

**(20)** The 2013 Recapitalization resulted in Eilermann and Arri having complete control over their own compensation. PRF ¶¶ 54–55.

**(21)** Despite the claim by McBride Defendants that they were concerned with the Five Executives leaving, after the 2013 Recapitalization the Five Executives did not have employment agreements, were not subject to non-competition covenants, and could resign at any time. PAF ¶ 72.

### b. *Citing to an Expert Creates Disputed Material Facts (Count IV).*

Like GreatBanc, McBride Defendants cite to the testimony of their expert Bloom. MB Br. at 6. Bloom's testimony has also been rebutted by Plaintiffs' experts. PAF ¶ 183. Conflicting expert testimony creates a disputed material fact. *See Godinez*, 2019 WL 5597190 at *2.

---

[24] Actual equity, which Arri and Eilermann received in exchange for their synthetic equity through the 2013 Recapitalization, is more valuable because synthetic equity, commonly defined as "imaginary" equity, does not carry with it an actual ownership interest in a company. *See O'Shea v. OMi Holdings, Inc.*, No. 20-1616, 2021 WL 4290803, at *6 (N.D. Ala. Sept. 21, 2021) (denying breach of contract claim of phantom stockholder because the plain meaning of phantom stock is "imaginary stock" that does not convey an ownership interest).

### 3. McBride Defendants Failed to Plead ERISA § 408(e) as an Affirmative Defense (Count II).

McBride Defendants argue they should be granted summary judgment as to Count II because the prohibited transaction fell within the exemption under "ERISA section 408(e) because the Plan received adequate consideration when it exchanged its MS Companies stock for MS Capital stock." MB Br. at 8. Although McBride Defendants asserted an affirmative defense under § 408(e) for the 2017 Transaction, they did not, until now, assert the defense for the 2013 Recapitalization. As an affirmative defense, it should have been pleaded in McBride Defendants' answer to the SAC—it was not. *Fish v. Greatbanc Tr. Co.*, 2016 WL 5923448, *61 (N.D. Il. Sept. 1, 2016) (the § 408(e) "adequate consideration" exemption is an "affirmative defense"); *see* PAF ¶ 181 (no § 408(e) defense listed in either answer, Dkts. 129, 164). It is therefore waived. *Walker v. Sheahan* 526 F.3d 973, 979 (7th Cir. 2008). After years of litigation, McBride Defendants cannot raise a new affirmative defense. Even if not waived, they fail to prove the defense for the same reasons discussed above in response to GreatBanc's motion. *See* § III.D.2.b. at p. 22, *supra*.

### 4. McBride Defendants Dealt with Plan Assets for Their Own Benefit in Violation of ERISA § 406(b)(1) (Count II).

There is no dispute that the MS Companies, Inc. stock held by the Plan is a plan asset. PRF ¶ 4. The undisputed evidence proves the 2013 Recapitalization was the brainchild of Eilermann and Arri. PRF ¶¶37, 39, 41–42. Acting through MS Management, the named fiduciary of the Plan, Eilermann and Arri dealt with the assets of the Plan when they caused the 2013 Recapitalization to occur. PAF ¶¶ 30–35. As a result, Eilermann and Arri received real equity and control of McBride, while the Plan lost equity and control. PRF ¶¶ 43, 49, 56–57, 80, 87–88; PAF ¶¶ 54, 57–59, 69; *see also* § III.A.1. at p. 12, *supra*.

### 5. There are Genuine Disputed Material Fact Over GreatBanc's Violation of Section 406(b)(2).

Defendants assert there cannot be a violation of ERISA § 406(b)(2) because, they claim,

Eilermann and Arri did not benefit from the 2013 Recapitalization. MB Br. at 9. But, as detailed above, the purpose of the 2013 Recapitalization was explicitly to benefit them, and it did. PRF ¶¶ 43, 49, 56–57, 80, 87–88; PAF ¶¶ 54, 57–59, 69; *see also* § III.A.1. at p. 12, *supra*.

### 6. There are Genuine Disputed Material Facts Over McBride Defendants' Violation of Section 406(b)(3).

McBride Defendants also seek summary judgment on Plaintiffs' § 406(b)(3) claim. This too fails. They received consideration for their own account as a result of the 2013 Recapitalization, such as receiving real ownership which was superior to the synthetic equity they had (PRF ¶¶ 49, 56–57; PAF ¶¶ 54, 57–59), excessive tax gross ups exceeding $8 million to cover their own personal liability (PAF ¶¶ 96–100), and taking control of McBride from the Plan including complete control over their compensation (PRF ¶ 54–57). *Chesemore*, 886 F. Supp. 2d at 1056–57 (the "source of the funds is irrelevant under § 406(b)(3), which prohibits fiduciaries of an ERISA plan from receiving any consideration coming from any party dealing with the plan in connection with a transaction involving plan assets").

### 7. There are Genuine Disputed Material Facts with Respect to Count V (co-fiduciary liability) and Count VI (knowing participation).

As noted by McBride Defendants, summary judgment must be denied regarding Counts V and IV if the Court denies summary judgment as to Counts I, II, III, and IV. MB Br. at 10. Additionally, summary judgment must be denied because McBride Defendants not only knew about GreatBanc's and each other's breaches, they actively participated in them. PAF ¶ 90.

## IV. ON THE LOSS OF VALUE CLAIMS BETWEEN 2013 AND 2017, THE COURT SHOULD ENTER PARTIAL SUMMARY JUDGMENT FOR PLAINTIFFS AND DENY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT.

The SAC alleges GreatBanc (Count VII) and Eilermann and Arri (Count VIII)[25] breached their fiduciary duties during 2013–2017, causing losses to the Plan. Plaintiffs also allege GreatBanc, MS

---

[25] The Court previously dismissed MS Capital from Count VIII. Dkt. 154 at 20–21.

Capital, Eilermann, and Arri are liable for losses to the Plan resulting from these breaches under co-fiduciary liability (Count IX)) and MS Capital, Eilermann, and Arri knowingly participated in breaches of fiduciary duties (Count X). Plaintiffs move for Partial Summary Judgment on Counts VIII through X as to Eilermann and Arri being fiduciaries, while Defendants have separately moved for Summary Judgment on Counts VII through X.

### A. The Court Should Grant Partial Summary Judgment on the Fiduciary Status of Eilermann and Arri as to Counts VIII, IX, and X.

"An action by a corporate officer who is also a plan fiduciary triggers ERISA standards where two conditions exist: the plan's assets include employer stock and the officer's decision is one from which he could directly benefit." Dkt. 154 at 18 citing *Johnson*, 572 F.3d at 1077.[26] During 2014–2017, Eilermann and Arri were corporate officers, company directors, and fiduciaries to the Plan and the only people who could and did act on behalf of MS Companies, MS Management and MS Capital, the named fiduciaries and plan administrators. PAF ¶¶ 6–8, 11–16, 19–25, 28. The Plan's sole asset was employer stock. PRF ¶¶ 4, 6. Eilermann and Arri directly benefitted from their discretionary decisions by awarding themselves compensation. PAF ¶¶ 59, 63–64, 108–114.[27] Therefore they are fiduciaries for their compensation decisions. And their "obvious self-dealing" "run[s] contrary to the duties of loyalty… in ERISA." Dkt. 154 at 18 (quoting *Johnson*, 572 F.3d at 1077); *Svigos v. Wheaton Secs., Inc.*, No. 17-4777, 2018 WL 587190, at *8 (N.D. Il. Jan. 29, 2018); *Spires v. Schools*, 271 F. Supp. 3d 795, 803

---

[26] The Court's holding mirrors the DOL's position in *Johnson*. The DOL noted, "it makes no difference to the analysis that an ESOP's assets generally consist of its stock, and not the underlying assets of the company." Brief for the Sec. of Labor as Amicus Curiae Supporting Appellees and Requesting Affirmance at 22, *Johnson v. Couturier*, No. 08-17631, 2009 WL 2444302 (9th Cir. January 30, 2009) citing 29 C.F.R. § 2510.3-101(h)(3). Rather, "ERISA fiduciaries have an obligation to affirmatively act to protect plan assets from dissipation, [and not] stand idly by while all the equity value is siphoned off for the benefit of corporate insiders to the detriment of the plan as the company's sole shareholder." *Id.* at 11.

[27] How they benefitted (PAF ¶¶ 91–106) from the excessive compensation is also discussed below. *See* § IV.B.3. at p. 49, *infra*.

(D.S.C. 2017). Eilermann and Arri are fiduciaries as to Counts VIII, IX, and X.[28]

> **B.    The Court Should Deny GreatBanc and McBride Defendants Summary Judgment on the Loss of Value Claims (Counts VII, VIII, IX, and X).**

Given the significant overlap between their briefs, it is appropriate to respond in tandem to both GreatBanc seeking summary judgment as to Counts VII and IX and McBride Defendants seeking summary judgment as to Counts VIII, IX, and X. As with the 2013 Recapitalization claims, most of the DSOF related to Counts VIII to X are disputed. *See* PRF ¶¶ 79–111.

> **1.    Defendants' Plan Asset Arguments Are Without Merit (Counts VII, VIII, IX, and X).**

Both GreatBanc and McBride Defendants argue that because the compensation paid to the Five Executives was not plan assets, no fiduciary duty under ERISA is implicated, and therefore they are not fiduciaries. GB Br. at 11–12; MB Br. at 10–12. They are wrong.

First, this Court has already rejected this argument and Defendants' test. *See* Dkt 154 at 18–19 (adopting the two-part test in *Johnson*, 572 F.3d at 1077); *see* § IV.A. at p. 37, *supra*.

Second, even if that were not the case, Defendants have not proved any McBride entity was an "operating company" within the definition of 29 C.F.R. § 2510.3-101(c)(1).[29] Whether a company is an operating company is a "factual determination." S*vigos*, 2018 WL 587190, at *8.[30] But GreatBanc fails to cite to any facts. GB Br. at 12. McBride cites to DSOF ¶ 1, but it does not demonstrate (1) which corporate entity or entities meet the definition, (2) any list of that entity's activities so that the

---

[28] Instead of grappling with the Court's prior ruling of law on fiduciary status, Defendants make a new argument about plan assets and operating companies, to which Plaintiffs respond in § IV.B.1. at p. 38, *infra*. Notably, each of the ESOP cases cited by the Court on the issue of fiduciary status involved operating companies. For example, in *Johnson*, the ESOP owned a company that manufactured and sold galvanized sheet metal. 572 F.3d at 1072. The Ninth Circuit found fiduciary status nevertheless. Defendants' arguments against fiduciary status are unavailing.

[29] This argument amounts to a defense raised for the first time. Defendants failed to assert it, (*see* PAF ¶ 182), despite Plaintiffs raising this issue (Dkt. 127 at ¶ 311), and thus it is waived. *See Sheahan* 526 F.3d at 979.

[30] *See also Spear v. Fenkell*, No. 13-2391, 2016 WL 5661720, at *46 (E.D. Pa. Sept. 30, 2016) ("I agree with the Department of Labor that, '[i]n general, whether a particular company is, or is not, an operating company...is a factual question to be resolved taking into account the particular characteristics of the entity under consideration'") quoting Final Reg. Relating to the Definition of Plan Assets, 51 FR 41262-01, *41271, 1986.

Court could determine which activity or activities the entity "primarily" engages in, and (3) that the McBride entity doesn't primarily invest in capital, given that McBride owns tens of millions of dollars in real estate at any given time. PRF ¶ 113.

Third, even if Defendants prove some McBride entity is an operating company, that determination alone does not carry the day. Defendants know this. Counsel for McBride Defendants lost this argument in *Spires v. Schools*, where they served as counsel for the Piggly Wiggly Carolina Company and the fiduciaries of the Piggly Wiggly ESOP. 271 F. Supp. 3d at 807. Defendants argued Piggly Wiggly was an operating company and, therefore, defendants were not dealing in plan assets when they allegedly engaged in the self-dealing transactions. The court did not agree. It held that because the plaintiffs' allegations did not concern managerial malfeasance of company executives but, instead, the failure of those company executives, as fiduciaries of the ESOP, to take action to protect *plan assets* by responding to managerial malfeasance that depleted the plan assets, plaintiffs alleged claims under ERISA even if Piggly Wiggly was an operating company. *Spires*, 271 F. Supp. at 802–03.

The same is true here. Plaintiffs allege Eilermann and Arri, fiduciaries to the Plan, placed their interests above the Plan by awarding excessive compensation and equity to themselves and the other executives, which diminished the value of the Plan's assets and diluted the Plan's stake. Discovery proves this. PAF ¶¶ 91–106.[31]

### 2. GreatBanc, Eilermann, and Arri Had a Fiduciary Duty to Protect the Plan from the Excessive Compensation (Counts VII, VIII, IX, and X).

GreatBanc contends it had no fiduciary duty because "there is no case we have found (and none

---

[31] GreatBanc cites to the same authority it referred to in its motion to dismiss, for example, *Armstrong v. Amsted Indus.*, No. 01-2963, 2004 U.S. Dist. LEXIS 14776, at *40–41 (N.D. Il. July 30, 2004). *Compare* Dkt. 115 at 3 *with* GB Br. at 12. As Plaintiffs explained in their opposition, *Armstrong* is distinguishable because it involved the purchase of an unrelated company where the plaintiffs *admitted* it did not involve a fiduciary act and there were no allegations of self-dealing. GreatBanc also refers to the case *Akers v. Palmer*, 71 F.3d 226, 228 (6th Cir. 1995), which is irrelevant to this issue because it held that the act of funding an ESOP is a settlor act not subject to ERISA's rules and regulations.

that Plaintiffs have identified) in which a court held that an independent third-party ESOP trustee like GreatBanc has an ERISA duty to second-guess or intervene in cash compensation decisions made by corporate officers or directors." GB Br. at 12.[32] It didn't look very hard.

Many cases address a trustee's obligation to protect an ESOP from excessive compensation, including through filing a derivative lawsuit to recover excess compensation, stop practices, and/or remove the offending fiduciaries. *Blankenship v. Chamberlain*, 695 F. Supp. 2d 966, 969 (E.D. Mo. 2010) (ESOP trustee had an obligation to bring a derivative suit or remove himself to stop fiduciary self-dealing such as the payment of excessive salaries, receiving distributions from the Company's net profits, and the use of company funds for personal expenses) citing *Feilen*, 965 F.2d at 667 (ESOP fiduciaries' decision whether to bring derivative suit to stop dissipation of plan assets subject to ERISA's fiduciary duties); *Delta Star, Inc.*, 76 F. Supp. 2d at 637 (ruling after a bench trial that ESOP trustee breached the fiduciary duties in failing to bring derivative suit to stop chairman of the board's receipt of excessive compensation); *Atwood v. Burlington Industries Equity, Inc.*, No. 92-716, 1994 WL 698314 at *3–4 (M.D. N.C. Aug. 3, 1994) (Trustees' failure to bring derivative suit to stop the plan sponsor's officers from siphoning capital out of the company and "treat[ing] themselves to extraordinary compensation" states a claim for fiduciary breach); *see also, Spires*, 271 F. Supp. 3d at 805.

GreatBanc forgets it was the trustee-defendant in the *Hurtado* case. The court held GreatBanc duties as trustee required it to act against self-dealing by the plan sponsor's directors and officers, including bringing a derivative suit to stop the transactions. *Hurtado v. Rainbow Disposal Co.*, No. 17-1605, 2018 WL 3372752, at *12 (C.D. Cal. July 9, 2018). The Trust Agreement here authorizes GretaBanc to file a lawsuit (PAF ¶¶ 17–18), but it didn't do anything. PAF ¶¶ 130–32.[33]

---

[32] This view clashes sharply with its own experts writings on the duties of ESOP trustees to monitor and review executive compensation, as detailed below. *See* § IV.B.4. at p. 42, *infra*.

[33] Plaintiffs previously identified the *Blankenship, Feilen,* and *Spires* cases for this point of law in opposing GreatBanc's motion to dismiss the SAC. *See* Dkt No. 125 at 16, FN 12.

Finally, the principle of law in these cases also applies to Eilermann and Arri. As explained above, they were fiduciaries with respect to their own compensation and, therefore, had a duty to remove themselves and stop the harm. PAF ¶¶ 15–16.

### 3. There are Genuine Disputed Material Facts as to Whether GreatBanc, Eilermann, and Arri Breached Their Fiduciary Duties (Counts VII, VIII, IX, and X).

Both GreatBanc and McBride Defendants claim there is no evidence they breached fiduciary duties as to executive compensation. GB Br. at 13–14; MB Br. at 13–15. They are wrong. There was no real process for determining compensation for the Five Executives.

**(1)** No independent persons sat on the board of directors or board of managers despite it being a widely regarded best practice. PRF ¶ 91; PAF ¶ 143.

**(2)** No independent compensation committee was formed despite it being best practice and required under the terms of the MS Capital Bylaws. PRF ¶ 91; PAF ¶ 143.

**(3)** TRS, the compensation consultant hired by Eilermann and Arri, was not independent and did not issue any recommendations. PRF ¶ 91.

**(4)** The ranges of compensation included in the TRS reports at the request of Eilermann and Arri were objectively excessive. PRF ¶¶ 97, 104; PAF ¶¶ 124–125.

**(5)** The Five Executives received total compensation of $███████ of which $███████ was excessive. PRF ¶ 106; PAF ¶¶ 101–104.

**(6)** The compensation paid to the Five Executives between 2013 and 2017 was ███████ as much as the appreciation of the value of the ████ shares of stock held by the Plan during the same time-period. PAF ¶ 105.

**(7)** The increase in equity held by the Plan from December 31, 2013 to November 30, 2017 (███████) did not even exceed the tax payments paid to the Five Executives as part of the 2013 Recapitalization (███████). PAF ¶ 106.

41

**(8)** GreatBanc failed to protect the Plan from the excessive compensation, including by failing to file a derivative lawsuit and failing to remove Eilermann and Arri as fiduciaries. PAF ¶¶ 130–141.

**(9)** GreatBanc failed to hire an independent compensation consultant on behalf of the Plan. PRF ¶ 97. Had it, it would have seen the bogus compensation ranges in the TRS reports. PRF ¶ 97.

**(10)** Defendants egregiously misrepresent the role played by the Outside Individuals, which they misleadingly refer to as an advisory board, but it had no power. PRF ¶¶ 11, 95. Defendants' evidence does not show the Outside Individuals were involved in compensation decisions. PRF ¶¶ 95.

**(11)** The Five Executives received preferential distributions over the Plan. PAF ¶¶ 115–123.

**(12)** Excessive tax payments were paid for the benefit of the Five Executives. PAF ¶¶ 96–100.

**(13)** Between 2014 and 2017, there was no written incentive plan. PAF ¶¶ 126–127.

**(14)** The Five Executives had no formal or written performance reviews. PAF ¶¶ 128–129.

**(15)** The termination and payout of the synthetic equity agreements was conflicted and flawed in part because the Five Executives wrongly received payouts at the December 31, 2014 valuation instead of the (lower) December 31, 2013 valuation as was in the termination agreements. PAF ¶¶ 91–95.

### 4. Citing an Expert Creates Disputed Materials Facts (Counts VII and IX).

GreatBanc cites the testimony of its expert Brown. GB Br. at 13–14. Brown's testimony has been rebutted by Plaintiffs' experts. PAF ¶ 183. Conflicting expert testimony creates disputed material facts. *See Godinez*, 2019 WL 5597190 at *2. Additionally, Brown's testimony about usual and customary practices is dubious. *See* § III.D.3.c. at p. 26, *supra*; *Bruister*, 54 F. Supp. 3d at 641. Brown's testimony conflicts with his writings on fiduciary oversight of executive compensation for ESOP companies. As Brown explains, trustees must carefully monitor activities of the board and management which impact value, such as executive compensation. PAF ¶¶ 185 (p. 61), 86 (p. 20). When evaluating economic impact on the ESOP, the trustee should consult with financial advisors, compensation consultants, attorneys, and accountants. PAF ¶ 185 (p. 61). Good corporate governance includes independent

board members who "control" the compensation committee. PAF ¶ 185 (pp. 61, 65) (compensation committee should have "only" independent directors); PAF ¶ 186 (p. 20 - when directors are conflicted on executive compensation, there is a compelling reason for independent directors). Compensation consultants should report directly to independent board members. *Id.* Further, the trustee should ensure that written performance incentive goals are established and are consistent with the company's business plans. *Id.* (p. 22). Brown also advises officers and directors against serving conflicting roles with the company. PAF ¶ 187. As Brown explains, ██████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ " *Id.* Instead, these multiple roles create "conflicts" "along with lack of oversight and accountability." *Id.* Indeed, Brown cites a "real-world" example, *Delta Star v. Patton*, where there were no outside or independent directors and the president awarded himself enormous salary, bonuses, and deferred compensation. *Id.* at 99. That's exactly what happened here. And as in *Delta Star*, Eilermann and Arri should be found liable under ERISA. The lack of oversight and accountability stem partly from GreatBanc's failure to condition the 2013 Recapitalization on good corporate governance and executive compensation oversight.

### 5. GreatBanc Breached ERISA § 405 (Count IX).

GreatBanc claims, without evidence, it is not liable as a co-fiduciary on the Excessive Compensation from 2013 to 2017. GB Br. at 14–15. But GreatBanc enabled the breaches of MS Capital, Eilermann, and Arri when it failed to protect the Plan from the excessive compensation, PAF ¶¶ 130–141, and failed to hire an independent compensation consultant on behalf of the Plan, PRF ¶ 97, and permitted a corporate governance structure without oversight or proper controls, as detailed above. Had GreatBanc prudently monitored and evaluated executive compensation, it would have seen how grossly excessive the compensation ranges were in the TRS reports. PRF ¶ 97. GreatBanc also knew of the breaches of MS Capital, Eilermann, and Arri and failed to make reasonable efforts

to remedy them, such as removing Eilermann and Arri as board members of MS Capital or filing a derivative suit to protect the Plan. PAF ¶¶ 131–32.

### 6. McBride Defendants Breached ERISA § 405 by Knowingly Participating in GreatBanc's and each other's Breaches (Counts IX and X).

Summary judgment must be denied regarding Counts IX and X if the Court denies summary judgment as to Counts VII and VIII. Additionally, summary judgment must be denied because McBride Defendants not only knew about GreatBanc's and each other's breaches, they actively participated in them. PAF ¶ 144.

### 7. The Plan Suffered Losses (Counts VII, VIII, IX, and X).

Eilermann and Arri caused losses to the Plan through their self-dealing, including (1) compensation paid to the Five Executives between 2013 and 2017, which exceeded the median comparable benchmarking data by a total of ██████ (PAF ¶ 103), (2) McBride's payment of the Five Executives' significant tax obligations in cashing out their synthetic equity (PAF ¶¶ 96–100); (3) illusory loan transactions between McBride and the Five Executives in which the Five Executives did not pay back the loans to McBride (PAF ¶¶ 97–98, 106); (4) payouts of the Five Executives' synthetic equity agreements that were structured to benefit the Five Executives and harm the Plan (PAF ¶¶ 91–95); and (5) the Five Executives receiving preferential distributions over the Plan (PAF ¶¶ 115–23). Assuming the 2013 Recapitalization is not reversed, had the excessive compensation paid to the Five Executives, along with the preferential distributions and loan forgiveness been distributed proportionally to the Units owners of MS Companies, LLC, the Plan could have received a total of $██████. PAF ¶ 123. The Plan is entitled to disgorgement of the excessive compensation and proportional distributions under 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3). *See* Dkt. 127 at ¶¶ 383; *see*

*also* ¶¶ 606–07, at pp. 148–51 (Prayer For Relief).[34] *See Leigh*, 727 F.2d at 122 ("ERISA expressly prohibits the use of assets for purposes other than the best interests of the beneficiaries, and the language of section 1109(a) providing for disgorgement of profits from improper use of trust assets is the appropriate remedy").

GreatBanc launches unfounded attacks on Plaintiffs' compensation expert, Kirkland (GB Br. at 15), but can't muster undisputed facts on damages. Kirkland is a compensation, tax, and financial consultant with a long record to support his expertise. *See* PAF ¶ 107. GreatBanc's claim that no damages exist is wrong. To the contrary, the evidence shows at least $███████ in excessive compensation paid to the Five Executives. PAF ¶¶105, 125.

### 8.    The ESOP's Equity was Diluted (Counts VII, VIII, IX, and X).

Plaintiffs' core equity dilution allegation has been consistent, yet apparently remains a mystery to Defendants. *See* MB Br. at 13 & GB Br. at 16. Eilermann and Arri created new B and C units of MS Companies, diluting the ESOP's interest in the McBride Enterprise and the fair market value of MS Capital stock.[35] The Plan's equity dilution occurred not directly through stock of *MS Capital*, but through the Plan's ownership of Class A Units of *MS Companies LLC* and the Five Executives'

---

[34] GreatBanc cites to *Fish, Mira, and Howell* for its claim that Plaintiffs have no damages. GB Br. at 15. But *Mira* is inapposite because there were no allegations or evidence of self-dealing and the individuals who sued were reimbursed of any economic damages. *See Mira*, 107 F.3d at 472–73 (7th Cir. 1997). *Fish* is inapposite because the court, in dicta, determined after a bench trial that the plaintiffs could not establish causation (not damages). *See Fish v. GreatBanc Tr. Co.*, No. 09-1668, 2016 WL 5923448, at *67 (N.D. Il. Sept. 1, 2016). And *Howell* is inapposite because the court did not dismiss the plaintiff's claim for lack of evidence of damages or even address the issue. *See Howell*, 633 F.3d at 565–73.

[35] GreatBanc claims Plaintiffs have "abandoned" their equity dilution allegations because discovery showed the Five Executives did not receive MS Capital distributions. GB Br. at 15. But the SAC alleges the Five Executives diluted the Plan's equity in McBride through Class B and C ownership units of MS Companies. *See e.g.,* Dkt. 127 at ¶ 6 ("From 2013 to 2017, Eilermann and Arri paid themselves, and other insiders, at least in various forms of compensation in addition to also awarding themselves further equity in the McBride Enterprise in the form of Class B Units and awarding other corporate insiders Class C Units of MS Companies, LLC. This had the effect of diluting the ESOP's ownership of the McBride Enterprise and suppressed the stock price of MS Capital"); *see also id.* at ¶¶ 160–203.

ownership of preferential ownership units, the Class B and C Units.[36] PRF ¶¶ 80, 85, 87–88.

The additional units were not purchased at fair market value through arm's length negotiation. PRF ¶89. Instead, each time additional units were offered[37] to the Five Executives from 2015 to 2017, the executives were given the units *along with additional cash compensation* to cover the income taxes on the receipt of the LLC value as income. *Id.*

Finally, as discussed above, from 2013 to 2017 the Plan's equity ownership in McBride decreased from ████████ despite Defendants' suggestion it increased. PRF ¶¶ 80, 85, 87–88.

## V. ON THE 2017 TRANSACTION, THE COURT SHOULD ENTER PARTIAL SUMMARY JUDGMENT FOR PLAINTIFFS AND DENY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT.

Plaintiffs allege GreatBanc caused and engaged in prohibited transactions (Count XI) and breached its fiduciary duties (Count XIII) and MS Capital engaged in prohibited transactions (Count XII) and breached its fiduciary duties (Count XIV). Plaintiffs also allege GreatBanc and MS Capital are liable as co-fiduciaries (Count XV).[38] Plaintiffs further allege MS Capital, Eilermann and Arri knowingly participated in the breaches of fiduciary duties and prohibited transactions in connection with the 2017 Transaction (Count XVI). Plaintiffs move for Partial Summary Judgment on Counts XI and XVI, while Defendants move for Summary Judgment on Counts XI through XVI.

### A. The Court Should Grant Partial Summary Judgment for Plaintiffs and against GreatBanc (Count XI).

Plaintiffs move for partial summary judgment on prohibited transaction claims against GreatBanc in Count XI. 29 U.S.C. § 1106(a)(1)(A) and (D). Plaintiffs must prove: (1) GreatBanc was a fiduciary with authority to cause the Plan to engage in the 2017 Transaction; (2) MS Capital, Arri and Eilermann

---

[36] Through the 2013 Recapitalization, the Plan owned ████ shares of MS Capital and MS Capital owned ████ Class A Units of MS Companies, LLC, a newly created limited liability company. Dkt. 127 at ¶ 137, PRF ¶ 70–74.

[37] Every time any Executive was offered shares of McBride, they purchased as many units as they possibly could, underscoring that Executives were purchasing well below any fair market price. PAF ¶ 160.

[38] The Court previously dismissed Eilermann and Arri from Counts XII, XIV, and XV. Dkt. 154 at 26.

were parties in interest to the Plan; (3) GreatBanc caused the Plan to sell stock to MS Capital as to § 406(a)(1)(A); and (4) GreatBanc caused a transaction which resulted in the use of Plan assets for the benefit of Eilermann and Arri as to § 406(a)(1)(D). *See* 29 U.S.C. § 1106(a)(1)(A) & (D). Because these elements are met, the Court should grant summary judgment on Plaintiffs' prima facie case under ERISA § 406(a)(1)(A) & (D) in Count XI.

### 1. GreatBanc was a fiduciary to the Plan with authority over its 2017 Transactions.

GreatBanc admits it was Trustee for the Plan at the time of the 2017 Transaction. *See* PAF ¶¶ 3, 4, 148. Arri retained GreatBanc to serve as trustee to evaluate and authorize the 2017 Transaction. PAF ¶ 146. GreatBanc had authority and control over the Plan's stock when it entered into the agreement that redeemed the Plan's shares of MS Capital. PRF ¶ 145.

### 2. MS Capital, Eilermann, and Arri were Parties in Interest.

MS Capital, Eilermann, and Arri were parties in interest to the Plan at the time of the 2017 Transaction. MS Capital was a party in interest to the Plan at the time of the 2017 Transaction pursuant to ERISA § 3(14)(A) & (C) because it was a fiduciary and employer. PAF ¶¶ 9–14. Eilermann and Arri were parties in interest because they were employees, officers, and the only directors of MS Capital. 29 U.S.C. § 1002(14)(H); PRF ¶¶ 9–10; PAF ¶ 23. Eilermann and Arri were also parties in interest because they were fiduciaries as the only people who could and did act on behalf of MS Capital, the named fiduciary of the Plan. 29 U.S.C. § 1002(14)(A); PAF ¶¶ 12–14, 23–24.

### 3. GreatBanc caused the Plan to sell its stock to MS Capital.

GreatBanc caused the Plan to engage in the 2017 Transaction when it signed, with Eilermann, the Redemption Agreement whereby the Plan sold its MS Capital stock to MS Capital, a party in interest. PRF ¶ 145. Plaintiffs therefore meet the third element of their Section 406(a)(1)(A) claim.

47

4. **GreatBanc caused the Plan to transfer assets to MS Capital and caused Plan assets to be used for the benefit of Eilermann, and Arri.**

GreatBanc caused the Plan to engage in the 2017 Transaction, which transferred property of the Plan—stock in MS Capital—to MS Capital, a violation of § 406(a)(1)(D). PRF ¶ 145. Eilermann and Arri benefitted from the 2017 Transaction because they had outstanding subscription agreements to purchase the MS Capital stock from the company and immediately after the 2017 Transaction became the sole owners of MS Capital stock. PRF ¶ 149. *See. Wallis*, 77 F. Supp. 3d at 745 (fiduciary violated Section 406(a)(1)(D) by directing that plan assets be used for the benefit of party in interest rather than for plan participants and their beneficiaries). Further, the transaction was a sweetheart insider deal as explained below. *See* § V.C.2. at p. 52, *infra*.

B. **The Court Should Grant Partial Summary Judgment for Plaintiffs and against MS Capital, Eilermann, and Arri (Count XVI).**

As detailed immediately above, Plaintiffs have proved two elements of the Count XVI knowing participation claim: (1) a § 406(a)(1)(D) prohibited transaction occurred (*see* § V.A. at p. 46, *supra*) and (2) the party in interest status of Eilermann and Arri with respect to the 2017 Transaction (*see* § V.A.2. at p. 47, *supra*). The Court should grant partial summary judgment on those elements.

C. **The Court Should Deny GreatBanc Summary Judgment on the 2017 Transaction Claims (Counts XI, XIII, and XV).**

Despite its assertions otherwise (GB Br. at 16), most of the facts cited by GreatBanc related to the 2017 Transaction are disputed. *See* PRF ¶¶ 112–48.

1. **There are Genuine Disputed Material Facts Over the § 408(e) Adequate Consideration Affirmative Defense (Count XI).**

GreatBanc moves for summary judgment on Plaintiffs' §§ 406(a)(1)(A), 406(a)(1)(D), and 406(b)(2) claims in Count XI. GB Br. at 20–21. GreatBanc does not argue Plaintiffs fail to prove their § 406(a) claims. *See* § V.A. at p. 46, *supra*. Instead, it argues the § 408(e) "adequate consideration" defense applies. GreatBanc has a "heavy burden" to prove the defense (*see Reliance Tr. Co.*, 2021 WL

48

795270, at *32) and there are genuine disputed material facts as to whether (1) the Plan received below fair market value for its MS Capital stock and (2) GreatBanc acted in good faith. *Fish*, 749 F.3d at 680. Further, § 408(e) does not exempt claims under ERISA § 406(b). *See* § II.B.1.d. at p. 7, *supra*.

As to adequate consideration, there are a host of disputed material facts and conflicting expert opinions on whether the Plan sold its stock for less than fair market value. First, the methods used by Stern Brothers during 2014–2017 were unreliable in numerous ways, as detailed below, such that GreatBanc should have questioned Stern Brothers' methods for the 2017 Transaction.

**(1)** McBride consistently low-balled financial projections, benefitting the Five Executives who acquired equity on the cheap during 2014–2017. Stern Brothers' valuation reports in this period do not explain why it accepted low-ball projections given McBride was the dominant homebuilder in St. Louis, which GreatBanc and Stern Brothers knew. PRF ¶ 142.

**(2)** During 2014–2017, Stern Brothers selected arbitrary valuation multiples in the Guideline Public Company Method ("GPC"). It provided not quantitative basis for selection. The discount to comparable companies changed from year-to-year without explanation, method, and pattern. The discounts were extreme, with no explanation provided. PRF ¶ 142.

**(3)** Stern Brothers valuations failed to include any comparable sales data from the GPC set, although that information was publicly available. PRF ¶ 142.

**(4)** Due to the excessive compensation paid to the Five Executives, Stern Brothers' valuation methodology during 2014–2017 was unreliable because the metrics did not account for the effect of excessive executive compensation. GreatBanc did not notice that all the metrics were gross of executive compensation, let alone question the metrics. PRF ¶ 142

**(5)** During 2014–2017, the valuation multiples selected by Stern Brothers for the terminal value calculation under the DCF were arbitrary, with no quantitative reason offered for selection. PRF ¶ 142. The terminal value sales multiple was below the lowest value in the comparable set every year

49

and in many cases was less than half the mean or median of the set. PRF ¶ 142.

Second, the methods used by Stern Brothers for the 2017 Transaction suffered from many of the same deficiencies and more.

**(1)** Stern Brothers ignored merger comparables, despite the contemplated change of control. PRF ¶ 142.

**(2)** Given the nature of the assets (mainly real estate) on the balance sheets of M&S Capital as of the 2017 Valuation Date, there is no reason to believe the Fair Market Values of those assets were substantially less than stated book value. PRF ¶ 142. GreatBanc and Stern Brothers should have considered the book value of M&S Capital when determining the Fair Market Value of the common stock of M&S Capital (PRF ¶ 142) because the indications of value provided by Stern Brothers were approximately ▓▓ of the book value of the equity owned by the Plan (PAF ¶ 152–55).

**(3)** The projections used by Stern Brothers for the 2017 Transaction include a $▓▓ million annual "incentive compensation expense". *This expense accounts for approximatel*▓▓ *of the projected operating income and substantially contributes to the* ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ PRF ¶ 142.

**(4)** Stern Brothers did not make normalizing adjustments for excessive officer compensation, effectively converting the purported controlling interest value of M&S Capital common stock to a noncontrolling value. Stern Brothers applied a ▓▓▓▓▓▓▓ which converted the noncontrolling value into a noncontrolling, nonmarketable value. But the stated purpose of the 2017 M&S Capital Opinion Letter was to value the common stock of M&S Capital on a control basis. Stern Brothers, however, valued the stock on a noncontrolling, nonmarketable basis, substantially understating its value. PRF ¶ 142.

**(5)** Stern Brothers' failure to make appropriate normalizing compensation adjustments to the historical and projected financial statements of the company for the GPC method also made that

50

conclusion of value deeply flawed. The selection of low GPC multiples is apparently based on the lower profit margins when compared to the GPCs, but those ███████████ were primarily due to excessive officer compensation. Stern Brothers rationalized selecting multiples substantially below the low end of the range of multiples observed for the GPCs due to the ████████████████. In other words, Stern Brothers applied artificially low multiples to artificially low measurements of earnings, resulting in a substantially understated value of the common stock of M&S Capital. The selected multiples have little relationship to the multiples reported by the GPCs. Failing to make appropriate normalizing adjustments and arbitrary selection of valuation multiples below the low end of the range of GPC multiples are red flags that would cause a hypothetical prudent person to conclude the 2017 M&S Capital Opinion Letter was unreliable. PRF ¶ 142.

**(6)** Stern Brothers failed to adjust the indications of value provided by the GPC and DCF methods with a control premium despite that (1) the indications of value under both methods were on a noncontrolling basis and (2) the stated objective of the analysis was to value the common stock on a control basis. PRF ¶ 142.

**(7)** The ESOP received below fair market value for its MS Capital stock, resulting in between $██████████████████████ PAF ¶¶ 177–80.

There were also clear indications that should have put GreatBanc on notice that the price was below fair market value: (1) Texas Capital Bank concluded McBride had a "Tangible Net Worth" of $████████. PAF ¶ 156; (2) The ESOP received less than the amount of its █████████████ ██████████. PAF ¶ 157; (3) The Five Executives never turned down an opportunity to get more ownership in McBride, including as part of the 2017 Transaction. PAF ¶ 160; *see also id.* at ¶ 158 ████ ███████████████████████████████████████████████████), ¶¶ 161–62.

As to good faith, GreatBanc's process was deeply flawed as discussed below with regard to GreatBanc's breach of prudence under ERISA § 404. *See* § V.C.3. at p. 52, *infra.*

**2.     There are Genuine Disputed Material Facts Over GreatBanc's § 406(b) Violations.**

As to Plaintiffs' § 406(b)(2) claim, Eilermann and Arri devised the 2017 Transaction so they could buy McBride at a price they depressed by projecting years of excessive compensation. Eilermann put it best in an email he sent to several friends on October 13, 2017, boasting █████████████ ███████████████████████████████████████████████████████████████ ███████████████   PRF ¶ 115. Numerous facts show GreatBanc acted to benefit MS Capital, Eilermann, and Arri in the 2017 Transaction: (1) Eilermann and Arri were the ultimately beneficiaries of the 2017 Transaction because they would own MS Capital immediately after the transfer. PRF ¶ 149; (2) They benefitted from the sale of MS Capital stock well below fair market value. PRF ¶ 142; (3) Eilermann and Arri controlled and pushed for an accelerated timeline to close the 2017 Transaction in part to save on fees they were paying to Butcher Joseph. PRF ¶ 115; (4) Eilermann and Arri prevented soliciting third party bids by limiting GreatBanc's engagement. PRF ¶ 115; (5) The goal of the 2017 Transaction was to get Eilermann to ███████ ownership of McBride. PRF ¶ 115; (6) Eilermann and Arri did not evaluate any alternative structures for the 2017 Transaction. PRF ¶ 115; and (7) Eilermann did not want to seek third party bids for McBride because it would be "extremely difficult" for him to work for someone else. PRF ¶ 115.[39] *See also* § V.A.4. at p. 48, *infra*.

**3.     GreatBanc Breached ERISA §§ 404 and 405 (Counts XIII and XV).**

GreatBanc cannot win summary judgment on Plaintiffs' breach of loyalty claim because GreatBanc did nothing to ensure this ███████████████ for Eilermann was in the best interest of the Plan. For the reasons stated in § V.C.1. at p. 48, *supra*, disputed facts on adequate consideration, and § V.C.2. at p. 52, *supra*, showing the 2017 Transaction benefited Eilermann and Arri, the Court

---

[39] GreatBanc's argument that a participant vote in favor of the transaction helps to prove fair market value is wrong for the reasons explained in § VII.A. at p. 60, *infra*, and also there is a genuine dispute about the vote. *See* PRF ¶¶ 135–140.

should deny summary judgment as to Plaintiffs' breach of loyalty claim.

As for Plaintiffs' prudence claim, there is ample evidence of GreatBanc's flawed process: (1) the "diligence" materials included a false "story" that McBride was ████████ (PRF ¶¶ 113, 126); (2) GreatBanc failed to get a check on price by taking the company to market, an important due diligence item in an insider buy-out (PRF ¶¶ 127, 188 (p. 7 - trustee should consider soliciting outside offers when the ESOP has a controlling interest in the company); (3) no investment bank was hired for the benefit of the Plan (PRF ¶ 126); (4) MVA's legal memo was a sloppy cut-and-paste job full of information about a different client's transaction, but GreatBanc didn't notice this obvious error (PRF ¶ 126); (5) the "diligence" period was so compressed participants were not told of the ████ price per share at the employee meeting[40] (PRF ¶ 126); (6) neither GreatBanc nor Stern Brothers investigated the basis for a $████████ "miscellaneous" expense item that was ████ percent of projected cash flows (PAF ¶ 150); (7) GreatBanc failed to consider whether the company's liquidation or book value exceeded the going concern value estimated by Stern Brothers so that it could have sufficient information to negotiate the sales price (PAF ¶¶ 152–55, 188 (p. 8); and (8) GreatBanc knew there were no independent directors to run the sales process (PAF ¶¶ 25, 143) (GreatBanc's expert Brown recognizing that ████████████████████████████████████████████████████████

### 4. Citing an Expert Creates Disputed Materials Facts (Counts XI, XIII, and XV).

GreatBanc cites the testimony of its experts Brown and Risius. GB Br. at 19–21. However, this testimony is rebutted by Plaintiffs' experts. PAF ¶ 183. Conflicting expert testimony creates disputed material facts. *See Godinez,* 2019 WL 5597190 at *2. Additionally, Brown's testimony about usual and customary practices is dubious. *See* § III.D.3.c. at p. 26, *supra*; *Bruister,* 54 F. Supp. 3d at 641.

---

[40] *See* e.g., *Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp. 2d 915, 937 (N.D. Il. 1998) ("[i]t is well established that independent valuation is not obtained by fixing a price, as in the Aetna May 5, 1992 board resolution, and then obtaining appraisals in confirmation of that price. A prudent investigation must precede, not follow, the valuation of an ESOP asset").

**D.** **The Court Should Deny McBride Defendants Summary Judgment on the 2017 Transaction Claims (Counts XII, XIV, XV, and XVI).**

      **1.** **<u>MS Capital was a Fiduciary with Respect to the 2017 Redemption (Counts XII, XIV, and XV).</u>**

McBride Defendants argue MS Capital was not a fiduciary for the 2017 Transaction. Wrong. First, MS Capital was the named fiduciary and plan administrator of the Plan at the time of the 2017 Transaction. PAF ¶¶ 9–14. Because a fiduciary named in the plan document possesses inherent discretionary responsibility concerning the plan, it must comply with its fiduciary responsibilities even in circumstances where it does not exercise those powers. *See Chao*, 649 F. Supp. 2d at 836; *Bruister*, 823 F.3d at 259–60. MS Capital also had discretion over management of the Plan and its assets as part of the 2017 Transaction. Eilermann, on behalf of MS Capital, signed the Redemption Agreement which had the clear effect of redeeming the shares of MS Capital from the Plan. PRF ¶ 145. Arri, on behalf of MS Capital, engaged GreatBanc as trustee for the transaction. PAF ¶ 146. MS Capital therefore had the ability to remove GreatBanc as trustee through the 2017 Transaction, demonstrating authority and control over it. PAF ¶¶ 19, 165. Arri, the Rule 30(b)(6) witness for MS Capital, acknowledged this authority and control when he testified that he and Eilermann had the discretion to stop the 2017 Transaction if they wanted to. PAF ¶ 19, 145. Further, Eilermann, on behalf of MS Capital, and Arri, on behalf of MS Capital, signed each other's subscription agreements as part of the 2017 Transaction, demonstrating control over the Plan's assets. PAF ¶ 147. MS Capital's motion for summary judgment on Counts XII, XIV, and XV should be denied.

      **2.** **<u>MS Capital Breached ERISA §§ 404 and 405 and Committed Prohibited Transactions in Violation of ERISA § 406 (Counts XII, XIV, and XV).</u>**

McBride Defendants' defense to Counts XII, XIV, and XV is incorporating pages 11 to 20 of GreatBanc's brief. MB Br. at 16 n.7. For the reasons stated above in (1) § V.A. at p. 46, *supra*, (2) § V.B. at p. 48, *supra*, and (3) § V.C. at p. 48, *supra*, as to GreatBanc, McBride Defendants' motion must

be denied.[41]

### 3. There are Genuine Disputed Material Facts regarding whether MS Capital, Eilermann, and Arri Knowingly Participated in ERISA Violations with Respect to the 2017 Transaction (Count XVI).

MS Capital, Eilermann, and Arri knowingly participated in the breaches of GreatBanc and MS Capital in the 2017 Transaction. Eilermann and Arri were parties in interest. *See* § V.A.2. at p. 47, *supra*. Neither GreatBanc nor MS Capital is entitled to summary judgment related to the 2017 Transaction. *See* § V.B. at p. 48 *supra* and § V.D.2. at p. 54, *supra* (where McBride Defendants adopt GreatBanc arguments in total).

In opposing Count XVI, McBride Defendants argue Plaintiffs must prove "the nonfiduciary defendants acted in bad faith or had actual or constructive notice of the circumstances that rendered the transaction unlawful" and there is a "presumption of good faith" where the consideration paid was "more than nominal." MB Br. at 16–17.[42] Hogwash. *Harris Trust*, 530 U.S. 238, not an unpublished, out-of-circuit district court decision, controls. *Harris Trust* requires proof the parties in interest knew or should have known the facts that gave rise to the ERISA violations, not that they knew there was an ERISA violation. There is no requirement of "bad faith" and there is no presumption of "good faith." Rather, Plaintiffs need only show the parties in interest had knowledge of the details of the transaction. *Neil*, 753 F. Supp. 2d at 731; *see also Haley v. TIAA*, 377 F. Supp. 2d 250, 261 (S.D.N.Y. 2019) ("nothing in *Harris* requires the … non-fiduciary transferee to [know] … the transaction violated ERISA"). There is no scienter requirement. *Neil*, 753 F. Supp. 2d at 731.[43]

---

[41] Plaintiffs assume that the reference to GreatBanc's brief should have been pages 16 to 21 because GreatBanc made no arguments about the 2017 Transaction before page 16 of their brief.

[42] Like Defendants' "operating company" defense, the "bonafide purchase" defense was not included in their pleadings or explored in discovery and therefore should be waived. *See Sheahan* 526 F.3d at 979.

[43] Unlike here, in *Harris Trust* the party in interest was not an "original wrongdoer." Here, however, the 2017 Transaction was designed and orchestrated by Eilermann and Arri and intended for their benefit. PRF ¶ 115. Indeed, Eilermann and Arri supplied the projections that allowed them to buy the company at far less than fair market value. PRF ¶ 142; PAF ¶ 150.

This Court already decided this issue here:

> On the question of knowledge of the fiduciary breach, the plaintiffs have alleged that the defendants in count 3 had knowledge of the following with respect to the 2017 stock sale: (1) MS Capital executed the 2017 sale; (2) it approved a sale price without first obtaining an independent valuation, which was a breach of fiduciary duty under section 404 of ERISA; and (3) the sale was a prohibited transaction under section 406 of ERISA. Knowledge of these facts constitutes "knowledge of the circumstances that rendered the transaction unlawful" under ERISA. *See* Harris Trust, 530 U.S. at 251.

Dkt. 74 at 16–17.

Further, the record abounds with disputed material facts about McBride Defendants' knowledge of GreatBanc's violations. Eilermann and Arri were not innocent bystanders or laypersons with little understanding of the business or corporate finance. Among other things, Eilermann and Arri knew: (1) GreatBanc did not go to the market to price the Plan's shares because Eilermann and Arri prevented it from doing so. PRF ¶ 127; (2) ████████████████████████████████████████ ████████████████████████████████████████████████████ PAF ¶ 157; ████████████ ████████████████████████████████████████ PAF ¶¶ 152–54; (4) ███████████████ ████████████████████████████████████████████████████. PRF ¶ 142; (5) ████████████████████████████████. PRF ¶ 113; (6) McBride was in no danger of running out of available lots for development— ████████████████ ████████████████████████. PRF ¶ 113; (7) ████████████████████████ ████████████████████████████████████████████████████ ████████. PRF ¶ 115; (8) Doing the transaction at ████████████████████████████ Eilermann and Arri. PRF ¶ 115; and (9) Stern Brothers' historic valuations were so low ████████████

---

[44] The historic valuations grossly understated value for the reasons explained in § V.C.1. at p. 48, *supra*. A premium on a bogus value is unreliable in any event.

██████████████████████████████████████████████████ PAF ¶ 160; *see also* PAF ¶ 163. All facts point to the conclusion that Eilermann and Arri knew $██ per share was below fair market value. Defendants have no evidence the Chief Financial and Executive Officers did not recognize these facts and appreciate their significance.

Defendants misrepresent the import of the *Hans* case, their best authority, as explained by subsequent decisions. In *Spear v. Fenkell,* the Eastern District of Pennsylvania considered *Hans* and noted "[t]he Supreme Court has relied on the Restatements to provide insight into equitable principles at play under ERISA. At common law, the bona fide transferor defense required 1) an exchange for value 2) a lack of knowledge of a breach of trust and 3) abstention from knowing participation in an illegal transaction." *Spear,* 2016 WL 5661720, at *40) (internal quotations omitted). Defendants must prove lack of knowledge, but any "difference in value … may be evidence that the transferee had notice that the transferor was committing a breach of trust in making the transfer." *Id.* As discussed above, there are numerous facts showing Eilermann and Arri knew they paid less than fair market value. Moreover, *Harris Trust, supra,* and *Neil, supra,* are, respectively, controlling and more compelling authorities.

## VI. ON THE FAILURE TO MONITOR GREATBANC, THE COURT SHOULD ENTER PARTIAL SUMMARY JUDGMENT FOR PLAINTIFFS AND DENY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT.

McBride Defendants seek summary judgment on Plaintiffs' duty to monitor claim, but this case bears no resemblance to their cited authority, *Fish v. GreatBanc Tr. Co.,* 2016 WL 5923448, at *49 (N.D. Il. Sept. 1, 2016).[45]

First, *Fish* was decided following a 34-day trial, not at summary judgment. *Id.* at *1.

Second, in *Fish,* the company's board "was comprised of 5 outside directors, 2 members of management, and 5 employee-owners elected by staff." *Id.* at *3. Here, the Board consisted of

---

[45] The McBride Defendants do not dispute their fiduciary status to monitor GreatBanc.

57

Eilermann and Arri, they never had meetings, let alone kept minutes, and had sole authority to appoint and remove GreatBanc as Trustee. PAF ¶¶ 164–68, 177.

Third, in one of the directors left her position on the Board to take on a full-time role as a liaison between the Company and GreatBanc, a role the court found she did "to the best of her ability." *Fish*, 2016 WL 5923448, at * 54. Here, there were no safeguards to ensure GreatBanc would perform its fiduciary obligations prudently and loyally and ensure the Plan received adequate consideration in the 2013 Recapitalization and the 2017 Transaction—McBride Defendants never appointed a "liaison" to GreatBanc.

Fourth, the individual defendants' level of monitoring in *Fish* went far beyond what happened here. GreatBanc "held telephonic meetings with members of management and management's legal and financial advisors; and had extensive email communications with management and management's legal and financial advisors." *Fish*, 2016 WL 5923448 at *61. The *Fish* court describes the extent of the *Fish* defendants' oversight:

> [T]he management team presented the Board with a written and verbal report about GreatBanc's negotiating positions and GreatBanc's financial and analytical rationales supporting its position (which at the time was that the Transaction was not fair to the ESOP). Moreover, Antioch's Board supplemented this monitoring by utilizing members of Antioch's management team as contact points with GreatBanc.

*Id.* at *52. "[B]ased on the presentation regarding the parties' negotiating positions, [the Antioch board members] felt that they were fully informed and understood the positions that GreatBanc was taking on behalf of the ESOP." *Id.* at *10. In contrast, here, as discussed in § V.C.3. at p. 52, *supra*, the processes were woefully deficient as Eilermann and Arri dictated the terms and consideration.

Fifth, the *Fish* plaintiffs' duty to monitor claim alleged only that GreatBanc did not receive information it needed, but the court concluded the missing information would not have impacted price. *Fish*, 2016 WL 5923448 at 55–56. Here, in contrast, Plaintiffs' claim is not that GreatBanc did not receive adequate information by the McBride Defendants (although the projections were highly

dubious), but that McBride Defendants should have aggressively monitored GreatBanc because (i) it was imprudent and disloyal to the ESOP in the 2013 Recapitalization and Loss of Value period; (ii) it was repeatedly sued by other ERISA participants and the DOL for failures under ERISA; PAF ¶ 170; (iii) it entered into a settlement agreement with the DOL in 2014 for its misconduct as ESOP trustee; PAF ¶ 171–76; and (iv) in response to learning about a GreatBanc lawsuit said ████████ ███████████████████████████████████████████████████████████████ PAF ¶ 168.

McBride Defendants do not address these facts.[46]

## VII.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON CERTAIN OF DEFENDANTS' AFFIRMATIVE DEFENSES.

### A.  The Court Should Grant Summary Judgment on Putative Affirmative Defenses Based upon the Participants' Vote on the 2017 Transaction.

Defendants raise waiver (GreatBanc's Fifth and McBride Defendants' Sixth Affirmative Defenses), estoppel (All Defendants' Sixth Affirmative Defenses), and ratification, acquiescence and/or consent (All Defendants' Seventh Affirmative Defenses) as defenses.[47] Dkt. 163 at pp. 221–22; Dkt. 129 at pp. 110–11). These defenses are premised on some class members voting in favor of the 2017 Transaction. The Court should enter summary judgment against these defenses.

**First,** it is undisputed the named Plaintiffs did not vote to approve the 2017 Transaction. The named Plaintiffs sued, *not* the absentee class members who voted on the 2017 Transaction. Plaintiffs did not do anything to consent, ratify, acquiesce, or waive their claims. Affirmative defenses that could theoretically be asserted against absentee class members are irrelevant to Plaintiffs' claims. *Brundle I*, 2016 WL 6542718, at *16.

---

[46] The other case law McBride offers on its duty to monitor claim is readily distinguishable. *See Newton v. Van Otterloo*, 756 F. Supp. 1121 (N.D. Ind. 1991) (no duty to monitor breach solely by virtue of a conflict of interest between a superior and employee); *Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861, 882 (N.D. Il. 2009), aff'd sub nom. *Howell*, 633 F.3d 552 (no duty to monitor breach because appointed fiduciaries served only on one year terms, was subject to monitoring by independent auditing team, and the duty did not otherwise extend to monitoring individual investments selected by appointed fiduciary).

[47] Unlike GreatBanc, the McBride Defendants do not assert an acquiescence defense.

**Second,** Plaintiffs sued under ERISA § 502(a)(2)-(3), 29 U.S.C. § 1132(a)(2)-(3), meaning they do not seek individual relief but, rather, restitution of the Plan's losses and disgorgement to the Plan of ill-gotten gains received by the Defendants, and other appropriate equitable relief.[48] As a matter of law, plan participants cannot waive a plan's claims, which a participant may pursue even if she signed a waiver of her own claims. *See Bowles v. Reade*, 198 F.3d 752, 759–60 (9th Cir. 1999) (holding the plaintiff's § 502(a)(2) and (a)(3) claims on behalf of the plans for relief for the plans and their participants were unaffected by her release); *Loomis v. Exelon Corp.*, No. 06-4900, 2007 WL 2060799, at *6 (N.D. Il. June 26, 2007) (citing *Bowles*, holding "releases that participants may have signed with respect to their own claims could not release claims they might bring on behalf of the Plan"); *see also Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 161 (S.D.N.Y. 2017) ("In cases brought on behalf of a plan, most courts have held that 'individuals do not have the authority to release a defined contribution plan's right to recover for breaches of fiduciary duty'; the consent of the plan is required for a release of 29 U.S.C. § 1132(a)(2) claims."). If they cannot waive a claim for relief to a plan, absentee class members certainly cannot waive named plaintiffs' right to seek relief to a plan.

**Third,** Defendants make up a nonexistent affirmative defense to Plaintiffs' Counts XI, XII and XVI prohibited transactions claims. Defendants couch their 2017 vote defense under various theories (waiver, estoppel, ratification, acquiescence and consent), but that is not a defense under ERISA § 408, and any such defense conflicts with the *per se* nature of ERISA's prohibited transaction protections. A fiduciary that causes a prohibited stock deal that it negotiated and authorized simply cannot escape liability by saying some of the participants voted their allocated shares in favor of it.[49] Nor may a fiduciary attempt an "end-run" around the stringent ERISA § 408(e) adequate consideration

---

[48] Should the Plan recover its losses it will allocate them in accordance with the written instruments governing the Plan and participants will receive *pro rata* allocations. *See, e.g., Bruister*, 823 F.3d at 258; 29 U.S.C. §§ 1102(a)(1), 1102(b)(4), 1104(a)(1)(D), 1132(a)(1)(B).

[49] Here, GreatBanc and MS Capital signed the relevant ESOP Redemption Agreement and agreed to the purchase price of ███ per share. PRF ¶ 145.

60

affirmative defense by putting a sale of plan stock for less than fair market value to a vote of lay participants. Defendants' proposed defense would require the Court to ignore the § 408 requirements for the exemption (*see* § II.B.1.d. at p. 7, *supra*), which it cannot do.

As a policy matter, to allow trustees to escape liability to a plan by "pointing the finger" at plan participants would eviscerate ERISA's "remedial scheme designed to protect the retirement security of plan participants and beneficiaries." *Wood v. Commissioner*, 955 F.2d 908, 914 (4th Cir. 1992). Moreover, the participants are unsophisticated laypersons, not financial experts. *See Chesemore*, 886 F. Supp. 2d at 1041 ("duty of care [under] § 404(a)(1)(B) requires ERISA fiduciaries to act in good faith as an objectively prudent fiduciary would act, not simply as a prudent layperson would act"), citing *Eyler*, 88 F.3d at 454. Plan participants do not act in a "like capacity" as a fiduciary trustee, nor are they "familiar with such matters" of stock valuation and due diligence as a GreatBanc should be. The participant vote is irrelevant to the question of whether GreatBanc met ERISA's fiduciary standard. The Court should reject the defense as a matter of law and grant summary judgment on the 2017 vote defenses with respect to the Counts XI, XII and XVI prohibited transactions claims.

**Fourth,** Plaintiffs should be granted summary judgment on the defense because Defendants have not adduced evidence showing Plan participants were provided the same or similar information available to GreatBanc and MS Capital (*compare* DSOF ¶ 136 *with* DSOF ¶¶ 121, 122, 127, 133) in order to make an informed decision with respect to the 2017 ESOP Transaction. Waivers that are not made "knowingly and voluntarily" are not valid. *Howell*, 633 F.3d at 559; *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 570–72 (7th Cir. 1995). For all these reasons, the Court should grant summary judgment on the "vote" defense.

**B.    The Court Should Grant Summary Judgment on the McBride Defendants' Eighth Affirmative Defense (Waiver & Release).**

McBride Defendants' Eighth Affirmative Defense of "Waiver and Release" is baseless. Dkt. 129 at p. 111. McBride Defendants failed to produce any evidence showing that there is a genuine issue of

material fact—or, indeed, any evidence at all—that either Plaintiff waived or released their claims. *See Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) ("A party that does not bear the burden of persuasion may move for summary judgment 'by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'") quoting *Celotex*, 477 U.S. at 325. Whether absent class members waived or released their claims is simply irrelevant to affirmative defenses asserted against the Plaintiffs. *See Brundle I*, 2016 WL 6542718, at *16 (granting summary judgment to ESOP participant against affirmative defenses of waiver and release where the defendant sought only to preserve the defense against other future class members). McBride Defendants admit this defense does not apply to Plaintiffs by arguing Plaintiffs could not represent a class because they did *not* sign releases that some other class members signed. Dkt. 166 at 14. Summary judgment therefore should be granted on the McBride Defendants' Eighth Affirmative Defense.


## VIII. CONCLUSION

For the reasons stated above, Plaintiffs' Partial Motions for Summary Judgment, against the McBride and GreatBanc Defendants, should be granted, and Defendants' Motions for Summary Judgment should be denied.

Dated: January 14, 2022           Respectfully submitted,


By: */s/ Mark G. Boyko*

Mark G. Boyko (IL #6288036)
mboyko@baileyglasser.com
Bailey & Glasser LLP
34 N. Gore Ave. – Suite 102
Webster Groves, MO 63119
Telephone: (314) 863-5446
Facsimile: (314)-863-5483

Patrick O. Muench (IL #6290298)
pmuench@baileyglasser.com
Bailey & Glasser LLP

318 W. Adams St., Ste. 1606
Chicago, IL 60606
Telephone: (312) 500-8680
Facsimile: (202) 463-2103

Ryan T. Jenny
rjenny@baileyglasser.com
Gregory Y. Porter (admitted *pro hac vice*)
gporter@baileyglasser.com
Bailey & Glasser LLP
1055 Thomas Jefferson St., NW, Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103

Thomas E. Clark Jr. (IL #6294921)
tclark@wagnerlawgroup.com
Jordan D. Mamorsky (IL #6337130)
jmamorsky@wagnerlawgroup.com
The Wagner Law Group, PC
190 South LaSalle Street, Suite 2100
Chicago, IL 60603
Telephone: (314) 236-0065
Facsimile: (314) 236-5743

*Attorneys for Plaintiffs*