## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GREGORY GODFREY, et al.,

     Plaintiffs,

v.

GREATBANC TRUST COMPANY, et al.,

     Defendants.

Case No. 1:18-cv-07918

Judge Matthew F. Kennelly

Magistrate Judge Michael T. Mason

---

## PLAINTIFFS' COMBINED STATEMENT OF ADDITIONAL MATERAL FACTS AND STATEMENT OF MATERIAL FACTS

   Pursuant to FRCP 56, LR 56.1(b)(3), LR 56.1(a)(2), and LR 56.1(e), Plaintiffs Gregory Godfrey ("**Godfrey**"), Jeffrey Sheldon ("**Sheldon**"), and Debra Ann Kopinski ("**Kopinski**") hereby submit their Combined (1) Statement of Additional Material Facts in Response to Defendants' Joint Statement of Material Facts (Dkt. 258-4) and (2) Statement of Material Facts in Support of Their Cross-Motions for Partial Summary Judgment (filed concurrently).[1]

---

[1] The Defendants in this case are McBride & Son Capital, Inc. ("**MS Capital**"), McBride & Son Management Company, LLC ("**MS Management**"), John F. Eilermann, Jr. ("**Eilermann**"), Michael D. Arri ("**Arri**") (collectively the "**McBride Defendants**"), and GreatBanc Trust Company ("**GreatBanc**"). Eilermann, Arri, Jeffrey Schindler ("**Schindler**"), Jeffrey Berger ("**Berger**"), and Jeffrey Todt ("**Todt**") collectively will be referred to as the "**Five Executives.**" "**McBride**" or "**Company**" refers to the McBride & Son conglomerate of subsidiaries and assets that for the time-period at issue in this case were owned by McBride & Son Companies, Inc. ("**MS Companies, Inc.**") and then through a combination of ownership by MS Capital and McBride & Son Companies, LLC ("**MS Companies, LLC**"). The McBride & Son Employee Stock Ownership Plan will be referred to as the "**ESOP**" or the "**Plan**").

References to Defendants' Joint Statement of Material Facts (Dkt. 258-4) will be noted as "**DSOF ¶ [#].**" Plaintiffs' Response to Defendants' Joint Statement of Material Facts (filed concurrently) will be noted as "**PRF ¶ [#].**" References to facts in this document will be noted as "**PAF ¶ [#].**" Plaintiffs' exhibits will be referenced as "**PE.**" Defendants' use of "Ex." has been substituted with "**DE**" for clarity.

## I.  BACKGROUND

### A.  The ESOP

| | |
|---|---|
| **1.** | The Summary Plan Description for the ESOP stated:<br><br>"The ESOP is designed to provide a beneficial ownership interest in Company Stock for employees — the people who are primarily responsible for the success of the Company. The ESOP is intended to provide Company employees with a meaningful stake in the Company, future economic security, and ultimately, an additional source of retirement income. This means that you have a unique opportunity to acquire an interest in Company Stock at no direct cost to you.<br><br>The success of the Company depends on the teamwork and performance of all employees. At every level of job responsibility, the efforts and devotion of many individuals have created the Company's success and will continue to help the Company remain successful. Providing employee ownership is an especially important way to recognize your contribution to the Company's success.<br><br>No one has a stronger interest in caring for and promoting a company's success than the people who benefit from its growth. That's the whole idea behind the ESOP-as a beneficial owner, you can see the mutual benefit of doing your best. With beneficial ownership you also have a special responsibility to your fellow owners and the Company. Hard work, good decisions and being good stewards of the company's resources are the ways employees can help to increase the value of the Company Stock." **DE 3** - Summary Plan Description 2007 - STERN0004518 at STERN0004523; **PE 96** - Summary Plan Description 2017 - MS_0006524 at MS_0006530 (same). |

| | |
|---|---|
| **2.** | A document created by McBride entitled "The Great Housing Bust: Lessons Learned" stated:<br><br><br><br>**PE 37** - The Great Housing Bust: Lessons Learned - MS_0036072 at MS_0036093. |

## B. GreatBanc

| 3. | As trustee to the ESOP, GreatBanc was a fiduciary under ERISA according to the governing plan documents. **PE 2** - GreatBanc's Answer to SAC (**Dkt. 163**) - at ¶ 36 ("GreatBanc admits that it was the Trustee for the Plan from on or about December 28, 2001 through the 2017 Transaction"); **DSOF ¶ 12**; **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006409 (§ 2.27 - the trustee is a fiduciary).<br><br>GreatBanc was at all relevant times a service provider to the ESOP. *See* **DE 17** - December 28, 2001 GreatBanc Successor Trustee Engagement Agreement - GBT_0024951 at GBT_0024951 (§1 "Appointment of Trustee"); **DE 38** - December 16, 2013 First Amendment to GreatBanc Successor Trustee Engagement Agreement - GBT_0024942 at GBT_0024942 (§1 "Appointment of Trustee"). |
|---|---|

| 4. | "GreatBanc admits that it was the Trustee for the Plan from on or about December 28, 2001 through the 2017 Transaction. GreatBanc admits that the extent of its services and fiduciary responsibilities are outlined in the Employee Stock Ownership Plan and Trust Agreements and GreatBanc's Engagement Agreements and their corresponding amendments, as well as ERISA…" **PE 2** - GreatBanc's Answer to SAC (**Dkt. 163**) - at ¶ 36. |
|---|---|

## C. MS Management

| 5. | Prior to and including Dec. 31, 2013, MS Management was an employer according to the governing plan document. **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006407 (§ 2.8 - **Company:** McBride & Son Management Co. or any successor corporation which assumes the obligations of the Company hereunder."); at MS_0006408 (§ 2.18 - "**Employer:** The Company…). |
|---|---|

| 6. | Prior to and including December 31, 2013, MS Management was the "named fiduciary" of the ESOP according to the governing plan document. **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006470 (§ 17.1 - "The Company and the Administrator shall constitute name Fiduciaries of the Plan for purposes of ERISA."); ***Id.*** at MS_0006407 (§ 2.8 - "**Company:** McBride & Son Management Co...."). |
|---|---|

| 7. | Prior to and including December 31, 2013, MS Management was the "plan administrator" of the ESOP according to the governing plan document which also defined the plan administrator as a "named fiduciary." of the ESOP. **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006406 (§ 2.1 - "**Administrator:** The person (or persons) or other legal entity appointed to administer the Plan under the provisions of Article 17."); ***Id.*** at MS_0006471 (§ 17.4(b) - "The Company shall designate an Administrator (which may be |
|---|---|

|   | itself…) which shall serve at the pleasure of the Company.”); **Id.** at MS_0006470 (§ 17.1 - “The Company and the Administrator shall constitute name Fiduciaries of the Plan for purposes of ERISA.”); **PE 23** - McBride 30(b)(6) Feb. 19, 2021 Depo at 65:21 – 66:13. |
|---|---|
| 8. | Participants were informed in the summary plan description that MS Management was the named fiduciary and plan administrator of the ESOP. **DE 3** - Summary Plan Description 2007 - STERN0004518 at STERN0004524 (“McBride & Son Management Co. is also the ‘Plan Administrator’ and ‘named fiduciary’ for the ESOP. As Plan Administrator, McBride & Son Management Co. manages the operation of the ESOP, which includes giving directions concerning all payments due under the ESOP”). |

### D. MS Capital

| 9. | MS Capital was created and incorporated by GreatBanc effective 5pm on December 31, 2013 and Arri was the Incorporator. **DE 70** - Certificate of Incorporation of MS Capital - MS_0013493 at MS_0013494–95; **DE 71** - Written Consent of MS Capital Board - MS_0013500 at MS_0013506 (execution of the written consent by GreatBanc in its capacity as Trustee as the “Sole Stockholder” of MS Capital stock). Arri was the incorporator. **DE 72** - Contribution Agreement - MS_0013365 at MS_0013365 ([GreatBanc] desires to create a holding company known as [MS Capital]). |
|---|---|
| 10. | MS Capital from December 31, 2013 through the effective termination of the ESOP was an employer according to the governing plan document to the ESOP after MS Management assigned all of its rights and responsibilities with regard to the ESOP to MS Capital. *See* **PAF at ¶ 5**, *supra*; **DE 77** - Dec. 31, 2013 Assignment and Assumption Agreement - MS_0014310 at MS_0014310 (On Dec. 31, 2013 MS Management as Assignor assigned all of its rights and responsibilities in, to, and under the ESOP to MS Capital as Assignee); **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006407 (§ 2.8 - “**Company:** McBride & Son Management Co. or any successor corporation which assumes the obligations of the Company hereunder.”); **DE 9** - Amendment No. Two to 2013 Plan Doc. - MS_0006493 at MS_0006493 (Amending § 2.8 to state “Company: McBride & Son Capital, Inc…”). |
| 11. | MS Management assigned its rights and responsibilities regarding the ESOP to MS Capital on December 31, 2013, the same day as the MS Companies, Inc. stock was swapped for MS Capital stock. **DE 77** - Dec. 31, 2013 Assignment and Assumption Agreement - MS_0014310 at MS_0014310 (“The ESOP holds shares of common stock of McBride & Son Companies, Inc. and the Assignor is a wholly owned subsidiary of McBride & Son Companies, Inc… The Assignor hereby assigns to the Assignee all of its rights and responsibilities in, to, and under the ESOP. The Assignee hereby accepts such assignment and assumes and agrees to keep, perform, and observe all of the terms, covenants, |

|  | agreements, and conditions contained in the ESOP, which shall accrue from and after the date of this Assignment, subject to the terms, covenants, and conditions contained in the ESOP and pursuant to the Employee Retirement Income Security Act of 1974."); **DE 71** - Written Consent of Board of MS Capital - MS_0013500 at MS_0013503; *see also* **DE 72** - Contribution Agreement - MS_0013365 at MS_0013365 ([I]mmediately upon the consummation of the Contribution, the parties desire that [MS Capital] become the sponsor of the Plan and assume all obligations as sponsor of the Plan.") |
|---|---|

| 12. | From December 31, 2013 through the time period the ESOP was effectively terminated, MS Capital was the "named fiduciary" of the ESOP as defined in 29 U.S.C. § 1102(a). *See* **PAF at ¶ 6**, *supra* (MS Management was a named fiduciary); **DE 77** - Dec. 31, 2013 Assignment and Assumption Agreement - MS_0014310 at MS_0014310 (On Dec. 31, 2013 MS Management as Assignor assigned all of its rights and responsibilities in, to, and under the ESOP to MS Capital as Assignee); **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006407 (§ 2.8 - "**Company:** McBride & Son Management Co. or any successor corporation which assumes the obligations of the Company hereunder."); **DE 9** - Amendment No. Two to 2013 Plan Doc. - MS_0006493 at MS_0006493 (Amending § 2.8 to state "Company: McBride & Son Capital, Inc…"); **DE 6** - 2017 Plan Document - MS_0006300 at MS_0006372 (§ 17.1 - "The Company and the Administrator shall constitute named Fiduciaries of the Plan for purposes of ERISA."); MS_0006310 (§ 2.8 - "Company: McBride & Son Capital, Inc…"). |
|---|---|

| 13. | From December 31, 2013 through the time period the ESOP was effectively terminated, MS Capital was the "plan administrator" of the ESOP as defined in 29 U.S.C. § 1002(16)(A) which by the terms of the governing document was also a "named fiduciary" of the ESOP. *See* **PAF at ¶ 7**, *supra* (MS Management was the plan administrator); **DE 77** - Dec. 31, 2013 Assignment and Assumption Agreement - MS_0014310 at MS_0014310 (On Dec. 31, 2013 MS Management as Assignor assigned all of its rights and responsibilities in, to, and under the ESOP to MS Capital as Assignee); **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006407 (§ 2.8 - "**Company:** McBride & Son Management Co. or any successor corporation which assumes the obligations of the Company hereunder."); **DE 9** - Amendment No. Two to 2013 Plan Doc. - MS_0006493 at MS_0006493 (Amending § 2.8 to state "Company: McBride & Son Capital, Inc…"); **DE 6** - 2017 Plan Document - MS_0006300 at MS_0006372 (§ 17.1 - "The Company and the Administrator shall constitute named Fiduciaries of the Plan for purposes of ERISA."); ***Id.*** at MS_0006310 (§ 2.8 - "Company: McBride & Son Capital, Inc…"). |
|---|---|

| 14. | Participants were informed in the summary plan description that MS Capital was the named fiduciary and plan administrator of the ESOP. **PE 96** - Summary Plan Description 2017 - MS_0006524 at MS_0006531 ("McBride & Son Capital, Inc. is also the 'Plan Administrator' and 'named fiduciary' for the ESOP. As Plan Administrator, McBride & Son Management |
|---|---|

| | Co. manages the operation of the ESOP, which includes giving directions concerning all payments due under the ESOP"). |

### E. Eilermann

| 15. | Eilermann wore the following hats:<br><br>(1) Member of the Board of Directors of MS Management (at all relevant times prior to December 31, 2013) (**PAF ¶ 20**);<br>(2) Member of the Board of Directors of MS Companies, Inc. (at all relevant times prior to December 31, 2013) (**PRF ¶ 5**);<br>(3) Member of the Board of Managers of MS Companies, LLC (**PRF ¶ 8**);<br>(4) Member of the Board of Directors of MS Capital (**PAF ¶ 23**);<br>(5) Chief Executive Officer of all McBride related corporate entities (**PRF ¶ 9**);<br>(6) Fiduciary to the ESOP (**PAF ¶¶ 6, 7, 8, 21**);<br>(7) Plan Administrator to the ESOP (**PAF ¶ 7, 8, 21**);<br>(8) ESOP plan participant (**DE 78** - ESOP and Synthetic Equity Balances as of 12/31/2013 - MS_0024550 at MS_0024550);<br>(9) Recipient of synthetic equity in MS Companies, Inc. (**PRF ¶ 84**);<br>(10) Proposer of the 2013 Recapitalization (**DSOF ¶¶ 48–49**);<br>(11) Beneficiary of the 2013 Recapitalization (**PRF ¶¶ 84, 85**);<br>(12) Owner (Member) of Class B Units of MS Companies, LLC (**PRF ¶¶ 76–77**);<br>(13) Proposer of the 2017 Transaction (**DSOF ¶ 121**); and<br>(14) Purchaser of MS Capital stock as part of the 2017 Transaction (**PRF ¶ 149**). |

### F. Arri

| 16. | Arri wore the following hats:<br><br>(1) Member of the Board of Directors of MS Management (at all relevant times prior to December 31, 2013) (**PAF ¶ 20**);<br>(2) Member of the Board of Directors of MS Companies, Inc. (at all relevant times prior to December 31, 2013) (**PRF ¶ 5**);<br>(3) Member of the Board of Managers of MS Companies, LLC (**PRF ¶ 8**);<br>(4) Member of the Board of Directors of MS Capital (**PAF ¶ 23**);<br>(5) Chief Financial Officer of all McBride related corporate entities (**PRF ¶ 10**);<br>(6) Fiduciary to the ESOP (**PAF ¶¶ 6–8, 21**);<br>(7) Plan Administrator to the ESOP (**PAF ¶ 7–8, 21**);<br>(8) ESOP plan participant (**DE 78** - ESOP and Synthetic Equity Balances as of 12/31/2013 - MS_0024550 at MS_0024550);<br>(9) Recipient of synthetic equity in MS Companies, Inc. (**PRF ¶ 84**);<br>(10) Proposer of the 2013 Recapitalization (**DSOF ¶¶ 48–49**);<br>(11) Beneficiary of the 2013 Recapitalization (**PRF ¶¶ 84–85**);<br>(12) Owner (Member) of Class B Units of MS Companies, LLC (**PRF ¶¶ 76–77**);<br>(13) Proposer of the 2017 Transaction (**DSOF ¶ 121**); and<br>(14) Purchaser of MS Capital stock as part of the 2017 Transaction (**PRF ¶ 149**). |

| | |
|---|---|

### G. The Governing Plan Documents

| 17. | The 2013 Plan Document and 2017 Plan Document stated the following:<br><br>(1) the ESOP must be operated for the exclusive benefit of participants and beneficiaries. **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006405; **DE 6** - 2017 Plan Document - MS_0006300 at MS_0006308; and<br><br>(2) the stock held by the ESOP must be valued at Fair Market Value in accordance with and subject to Code Section 401(a)(28(C). **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006409 (§ 2.26 Fair Market Value), MS_0006436 (§ 7.4 Fair Market Value); **DE 6** - 2017 Plan Document - MS_0006300 at MS_0006313 (§ 2.26 Fair Market Value); **DE 6** - 2017 Plan Document - MS_0006300 at MS_0006338 (§ 7.4 Fair Market Value). |
|---|---|

### H. The Trust Agreement

| 18. | The Trust Agreement stated the following:<br><br>(1) the Trustee may not enter into a non-exempt prohibited transaction under ERISA § 406. **PE 97** - 2013 Trust Agreement - GBT_0001779 at GBT_0001783–84 (§ 2.4 Purchase and Sale Transactions);<br><br>(2) the Trustee had the right to "begin, maintain, or defend any litigation necessary in connection with the investment, reinvestment, and the holding of the assets of the Trust Fund, and the administration of the Trust." **PE 97** - 2013 Trust Agreement - GBT_0001779 at GBT_0001784 (§ 2.6(d));<br><br>(3) the Trustee was to "act as the shareholder of record for the benefit of the Trust." **PE 97** - 2013 Trust Agreement - GBT_0001779 at GBT_0001787 (§ 2.6(v));<br><br>(4) the Trustee "shall not cause the Trust to engage in any transaction prohibited by [the] Trust Agreement, ERISA or the Code." **PE 97** - 2013 Trust Agreement - GBT_0001779 at GBT_0001789 (§ 2.8);<br><br>(5) the Trustee "shall discharge its duties under [the] Trust Agreement solely in the interest of the Plan participants and their beneficiaries and:<br><br>    (a) For the exclusive purpose of:<br><br>        (i) providing benefits to participants and their beneficiaries of the Plan; and<br><br>        (ii) defraying reasonable expenses of administering the Trust; |
|---|---|

7

|   | (b) With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; and<br><br>(c) In accordance with the documents and instruments governing the Trust and the Plan insofar as those documents and instruments are consistent with the provisions of ERISA"<br><br>**PE 97** - 2013 Trust Agreement - GBT_0001779 at GBT_0001789 (§ 2.8);<br><br>(6) "no part of the corpus of income of the Trust Fund shall revert to the Company or be used for, or diverted to, purposes other than for the exclusive benefit of participants and their beneficiaries of the Plan," **PE 97** - 2013 Trust Agreement - GBT_0001779 at GBT_0001789 (§ 3.1); and<br><br>(7) "If there is a disagreement between the Trustee and anyone as to any act or transaction reported in any accounting, the Trustee shall have the right to have accounts settled by a court of competent jurisdiction." **PE 97** - 2013 Trust Agreement - GBT_0001779 at GBT_0001781 (§ 5.1). |
|---|---|

## I.      Eilermann and Arri's Total Control over the ESOP.

| 19. | From at least January 1, 2013 through the effective termination of the ESOP, Eilermann and Arri had total control over the ESOP at McBride:<br><br>(1) There was no one else at McBride who could or did exercise discretion over the ESOP except Eilermann and Arri. **PE 18** - Templeton Oct. 6, 2020 Depo at 36:20 – 38:2, 38:23 – 40:12; **PE 22** - Todt Feb. 18, 2021 Depo at 29:6 – 29:10;<br><br>(2) Decision making and legal responsibility fell to Eilermann and Arri as the only members of the MS Capital Board of Directors. **PE 23** - McBride 30(b)(6) Feb. 19, 2021 Depo at 21:23 – 22:3;<br><br>(3) Eilermann and Arri, as the MS Capital Board of Directors, hired service providers for the ESOP, GreatBanc and Fiduciary Advisors. **PE 23** - McBride 30(b)(6) Feb. 19, 2021 Depo at 55:2 – 56:18;<br><br>(4) Eilermann signed the McBride & Son Employee Stock Ownership Trust (as amended and restated effective December 27, 2013) on behalf of MS Management. **PE 1** - McBride Defendants' (First) Answer to SAC (**Dkt. 129**) - at ¶ 26; **PE 2** - GreatBanc's Answer to SAC (**Dkt. 163**) - at ¶ 26 (same);<br><br>(5) each time GreatBanc delivered the annual valuation to Arri, it recognized his role as a fiduciary. **PE 2** - GreatBanc's Answer to SAC (**Dkt. 163**) - at ¶ 113 (""GreatBanc admits that the cover correspondence with a copy of the Stern Brothers valuation reports it sent to |

| | Arri between 2012–2016 stated in part that the 'report is being delivered to you in your capacity as plan fiduciary.'" |
|---|---|

### 1.   Total Control Over MS Management.

| 20. | Eilermann and Arri were the only members of the Board of Directors of MS Management. **PE 1** - McBride Defendants' (First) Answer to SAC (**Dkt. 129**) - at ¶ 50 ("McBride Defendants admit that Eilermann and Arri, at relevant times prior to January 1, 2014, were the only members of the board of directors of McBride & Son Management Co."), ¶¶ 64, 74 (same). |
|---|---|

| 21. | MS Management, as a corporate entity, cannot act on its own without any human counterpart. In this regard, MS Management could only act through its Board of Directors. As the only members of the Board of Directors of MS Management, Eilermann and Arri were the only individuals who could and did act on behalf of MS Management with regard to the ESOP prior to and including December 31, 2013. **PE 1** - McBride Defendants' (First) Answer to SAC (**Dkt. 129**) - at ¶ 50 ("McBride Defendants admit that Eilermann and Arri, at relevant times prior to January 1, 2014, were the only members of the board of directors of McBride & Son Management Co."), ¶¶ 64, 74 (same); **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006475 (§ 17.12 - "Company and Employer Actions. Except as otherwise provided in the remaining provisions of this Plan, any action of the Company or Employer under this Plan may be taken either by resolution of its Board of Directors or other governing body or by any person or persons duly authorized to take such action by resolution of said Board of Directors or other governing body or by its by-laws or other governing instrument.") |
|---|---|

| 22. | GreatBanc failed to cause to be appointed independent non-conflicted members of the Board of Directors of MS Management despite having the ability to do so and Patrick DeCraene of GreatBanc writing that it's a best practice. **PE 63** - By-Laws of McBride & Son Companies, Inc. January 8, 2010 - MS_0009629 at MS_0009633 (§ 3.02 - GreatBanc as representative of the ESOP as the sole shareholder voted for the directors); **PE 98** - Articles of Incorporation and Bylaws of MS Management - MS_0009807 at MS_0009811–12 (§ 1); **PE 25 -** DeCraene Feb. 24, 2021 Depo at 34:14 – 35:6 (GreatBanc was aware that Defendants Eilermann and Arri were insiders); **PE 68** - Things My ESOP Advisor Never Told Me by Patrick DeCraene, et al. - Plaintiffs-00001034 at Plaintiffs-00001096 ("A board of directors consisting solely of insiders is also an area of concern for a trustee. Best practices dictate that an ESOP company has at least one or two outside, independent board members. The implementation of outside board members removes conflicts of interest that may otherwise exist. This adds a level of protection to the decisions made by the board and protects the trustee in monitoring the board. In addition, outside board members add a different perspective and bring different experiences to bear that are often helpful in the boardroom."); **PE 25** - DeCraene - Feb. 24, 2021 Depo at 33:10 – 34:13 (agreeing with the |
|---|---|

statement he wrote in the article);



## 2. Total Control Over MS Capital.

| 23. | GreatBanc appointed Defendants Eilermann and Arri as the only members of the Board of Directors of MS Capital. **PE 1** - McBride Defendants' (First) Answer to SAC (**Dkt. 129**) - at ¶ 59 ("McBride Defendants admit that Eilermann and Arri were the only members of the board of directors of McBride & Son Capital, Inc."); **PE 2** - GreatBanc's Answer to SAC (**Dkt. 163**) - at ¶ 59 (same); **PRF at ¶ 7** ("GreatBanc appointed John Eilermann Jr. and Michael D. Arri to serve on the Board of Directors of MS Capital.") |
|---|---|
| 24. | MS Capital, as a corporate entity, cannot act on its own without any human counterpart. In this regard, MS Capital could only act through its Board of Directors. Defendants Eilermann and Arri were the only members of the Board of Directors of MS Management and thus the only individuals who could and did act on behalf of MS Capital with regard to the ESOP from December 31, 2013 through the effective termination of the ESOP. **PE 1** - McBride Defendants' (First) Answer to SAC (**Dkt. 129**) - at ¶ 59 ("McBride Defendants admit that Eilermann and Arri were the only members of the board of directors of McBride & Son Capital, Inc."); **PE 2** - GreatBanc's Answer to SAC (**Dkt. 163**) - at ¶ 59 (same); **PRF at ¶ 7** ("GreatBanc appointed John Eilermann Jr. and Michael D. Arri to serve on the Board of Directors of MS Capital.); **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006475 (§ 17.12 - "Company and Employer Actions. Except as otherwise provided in the remaining provisions of this Plan, any action of the Company or Employer under this Plan may be taken either by resolution of its Board of Directors or other governing body or by any person or persons duly authorized to take such action by resolution of said Board of Directors or other governing body or by its by-laws or other governing instrument."); **DE 9** - Amendment No. Two to 2013 Plan Doc. - MS_0006493 at MS_0006493 (Amending § 2.8 to state "Company: McBride & Son Capital, Inc…"); **DE 6** - 2017 Plan Document - MS_0006300 at MS_0006310 (§ 2.8 - "Company: McBride & Son Capital, Inc…"), MS_0006377 (§ 17.12 - "Company and Employer Actions. Except as otherwise provided in the remaining provisions of this Plan, any action of the Company or Employer under this |

| | |
|---|---|
| | Plan may be taken either by resolution of its Board of Directors or other governing body or by any person or persons duly authorized to take such action by resolution of said Board of Directors or other governing body or by its by-laws or other governing instrument.") |

| | |
|---|---|
| 25. | GreatBanc failed to appoint independent non-conflicted members of the Board of Directors of MS Capital despite having the ability to do so. **DE 57** - Bylaws of McBride & Son Capital, Inc. - MS_0013538 at MS_0013544 (Article II § 1 - GreatBanc as representative of the ESOP as the sole shareholder voted for the directors); **PE 25 -** DeCraene Feb. 24, 2021 Depo at 34:14 – 35:6 (GreatBanc was aware that Defendants Eilermann and Arri were insiders); **PE 68** - Things My ESOP Advisor Never Told Me by Patrick DeCraene, et al. - Plaintiffs-00001034 at Plaintiffs-00001096 ("A board of directors consisting solely of insiders is also an area of concern for a trustee. Best practices dictate that an ESOP company has at least one or two outside, independent board members. The implementation of outside board members removes conflicts of interest that may otherwise exist. This adds a level of protection to the decisions made by the board and protects the trustee in monitoring the board. In addition, outside board members add a different perspective and bring different experiences to bear that are often helpful in the boardroom."); **PE 25** - DeCraene - Feb. 24, 2021 Depo at 33:10 – 34:13 (agreeing with the statement he wrote in the article); ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████. ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████ |

### 3. Failure to Have Formal Meetings When Self Interest Involved.

| | |
|---|---|
| 26. | From at least January 1, 2013 to the effective termination of the ESOP, the Board of Directors of MS Management and the Board of Directors of MS Companies, Inc. never held formal meetings and kept no minutes of any decision making both at the corporate level and regarding the ESOP. GreatBanc failed to insist that the Board of Directors of MS Management and the Board of Directors of MS Capital hold meetings and keep minutes of decision making regarding the ESOP during this time-period. **PE 23** - McBride 30(b)(6) Feb. 19, 2021 Depo at 20:19 – 21:2, 66:14 – 67:12; **PAF ¶ 22**; **PAF ¶ 25**; **PE 98** - Articles of Incorporation and Bylaws of MS Management - MS_0009807 at MS_0009811 (Art. II § 2 requiring there to be at least an annual meeting), MS_0009812 (Art. III § 3 requiring there |

|  | to be regular meetings); **DE 57** - Bylaws of McBride & Son Capital, Inc. - MS_0013538 at MS_0013541 (Art. 1 § 1 requiring annual meeting), MS_0013545 (Art. II § 4 requiring there to be regular meetings); **PE 68** - Things My ESOP Advisor Never Told Me by Patrick DeCraene, et al. - Plaintiffs-00001034 at Plaintiffs-00001092 ("[T]he trustee does have a duty to monitor the board…[m]onitoring can also be accomplished by periodically attending board meetings."), Plaintiffs-00001094 (DeCraene acknowledged in an article that it is important for all fiduciary decisions to be documented).<br><br>For example, there is no formal documentation of any determination by the Board of Directors of MS Management that the 2013 Recapitalization was in the best interest of the ESOP and its participants. **PE 23** - McBride 30(b)(6) Feb. 19, 2021 Depo at 50:21 – 51:7. |
|---|---|
| 27. | With regard to McBride's corporate activities, Eilermann and Arri recognized the importance and benefit of a disciplined, thoughtful, and documented governance process. **PE 37** - The Great Housing Bust: Lessons Learned - MS_0036072 at MS_0036083 <br><br>Previously in 2008 and 2009, when it wasn't Eilermann and Arri's self-interest at issue, they recognized |
| 28. | In the 2008 and 2009 meeting minutes, Eilermann and Arri, as members of the Board of Directors of MS Management, recognized:<br><br>(1) Under the ESOP Plan Documents, <br><br>(2) |



| 29. |  |

## II.    THE 2013 RECAPITALIZATION

### A.    Control Over the ESOP and its Assets, Management, and Administration.

| 30. | Defendants Eilermann and Arri, as the only members of the MS Management Board of Directors, had the power and authority to stop the 2013 transaction, if they wanted to. **PE 23** - McBride 30(b)(6) Feb. 19, 2021 Depo at 95:5 – 95:10. |

| 31. | Arri signed the December 20, 2013 engagement agreement with GreatBanc regarding services for the 2013 Recapitalization. **DE 38** - First Amendment to Successor Trustee Engagement Agreement - GBT_0024942 at GBT_0024944. |

| 32. | Arri signed the December 31, 2013 Contribution Agreement allowing the stock to be exchanged. **DE 72** - Dec. 31, 2013 Contribution Agreement - MS_0013365 at MS_0013372. |

| 33. | Arri signed the November 14, 2013 engagement agreement with Moore & Van Allen regarding services for the 2013 Recapitalization. **DE 39** - 2013 MVA Engagement - GBT_0012144 at GBT_0012148. |

| 34. | Arri signed the November 26, 2013 engagement agreement with Stern Brothers regarding services for the 2013 Recapitalization. **DE 40** - 2013 Stern Brothers Engagement - GBT_0012149 at GBT_0012150. |

| 35. | Eilermann recognized he had a duty to ensure the 2013 Transaction was fair to the ESOP. **PE 24** - Eilermann Feb. 23, 2021 Depo at 16:17 – 17:2. |

| 36. | "GreatBanc further admits that the extent of its services and fiduciary responsibilities are outlined in the Employee Stock Ownership Plan and Trust Agreements and GreatBanc's Engagement Agreements and their corresponding amendments, as well as ERISA…" **PE 2** - GreatBanc's Answer to SAC (**Dkt. 163**) - at ¶ 339, *see also* ¶¶ 375, 378–79, 403. |

| 37. | GreatBanc did not remove Eilermann and Arri as board members of MS Management as part of the 2013 Recapitalization. **PE 63** - By-Laws of McBride & Son Companies, Inc. January 8, 2010 - MS_0009629 at MS_0009633 (§ 3.02 - GreatBanc as representative of the ESOP as the sole shareholder voted for the directors); **PE 98** - Articles of Incorporation and Bylaws of MS Management - MS_0009807 at MS_0009811–12 (§ 1); **PE 25 -** DeCraene Feb. 24, 2021 Depo at 34:14 – 35:6 (GreatBanc was aware that Defendants Eilermann and Arri were insiders). |

### B. Compensation Prior to the 2013 Recapitalization

#### 1. Any Section 409(p) Issues Were Created by Eilermann and Arri Paying Themselves Excessive Compensation.



38. **PE 47** - Executive and Director Compensation in ESOP Companies - at pp. 8–9 ("Section 409(p) of the Internal Revenue Code was written to prevent S ESOPs from being used primarily to benefit a few people."); p. 35 (Most often, when equity is provided, it falls in the 10% to 20% range. Larger allocations should be carefully discussed with plan advisors, including the valuation firm, to understand how that dilution will affect plan participants. The DOL has been skeptical of dilution from these plans beyond about 15% to 20%.");



39.



40.



There is no discussion of these clauses in any of the alleged due diligence materials for the 2013 Recapitalization.

| 41. | The governing plan document for the ESOP also provided mechanisms for addressing Section 409(p) that did not involve filing bankruptcy. **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006429 (§ 6.4(f) - "Notwithstanding any other provision of the Plan, in order to satisfy the requirements of Section 409(p) of the Code, no portion of the assets of the Plan attributable to (or allocable in lieu of) Company Stock shall, during a Nonallocation Year, accrue (or be allocated directly or indirectly under any plan of the Company meeting the requirements of Code Section 401(a)) for the benefit of any Disqualified Person."), MS0006429–32 (§§ 6.4(g) & (h).<br><br>There is no discussion of this clause in any of the alleged due diligence materials for the 2013 Recapitalization. |
| --- | --- |

### 2. Pay Out Schedules from Synthetic Equity Agreements.



Any Section 409(p) limit issue would have resolved given that



There is no discussion of these payout schedules in any of the alleged due diligence materials for the 2013 Recapitalization.

| 43. | The 2010 Eilermann Phantom Stock Agreement contained the following payout schedule where Eilermann would receive the cash value of the phantom units: |
| --- | --- |



*See* **DE 79** - Eilermann 2010 Phantom Stock Agreement - GBT_0010424 at GBT_0010425 (§ 1.5 - "Deferral Date"), GBT_0010426 (§ 1.11 - "Units"), GBT_0010428 (§ 3.2(b)).

The 2010 Arri Phantom Stock Agreement contained the following payout schedule where Arri would receive the cash value of the phantom units:



*See* **DE 80** - Arri 2010 Phantom Stock Agreement -STERN0004044 at STERN0004045 (§ 1.5 - "Deferral Date"), STERN00040446 (§ 1.11 - "Units"), STERN00040446 (§ 3.2(b)).

| 44. | The 2011 Eilermann SAR Deferred Compensation Agreement contained the following payout schedule where Eilermann would receive the cash value of the phantom units: |
|---|---|



*See* **PE 48** - Eilermann 2011 SAR Agreement - MS_0009174 at MS_0009175 (§ 1.6 - "Deferral Date"), MS_0009176 (§ 1.12 - "Units"), MS_0009178 (§ 3.2(b)).

The 2011 Arri SAR Deferred Compensation Agreement contained the following payout schedule where Arri would receive the cash value of the phantom units:



*See* **PE 49** - Arri 2011 SAR Agreement - MS_0009184 at MS_0009185 (§ 1.6 - "Deferral Date"), MS_0009186 (§ 1.12 - "Units"), MS_0009188 (§ 3.2(b)).

| 45. | The 2012 Schindler Phantom Stock Agreement contained the following payout schedule where Schindler would receive the cash value of the phantom units: |
|---|---|



*See* **PE 50** - Schindler 2012 Phantom Stock Agreement - MS_0025618 at MS_0025619 (§ 1.5 - "Deferral Date"), MS_0025620 (§ 1.11 - "Units"), MS_0025623 (§ 3.2(b)).

The 2012 Berger Phantom Stock Agreement contained the following payout schedule where Berger would receive the cash value of the phantom units:



*See* **PE 051 -** Berger 2012 Phantom Stock Agreement - MS_0025628 at MS_0025629 (§ 1.5 - "Deferral Date"), MS_0025630 (§ 1.11 - "Units"), MS_0025633 (§ 3.2(b)).

The 2012 Todt Phantom Stock Agreement contained the following payout schedule where Todt would receive the cash value of the phantom units:



*See* **PE 52** - Todt 2012 Phantom Stock Agreement - MS_0025638 at MS_0025638 (§ 1.5 - "Deferral Date"), MS_0025640 (§ 1.11 - "Units"), MS_0025640–41 (§ 3.2(b)).

| 46. | The 2013 Eilermann Phantom Stock Agreement contained the following payout schedule where Eilermann would receive the cash value of the phantom units: |

19



*See* **PE 53** - Eilermann 2013 Phantom Stock Agreement - MS_0036805 at MS_0036806 (§ 1.5 - "Deferral Date"), MS_0036807 (§ 1.11 - "Units"), MS 0036810 (§ 3.2(b)).

The 2013 Arri Phantom Stock Agreement contained the following payout schedule where Arri would receive the cash value of the phantom units:



*See* **PE 55** - Arri 2013 Phantom Stock Agreement - MS_0023276 at MS_0023277 (§ 1.5 - "Deferral Date"), MS_0023281 (§ 1.11 - "Units"), MS_0023277 (§ 3.2(b)).

The 2013 Schindler Phantom Stock Agreement contained the following payout schedule where Schindler would receive the cash value of the phantom units:



*See* **PE 56** - Schindler 2013 Phantom Stock Agreement - MS_0023286 at MS_0023287 (§ 1.5 - "Deferral Date"), MS_0023288 (§ 1.11 - "Units") MS_0023291 (§ 3.2(b)).

The 2013 Berger Stock Agreement contained the following payout schedule where Berger would receive the cash value of the phantom units:

*See* **PE 57** - Berger 2013 Phantom Stock Agreement - MS_0023256 at MS_0023257 (§ 1.5 - "Deferral Date"), MS_0023258 (§ 1.11 - "Units") MS_0023261(§ 3.2(b)).

The 2013 Todt Stock Agreement contained the following payout schedule where Todt would receive the cash value of the phantom units:



*See* **PE 58** - Todt 2013 Phantom Stock Agreement - MS_0023266 at MS_0023267 (§ 1.5 - "Deferral Date"), MS_0023268 (§ 1.11 - "Units") MS_0023271 (§ 3.2(b)).

## C.  Earlier Proposals Were More Favorable to the ESOP.

| 47. | Prior to the 2013 Recapitalization, earlier proposals ("Earlier Proposals") were given by Butcher Joseph. **PE 24** Eilermann Feb. 23, 2021 Depo at 12:5 – 12:15, 142:4 – 142:12. |

In 2012, Eilermann and Arri were provided a feasibility study by Butcher Joseph regarding the ESOP. The feasibility study included a proposal that would have:



**PE 99** - May 29, 2012 Butcher Joseph Presentation - MS_0035106 at MS_35110–13; **PE 20** - del Pilar Feb. 9, 2021 Depo at 59:5 – 67:12.

In comparison to this 2012 feasibility study proposal, the 2013 Transaction was less favorable to the ESOP participants in the following ways:



| | |
|---|---|
| 48. | GreatBanc failed to consider any alternative structures for the 2013 Recapitalization. |



**D.    The 2013 Recapitalization Was Designed for the Benefit of the Five Executives.**

    **1.    Butcher Joseph Was Hired for the Benefit of the Five Executives.**

| | |
|---|---|
| 49. | Butcher Joseph was engaged for the benefit of the Five Executives including with the stated purpose of ███████████████████ Butcher Joseph was not engaged on behalf of or for the benefit of the ESOP. |





## 2. The Five Executives Were Already Incentivized.



**50.** The Five Executives were already incentivized given the ownership they already had in McBride through the ESOP and through the synthetic equity grants. Evidence produced shows that the Five Executives were fully incentivized, performing appropriately, and there was no risk of them leaving.



**51.**



**52.**

| | |
|---|---|

### 3. The Five Executives Benefitted from Owning Units of MS Companies, LLC.

| 53. | Synthetic equity does not give the holder ownership of actual real equity and this was |
|---|---|



| 54. | The Five Executives, prior to the 2013 Recapitalization, possessed none of the rights of a common stockholder such as: |
|---|---|



| 55. | The true purpose of the 2013 Recapitalization was: |



| 56. | GreatBanc approved the 2013 Recapitalization knowing the structure and intent was to  |
|---|---|

### 4. Eilermann and Arri Took Control of McBride from the ESOP.

| 57. |  |
|---|---|

| 58. |  |
|---|---|

| 59. | GreatBanc through the 2013 Recapitalization gave up key components of governance that would have allowed it to exercise responsible oversight over the Five Executives on behalf of the ESOP. It relinquished these governance mechanisms and the result was that the ESOP gave up effective control and distribution rights in 2013 without ever having been paid for it. **PE 5** - Goldman March 19, 2021 Report at pp. 14–19 ¶¶ 62–83; **PE 11** - Van Vleet March 19, 2021 Damages Report at p. 11 ¶ 50, p. 44 ¶ 184; **PE 13** - Van Vleet April 30, 2021 Rebuttal Report at p. 40 ¶¶ 160–61. |
|---|---|

| 60. | Prior to December 31, 2013, GreatBanc had the ability to appoint and remove the members of the Board of Directors of MS Companies, Inc. for any reason. **PE 63** - MS Companies, Inc. Bylaws - MS_0009629 at MS_0009633 (§ 3.02 - "A majority of the votes of the total issued and outstanding shares of Stock present at a meeting of the Shareholders at which a quorum is present shall have the right to elect or remove (**with or without cause**) any of the Directors.") (emphasis added); **PE 5** - Goldman March 19, 2021 Report at pp. 15–16 ¶ 71. |
|---|---|

| 61. | After December 31, 2013, GreatBanc only had the ability to remove members of the Board of Directors of MS Capital for cause. **DE 57** - Bylaws of McBride & Son Capital, Inc. - MS_0013538 at MS_0013544 (§ 2 - "No director may be removed except **for cause** by the affirmative vote of the holders of a majority of all outstanding shares of stock of the Corporation entitled to vote generally in the election of directors, considered for this purpose as a single class.") (emphasis added); **PE 5** - Goldman March 19, 2021 Report at pp. 15–16 ¶ 71. |
|---|---|

| 62. | Directors should instead serve at the pleasure of the shareholders, here the ESOP, because it is extremely difficult to have them removed for cause requiring a lawsuit to be filed if they refuse to resign. **PE 5** - Goldman March 19, 2021 Report at pp. 15–16 ¶ 71. |
|---|---|

| 63. | After the 2013 Recapitalization, |
|---|---|



| 64. | Eilermann and Arri, |
|---|---|



| 65. | The MS Companies, LLC Agreement provided that |
|---|---|



66. The MS Companies, LLC Agreement also prevented 

67. The MS Companies, LLC Agreement could not be changed or amended without 

68. GreatBanc agreed to 

69. The original proposal for the creation of MS Companies, LLC recognized that 



| 70. | Section 5.5 of the MS Companies, LLC Operating Agreement provides that MS Companies, LLC cannot take  |

### 5. Other Favorable Benefits for the Five Executives.

| 71. | The 2013 Transaction benefitted the Five Executives because they would now be subject to capital gains taxation as opposed to income taxation for a significant portion of their compensation, which only was possible because McBride ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Eilermann wrote in an email to his financial advisor discussing the benefit to him from the capital gain taxation:  |

| 72. |  |

|  |  |
|--|--|

**E.     Due Diligence for the 2013 Recapitalization Was Flawed and Conflicted.**













| 79. | The Stern Brothers Fairness Opinion: |
|---|---|
| |  |



| 80. | Butcher Joseph was not engaged on behalf of or for the benefit of the ESOP. |



| 81. | Although he was one of only two members of the MS Management Board of Directors, the named fiduciary of the ESOP, Eilermann testified that he |



32

## F. The 2013 Recapitalization Required a Vote.

| 82. | The transaction that occurred on December 31, 2013 was a Recapitalization. |
| --- | --- |



| 83. |  |
| --- | --- |

| 84. | Amendment One to the 2013 Plan Document, effective December 27, 2013, contained the following language:<br><br>"14.1 Authority to Vote… With respect to Company Stock held in a Participant's ESOP Account which is not part of a registration-type class of securities (as defined in Code Section 409(e)(4)), (i) the Participants (or their Beneficiaries) of the Plan shall be entitled to direct the Trustee regarding the voting of Company Stock that is allocated to his or her ESOP Account or Matching Contribution Account with respect to any corporate matter which involves the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all assets of a trade or business, or such similar transaction as the Department of Treasury may prescribe in Treasury Regulations, and (ii) the Trustee, in its discretion, shall have the right to vote: (1) the shares of Company Stock that are not allocated to the Participant's ESOP Account; and (2) the shares of Company Stock allocated to a Participant's ESOP Account or Matching Contribution Account for which a participant (or beneficiary) failed to provide direction to |
| --- | --- |

| | the Trustee on how to vote, or untimely provided direction to the Trustee regarding the voting of such Company Stock on matters described in (a) (i) above." |
|---|---|
| | **PE 112 -** Amendment One to 2013 Plan Document - GBT_0001774 at GBT_0001774 (§ 14.1). |

### G. The 2013 Recapitalization was Not Disclosed to the ESOP Participants.

| 85. | Neither the 2013 ESOP Recapitalization nor any of its details were disclosed to the ESOP participants.; **PE 15** - Sheldon Mar. 11, 2020 Depo at 15:22 – 16:12, 204:22 – 205:24; **PE 16** - Kopinski - Mar. 12, 2020 Depo at 25:13 – 26:21, 239:8 – 239:11; **PE 17** - Godfrey Mar. 13, 2020 Depo at 9:18 – 11:13, 133:15 – 134:4. |
|---|---|

| 86. | Templeton, who was in charge of ESOP participant communications, testified she was unaware of any communication that informed the participants about the Class A and Class B Units of MS Companies, LLC and who owned them. **PE 18** - Templeton - Oct. 6, 2020 Depo at 269:11 - 270:14. |
|---|---|

| 87. | The 2013 Recapitalization was never discussed at the October 23, 2017 participant meeting regarding the ESOP's ownership of Class A Units of MS Companies, LLC or the executives' ownership of Class B and Class C Units. **PE 18** - Templeton - Oct. 6, 2020 Depo at 268:21 – 269:10. |
|---|---|

| 88. | Defendants did not produce in discovery any amended and updated summary plan description or statement of material modification between Dec. 31, 2013 and Jan. 1, 2017 at all. Thus, the primary document used to inform participants about their investment in the ESOP continued to state they were invested in MS Companies, Inc. stock. **DE 3** - SPD Amended and Restated as of January 1, 2007, Revised July 2009 and July 2011 - STERN0004518 at STERN0004522 ("The ESOP is a retirement plan which owns stock of McBride & Son Companies, Inc."). |
|---|---|

| 89. |  |
|---|---|

**H.** **Eilermann and Arri's Knowledge and Participation in the 2013 Recapitalization.**

| 90. | Eilermann and Arri, acting on behalf of themselves and as the only people who could and did act on behalf of MS Management (PAF ¶ 9), had knowledge of and actively participated in the 2013 Recapitalization including: |





III.     **EXCESSIVE COMPENSATION BETWEEN 2013 AND 2017.**

     A.     **The Termination and Payout of the Synthetic Equity Agreements was Conflicted and Flawed.**











**B.** **Excessive Tax Payments Paid for the Benefit of the Five Executives.**



97. 

98.







**C.** **As a Result of the 2013 Recapitalization, the Five Executives Benefitted at the Expense of the ESOP.**

**1.** **Compensation Paid to the Five Executives.**





**2.      Comparable Benchmarking Data.**





### 3. Compensation Paid to the Five Executives was Excessive.









4.    **Compensation Was Ten Times the Equity Increase to the ESOP.**





### 5. Plaintiffs' Expert Kirkland is Qualified.

| 107. | Kirkland is a compensation, tax, and financial consultant who has provided expert testimony in 16 judicial proceedings in the last four years and has authored at least 33 articles concerning executive compensation issues in the last ten years. **PE 8** - Kirkland March 19, 2021 Report - at p. 72. |
|------|---|

### D. Decision Making Over Compensation to the Five Executives was Conflicted and Flawed.

#### 1. Eilermann and Arri Had Total Control Over Compensation.







114. 

     **2.**     **The Five Executives Received Preferential Distributions Over the ESOP.**

115. 

116. 

117. 

118. 



122.



123.



### 3. The TRS Reports Were Unreliable.



125.



52



**4.      Between 2014 and 2017 There Was no Written Inventive Plan.**

126. 

127.



5. **The Five Executives Had No Formal or Written Performance Review.**

128.



129.

6. **GreatBanc Failed to Protect the ESOP from the Excessive Compensation.**

| 130. | "GreatBanc further admits that the extent of its services and fiduciary responsibilities are outlined in the Employee Stock Ownership Plan and Trust Agreements and GreatBanc's Engagement Agreements and their corresponding amendments, as well as ERISA…" **PE 2** - GreatBanc's Answer to SAC (**Dkt. 163**) - at ¶ 436, *see also* ¶¶ 439–440, 464. |

| 131. | GreatBanc failed to remove Eilermann and Arri as board members of MS Capital while excessive compensation was paid from 2013 to 2017. **DE 57** - Bylaws of McBride & Son Capital, Inc. - MS_0013538 at MS_0013544 (§ 2 - "No director may be removed except for cause by the affirmative vote of the holders of a majority of all outstanding shares of stock of the Corporation entitled to vote generally in the election of directors, considered for this purpose as a single class.") (emphasis added); **PE 97** - 2013 Trust Agreement - GBT_0001779 at GBT_0001784 (§ 2.6(d) - the Trustee had the right to "begin, maintain, or defend any litigation necessary in connection with the investment, reinvestment, and the holding of the assets of the Trust Fund, and the administration of the Trust."); **PE 25** - DeCraene Feb. 24, 2021 Depo at 34:14 – 35:6 (GreatBanc was aware that Defendants Eilermann and Arri were insiders). |

| 132. | GreatBanc did not file a derivative lawsuit against either of the Boards of MS Management and MS Capital regarding the excessive compensation paid to the Five Executives. **PE 97** - 2013 Trust Agreement - GBT_0001779 at GBT_0001784 (§ 2.6(d) - the Trustee had the right to "begin, maintain, or defend any litigation necessary in connection with the investment, reinvestment, and the holding of the assets of the Trust Fund, and the administration of the Trust."). |

| 133. | DeCraene in an article he authored acknowledged that when a board of directors does not include any independent or disinterested members, a trustee, such as GreatBanc, must monitor board activities such as executive compensation under ERISA including the duty of prudence. **PE 68** - Things My ESOP Advisor Never Told Me by Patrick DeCraene, et al. - Plaintiffs-00001034 at Plaintiffs-00001091. |

| 134. |  |



| 141. | The following compensation practices were published in a proxy statement filed by a publicly traded homebuilder that Stern Brothers would compare McBride to in their annual valuations and was in Stern Brothers possession.

"Our compensation program incorporates the following best practices:

- **The majority of our compensation is performance-based and can be earned only upon the achievement of corporate and individual performance targets designed to enhance stockholder value.** |

- **Incentive compensation earned by our executives is subject to claw-back provisions in certain instances where compensation is based in whole or in part on reported financial results that are subsequently modified as a result of a restatement and the executive has engaged in misconduct.**
- **Following a change-in-control, post termination benefits are not payable unless an executive's employment is terminated ("double trigger").**
- **We do not provide perquisites for our executive officers that are not generally available to all of our employees.**
- **We do not provide tax-gross ups on perquisites to our executives.**
- **We do not offer preferential or above market returns on compensation deferred by our executives.**
- **We have stock ownership guidelines that set forth required ownership levels for our executives.**
- **Our Compensation Committee is comprised entirely of independent directors.**
- **Our Compensation Committee is advised by an independent compensation consultant. This consultant is retained directly by the Committee.**
- **We have an Insider Trading Policy which prohibits all covered persons, including executives, from hedging the economic risk of owning Company shares.**

…

**Procedure for Setting Executive Compensation**

*Role of the Compensation Committee.* The Committee is responsible for all aspects of executive compensation, including, among other things:

- **establishing the Company's compensation philosophy, objectives and policies;**
- **reviewing and approving all elements and levels of the compensation and benefits of the Company's executive officers;**
- **annually appraising the performance of the Chief Executive Officer and providing developmental feedback to the Chief Executive Officer and, when appropriate, to the other executive officers of the Company; and**
- **administering the Company's compensation plans, including its stock incentive plans.**

**PE 102** - Standard Pacific Director Compensation - STERN0007942 at STERN0007944-45.

### 7. There Were No Independent Directors and No Compensation Committee was Formed.

| | |
|---|---|
| 142. | There were no independent board members and no independent compensation committee was formed despite it being widely regarded as a best practice and required under the terms of the MS Capital Bylaws. **PE 63** - By-Laws of McBride & Son Companies, Inc. January 8, 2010 - MS_0009629 at MS_0009633 (§ 3.02 - GreatBanc as representative of the ESOP as the sole shareholder voted for the directors); **DE 57** - Bylaws of McBride & Son Capital, Inc. - MS_0013538 at MS_0013544 (Article II § 1 - GreatBanc as representative of the ESOP as the sole shareholder voted for the directors); **PE 25 -** DeCraene Feb. 24, 2021 Depo at 34:14 – 35:6 (GreatBanc was aware that Defendants Eilermann and Arri were insiders); **PE 68** - Things My ESOP Advisor Never Told Me by Patrick DeCraene, et al. - Plaintiffs-00001034 at Plaintiffs-00001096 ("""A board of directors consisting solely of insiders is also an area of concern for a trustee. Best practices dictate that an ESOP company has at least one or two outside, independent board members. The implementation of outside board members removes conflicts of interest that may otherwise exist. This adds a level of protection to the decisions made by the board and protects the trustee in monitoring the board. In addition, outside board members add a different perspective and bring different experiences to bear that are often helpful in the boardroom."); **PE 25** - DeCraene - Feb. 24, 2021 Depo at 33:10 – 34:13 (agreeing with the statement he wrote in the article); **PE 5** - Goldman March 19, 2021 Report at p. 14 ¶ 64 ("The presence of outside, independent directors is one of the most basic tools in the arsenal of good governance techniques. In the case of McBride, throughout the entire period, there were only two board members for the various McBride corporate entities (or two Managers of the Board of Managers for Companies, LLC) and they consisted of John Eilermann and Michael Arri, the CEO and CFO. This failure to have independent board members also occurred during a period where no formal board meetings were held, no minutes of meetings were kept, and no committees of the boards were formed. I require the boards that I oversee to follow such basic governance practices."), p. 19 ¶ 82 ("Setting and reviewing executive compensation is a critical board function. When executives sit on the board, executive compensation should be set by independent directors so that insiders don't decide how much they should be paid. Further, compensation and salaries should be fixed in writing, typically by an employment agreement, and incentive compensation is generally tied to specific, objective targets. Sometimes there is room for discretionary bonuses and the like. This has been my experience in overseeing many privately held companies in my firm's portfolio."), p. 19 ¶ 83 ("There were no independent directors on the Board of McBride Capital or any other McBride corporate entity. There were no independent Managers on the Board of Managers of Companies LLC. Neither the Board of Directors nor the Board of Managers created a compensation committee. There was no employment agreement or written document setting out the salary and other compensation for Eilermann and Arri. Instead, Eilermann and Arri met each year to decide how much they should get paid. GreatBanc played no role in this process whatsoever. It did not seek or review employment agreements; it did not seek or demand independent directors or managers; it did not seek a compensation committee; it did not seek or review any information at all about the salaries paid to Eilermann and Arri or the processes by which those salaries were determined. In my opinion, this was a gross failure of oversight."); **DE 57** - Bylaws of McBride & Son Capital, Inc. - MS_0013538 at MS_0013546 (Article II § 9 (1) - requiring Compensation Committee to be formed); **PE 24** - Eilermann Feb. 23, 2021 Depo at 76:21 – 78:17; **PE 27** - Arri Feb. |

26, 2021 Depo at 65:24 – 66:5, 67:7 – 67:22, 67:23 – 68:13, 68:14 – 69:8;



**PE 47** - NCEO - "Executive and Director Compensation in ESOP Companies" - at pp. 1, 3 (The National Center for Employee Ownership ("NCEO") stated in an article "[o]ne of the most notable trends in recent years is that the boards in a significant majority of ESOP companies are taking a more active role and seeking independent voices in compensation decisions. Doing so is clearly a best practice…Advisors universally agree that the gold standard for a board is to have a compensation committee made up entirely or primarily of independent board members. It is very difficult for insiders to set the pay of another insider; one is likely to report to the other."); **PE 69** - NCEO - "ESOPs and Corporate Governance A Guide for Directors and Fiduciaries" - at p. 2 ("In recent years, however, there has been a clear trend toward professionalizing boards. That includes regular meetings, board committees, and adding outside directors. In a 2016 NCEO survey of ESOP companies, the median number of directors was five, and just 19% of the companies had three or fewer members. **Seventy-one percent had at least one outside director**…") (emphasis added);

| 143. |  |
| --- | --- |

E. **Eilermann and Arri's Knowledge and Participation in the Excessive Compensation From 2013 to 2017.**

| 144. | Eilermann and Arri, acting on behalf of themselves and as the only people who could and did act on behalf of MS Capital (**PAF ¶ 9**), had knowledge of and actively participated in the Excessive Compensation from 2013 to 2017 including:<br><br> |
| --- | --- |



## IV.    THE 2017 TRANSACTION

### A.    Control Over the ESOP and its Assets, Management, and Administration.

| | |
|---|---|
| **145.** | Eilermann and Arri as the only members of the MS Capital Board of Directors, had the power and authority to stop the 2017 transaction, if they wanted to. **PE 23** - McBride 30(b)(6) Feb. 19, 2021 Depo at 95:11 – 95:15. |

| | |
|---|---|
| **146.** | Arri, on behalf of MS Capital, signed the November 20, 2017 engagement agreement with GreatBanc regarding services for the 2017 Transaction. **DE 120** - Second Amendment to GreatBanc Trustee - GBT_0005725 at GBT_0005727; **PE 2** - Defendant GreatBanc's Answer to SAC (**Dkt. 163)** at ¶ 211. |

| 147. |  |
|---|---|

| 148. | "GreatBanc admits that the extent of its services and fiduciary responsibilities with regard to the 2017 Transaction are outlined in the Employee Stock Ownership Plan and Trust Agreements and GreatBanc's Engagement Agreements and their corresponding amendments, as well as ERISA…" **PE 2** - Defendant GreatBanc's Answer to SAC (**Dkt. 163)** at ¶ 36. |
|---|---|

| 149. | GreatBanc did not remove Eilermann and Arri as board members of MS Capital as part of the 2017 Transaction. **DE 57** - Bylaws of McBride & Son Capital, Inc. - MS_0013538 at MS_0013544 (§ 2); **PE 97** - 2013 Trust Agreement - GBT_0001779 at GBT_0001784 (§ 2.6(d) - the Trustee had the right to "begin, maintain, or defend any litigation necessary in connection with the investment, reinvestment, and the holding of the assets of the Trust Fund, and the administration of the Trust."); **PE 25 -** DeCraene Feb. 24, 2021 Depo at 34:14 – 35:6 (GreatBanc was aware that Defendants Eilermann and Arri were insiders). |
|---|---|

**B.      Stern Brother's Valuation Was Flawed.**

| 150. |  |
|---|---|









| 161. |  |
|---|---|

| 162. |  |
|---|---|

**D.     Eilermann and Arri's Knowledge and Participation in the 2017 Transaction.**

| 163. | Eilermann and Arri, acting on behalf of themselves had knowledge of and actively participated in  the 2017 Transaction when:  |
|---|---|

65

## V.     FAILURE TO MONITOR AND REMOVE GREATBANC

| 164. | Under the terms of the 2013 Plan Document, MS Management, Eilermann, and Arri had the sole authority to appoint and remove GreatBanc as Trustee from the relevant time period through December 31, 2013. **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006471 (§ 17.4), MS_0006407 (§ 2.8 - "**Company:** [MS Management]; **PAF ¶ 21** (Eilermann and Arri controlled MS Management), *supra; see also* **DE 3** - Summary Plan Description 2007 - STERN0004518 at STERN0004524 ("McBride & Son Management Co. has entered into a Trust Agreement with GreatBanc Trust Company pursuant to which GreatBanc serves as Trustee of the ESOP."); **PE 23** - McBride 30(b)(6) Feb. 19, 2021 Depo at 87:15 – 87:23. |
|---|---|

| 165. | Under the terms of the 2013 and 2017 Plan Documents, MS Capital, Eilermann, and Arri had the sole authority to appoint and remove GreatBanc as Trustee from December 31, 2013 through the effective termination of the ESOP. **DE 7** - 2013 Plan Document - MS_0006398 at MS_0006471 (§ 17.4), MS_0006407 (§ 2.8 - "**Company:** McBride & Son Management Co.); **DE 9** - Amendment No. Two to 2013 Plan Doc. - MS_0006493 at MS_0006493 (Amending § 2.8 to state "Company: McBride & Son Capital, Inc…"); **DE 6** - 2017 Plan Document - MS_0006300 at MS_0006373 (§ 17.4), MS_0006310 (§ 2.8 - "Company: McBride & Son Capital, Inc…"); **PAF ¶ 24** (Eilermann and Arri controlled MS Capital); *see also* **PE 96** - Summary Plan Description 2017 - MS_0006524 at MS_0006531 ("McBride & Son Capital, Inc. has entered into a Trust Agreement with GreatBanc Trust Company pursuant to which GreatBanc serves as Trustee of the ESOP."). |
|---|---|

| 166. | The Trust Agreement stated: "By action of the Company's Board of Directors [] or of a person designated by resolution of its Board of Directors, the Company may remove the Trustee by giving at least thirty (30) days' advance written notice to the Trustee." **PE 97** - 2013 Trust Agreement - GBT_0001779 at GBT_0001790 (§ 4.2). |
|---|---|

| 167. | There is no written documentation of any monitoring of GreatBanc by Defendants Eilermann and Arri as members of the MS Capital Board of Directors. **PE 23** - McBride 30(b)(6) Feb. 19, 2021 Depo at 60:4 – 60:10; **PE 24** - Eilermann Feb. 23, 2021 Depo at 261:11 – 261:19. |
|---|---|

| 168. |  |
|---|---|



| 170. | GreatBanc has been sued by the DOL, plan participants and/or plan fiduciaries at least 18 times (including this case) over alleged ERISA violations with respect ESOP transactions:<br><br>• *Chao v. Hagemeyer North America, Inc.*, No. 06-1173 (D.S.C. 2006);<br>• *Register v. Cameron & Barkley Co.*, No. 03-2672 (D.S.C. 2003);<br>• *Neil v. Zell*, No. 08-6833 (N.D. Il. 2008);<br>• *Fish v. GreatBanc*, No. 09-1668 (N.D. Il. 2009);<br>• *Harris v. GreatBanc*, No. 12-1648 (C.D. Cal. 2012);<br>• *Solis v. GreatBanc*, No. 12-1648 (C.D. Cal. 2012);<br>• *Douglin v. GreatBanc*, No. 14-620 (S.D.N.Y. 2014);<br>• *Allen v. GreatBanc*, No. 15-3053 (N.D. Il. 2015);<br>• *McMaken v. GreatBanc*, No. 17-4983 (N.D. Il. 2017);<br>• *Hurtado et al. v. Rainbow Disposal Co. et al*, No. 17-1605 (C.D. Cal. 2017);<br>• *Godfrey et al v. GreatBanc*, No. 18-7918 (N.D. Il. 2018);<br>• *Ferrell Companies, Inc. v. GreatBanc*, No. 19-2656 (D. Ks. 2019);<br>• *Rush v. GreatBanc*, No. 19-738 (N.D. Il. 2019);<br>• *Szlanski, Brenda, v. Arnold, Mike, et al*, No. 19-940 (D. Wis. 2019);<br>• *Zavala v. Kruse-Western, Inc.*, No. 19-140 (E.D. Cal 2019);<br>• *Kohlberg et al v. Birdsey et al*, No. 20-6250 (S.D.N.Y. 2020).<br>• *Smith v. GreatBanc*, No. 20-2350 (N.D. Il. 2020); |

|  | • *Clare v. GreatBanc*, No. 21-367 (N.D. Il. 2021); |

| 171. | The DOL resolved its litigation against GreatBanc, *Solis v. GreatBanc*, 5:12-CV-01648 (C.D. Cal. 2012) through a settlement agreement fully executed on June 2, 2014 (the "**GreatBanc DOL Settlement**"). **PE 104** - GreatBanc DOL Settlement Agreement - at pp. 23–24. |

| 172. | The GreatBanc DOL Settlement Agreement included an Agreement Concerning Fiduciary Engagements and Process Requirements for Employer Stock Transactions ("**Process Agreement**") in which the Secretary of the United States Department of Labor and GreatBanc agreed to policies and procedures GreatBanc must comply with whenever it serves as a trustee or other fiduciary of any employee stock ownership plan subject to Title I of ERISA in connection with transactions in which the ESOP is purchasing or selling, is contemplating purchasing or selling, or receives an offer to purchase or sell, employer securities that are not publicly traded. **PE 104** - GreatBanc DOL Settlement Agreement - at pp. 13–22. |

| 173. | The Process Agreement included policies and procedures that GreatBanc must comply with in engaging a valuation advisor in its capacity as serving as a trustee and/or fiduciary to an ESOP in connection with an ESOP transaction: (1) prudently investigate the valuation advisor's qualifications; (2) take reasonable steps to determine that the valuation advisor receives complete, accurate and current information necessary to value the employer securities; and (3) prudently determine that its reliance on the valuation advisor's advice is reasonable before entering into any transaction in reliance on the advice. **PE 104** - GreatBanc DOL Settlement Agreement - at p. 13 (§ A "Selection and Use of Valuation Advisor - General"). |

| 174. | The Process Agreement included policies and procedures that GreatBanc must comply with in engaging a valuation advisor in its capacity as serving as a trustee and/or fiduciary to an ESOP in connection with an ESOP transaction, including a requirement to engage in a fiduciary review process that includes (1) taking reasonable steps necessary to determine the prudence of relying on the ESOP sponsor's financial statements provided to the valuation advisor; (2) critically assessing the reasonableness of any projections (particularly management projections), and if the valuation report does not document in writing the reasonableness of such projections to GreatBanc's satisfaction, preparing supplemental documentation explaining why and to what extent projections are or are not reasonable; and (4) documenting in writing its bases for concluding that the information supplied to the valuation advisor, whether directly from the ESOP sponsor or otherwise, was current, complete, and accurate. **PE 104** - GreatBanc DOL Settlement Agreement - at p. 18 (§ F "Fiduciary Review Process - General"). |

| 175. | The Process Agreement included policies and procedures that GreatBanc must comply with in engaging a valuation advisor in its capacity as serving as a trustee and/or fiduciary to an ESOP in connection with an ESOP transaction, including a requirement that GreatBanc personnel responsible for the proposed ESOP transaction will document in writing its work with respect to (1) reading and understanding the valuation report; (2) identifying and questioning the valuation report's underlying assumptions; (3) making reasonable inquiry as to as to whether the information in the valuation report is materially consistent with information in the Trustee's possession; (4) analyzing  whether the valuation report's conclusions are consistent with the data and (5) analyzing whether the valuation report is internally consistent in material respects. **PE 104** - GreatBanc DOL Settlement Agreement - at p. 20 (§ H "Fiduciary Review Process - Reliance on Valuation Report"). |
|---|---|

| 176. | The Process Agreement included policies and procedures that GreatBanc must comply with in engaging a valuation advisor in its capacity as serving as a trustee and/or fiduciary to an ESOP in connection with an ESOP transaction including the specific requirement that GreatBanc will not cause an ESOP to purchase employer securities for more than their fair market value or sell employer securities for less than their fair market value. **PE 104** - GreatBanc DOL Settlement Agreement - at p. 21 (§ J "Fair Market Value"). |
|---|---|

## VI.    DAMAGES TO THE ESOP

| 177. |  |
|---|---|





Case: 1:18-cv-07918 Document #: 267-2 Filed: 01/14/22 Page 71 of 80 PageID #:9904





71



180. 

|  |  |
|---|---|

## VII.    DEFENDANTS' AFFIRMATIVE DEFENSES

| 181. | McBride Defendants did not plead ERISA § 408(e) affirmative defenses against Plaintiffs' 2013 Recapitalization claim in the SAC. *See* **PE 1** - McBride Defendants' (First) Answer to SAC (**Dkt. 129)** - at p. 109; **PE 3** - McBride Defendants' (Second) Answer to SAC (**Dkt. 164**) - at p. 57. |
|---|---|

| 182. | McBride Defendants did not plead the affirmative defense that the Plan Assets Regulation (C.F.R. § 2510.3-101) bars Plaintiffs' 2013–2017 Loss of Value Allegations because McBride is an "operating company." *See* **PE 1** - McBride Defendants' (First) Answer to SAC (**Dkt. 129)** - at pp. 109–11; **PE 2** - Defendant GreatBanc's Answer to SAC (**Dkt. 163)** at pp. 220–22. **PE 3** - McBride Defendants' (Second) Answer to SAC (**Dkt. 164**) - at p. 57. |
|---|---|

## VIII.    REBUTTAL OF DEFENDANTS' EXPERTS

| 183. |  |
|---|---|

|  |  |
|--|--|

| **184.** | GreatBanc's expert Brown authored an article in which he stated: "Section 656 of Economic Growth and Tax Reduction and Reform Act ("EGTRRA") imposes restrictions on allocations of stock to certain participants under an ESOP that is maintained by an S corporation to ensure that such plans are maintained primarily for the benefit of employees other than principal owners of the business and prevent the owners of an S corporation from using an ESOP to shelter business income from tax by requiring that an ESOP that owns stock in an S corporation must provide meaningful benefits to a broad group of rank-and-file employees of the S corporation." |

**PE 105** - "S corporation ESOP Double Jeopardy: Sections 409(a) and 409(p)" - Gregory K. Brown - at p. 7-3

Brown further stated: "Congress was concerned with two potential types of abuse:

A highly paid professional puts his or her business into a corporation, which establishes an ESOP to acquire all of its shares and employs the professional as its sole employee and sole ESOP participant. The corporation and the individual will now be free of federal income tax, except to the extent that the individual takes money from the corporation or the ESOP for living expenses. The owner of an S corporation with 1,000 outstanding shares sells 10 of them to an ESOP and converts the remaining 990 shares into warrants or some other form of synthetic equity. The corporation can now grow rapidly on a tax-free basis. Shortly before the corporation is sold many years from now, the owner exercises his warrants and captures 99% of the value of the corporation's tax-free growth."

**PE 105** - "S corporation ESOP Double Jeopardy: Sections 409(a) and 409(p)" - Gregory K. Brown - at pp. 7-3 to 7-4

Brown further stated: "In the revenue ruling, the IRS identified and eliminated another form of ESOP S corporation abuse involving qualified S subsidiary corporations, often referred to as "QSUBs." A QSUB is a corporation that is wholly-owned by an S corporation and for which an election has been filed to be treated as a QSUB. When this election is filed, for tax purposes, the QSUB becomes a disregarded entity; all items of income and expense become items of income and expense of the parent S corporation. However, the entity still exists for corporate law purposes. A similar result is achieved where an S corporation becomes the sole owner of a limited liability company.

The three examples described three situations in which a QSUB was formed for the purpose of operating a professional services corporation and a principal provider of those services retained an option to re-acquire at least a majority of the QSUB. The QSUB's earnings were retained in a separate account of the QSUB rather than being distributed to the S corporation parent. In each situation, IRS found that the partnership structure was designed to avoid or evade the operation of Code § 409(p) and that (1) the individual service provider is a disqualified person, (2) a nonallocation year occurs, and (3) the individual is treated as owning synthetic equity in the form of his option to acquire QSUB shares. The IRS held

that it does not matter how large or small the individual's interest is in relation to the 10% test for determining a disqualified person or the 50% test for determining a nonallocation year. The ruling also suggests that IRS will use additional theories to attack these arrangements, including arguing that the individual never actually transferred his business to the S corporation and that the business is not really a QSUB."

**PE 105** - "S corporation ESOP Double Jeopardy: Sections 409(a) and 409(p)" - Gregory K. Brown - at pp. 7-12 to 7-13.

Brown further stated: "Whether the principal purpose of the ownership structure of an S corporation involving synthetic equity constitutes an avoidance or evasion of Code § 409(p) is determined by taking into account all of the surrounding facts and circumstances, including all features of the ownership of the S corporation's outstanding stock and related obligations (including synthetic equity), any shareholders who are taxable entities, and the cash distributions made to shareholders, to determine whether, to the extent of the ESOP's ownership, the ESOP receives the economic benefits of ownership in the S corporation that occur during the period that the ESOP owns the S corporation stock. The factors indicating that the ESOP receives these benefits include voting rights, the rights to receive distributions made to shareholders and the right to benefit from the profits earned by the S corporation, including the extent to which actual distributions of profits are made from the S corporation to the ESOP and the extent to which the ESOP's ownership interest in undistributed profits and future profits is subject to dilution as a result of synthetic equity. For this purpose, the ESOP's ownership interest is not subject to dilution if the total amount of synthetic equity is a relatively small portion of the total number of shares and deemed owned shares of the corporation."

**PE 105** - "S corporation ESOP Double Jeopardy: Sections 409(a) and 409(p)" - Gregory K. Brown - at pp. 7-17 to 7-18.

---

| 185. | GreatBanc's expert Brown authored a presentation in which the following information appeared: |
|---|---|



**PE 106** - "Legal Risks of ESOPs: Strategies to Avoid Violations and Liability" - at p. 61.

75

The following information also appeared:

- Governance Committee reviews annually the performance of the ESOP Administrative Committee and reports its findings to Board

- Board meets annually with ESOP Administrative Committee

- Audit Committee, Governance Committee and Compensation Committee consist only of independent directors

**PE 106** - "Legal Risks of ESOPs: Strategies to Avoid Violations and Liability" - at p. 65.

---

| 186. | GreatBanc's expert Brown authored a presentation in which the following information appeared: |
|---|---|

### Implementing Executive Compensation Arrangements – How is the ESOP Involved?

- Corporate Governance Issues:
    - Approval of executive compensation arrangements may come from the Board of Directors, an appointed Compensation Committee, or the Company's Shareholders
    - Board has duty to act in best interests of company shareholders (shareholders elect the board)
    - Interested/conflicted Directors may desire outside review
    - Compelling reason for independent Board member(s)
    - Compensation consultant reports to independent Board member(s)
- Trustee represents ESOP's interest as a shareholder
    - Heightened scrutiny where there are no independent Board members
- Trustee's duty as an ERISA fiduciary is to act solely in the interests of ESOP participants and beneficiaries
- Fiduciary prudence – review/monitor the impact of executive compensation arrangements

20

2013 Las Vegas Conference and Trade Show

**PE 136** - "Designing Executive Benefits in ESOP Companies" - Gregory K. Brown et al. at p. 20.

The following information also appeared:

- How was the amount of compensation determined (e.g. use of an independent compensation consultant)?
- How were the performance incentive goals determined (e.g. input from compensation consultant, accountants, attorney, financial advisor to ESOP)?
- Are the performance incentive goals consistent with:
    - Company's business plan for long-term growth (discrepancy between goals and business plan are problematic)
    - Cash flow projections applied in an annual valuation?
- Have any non-competition/non-solicitation provisions been negotiated?
- Are there any "2nd Class of Stock" concerns? (S-Corp)
- What happens in the event of a change-in-control?
- Does the arrangement comply with 409A? (Attorney)
- How is the plan modified/amended?

**PE 136** - "Designing Executive Benefits in ESOP Companies" - Gregory K. Brown et al. at p. 22.

The following information also appeared:

## Examining Impact of Economic Dilution

- No established test to confirm "unfair" economic dilution

- Trustee's examination of economic dilution should be a comprehensive, interactive process:
    - Financial Advisor
    - Compensation Consultant
    - Attorney
    - Accountant

- Show your process – discuss and document

**PE 136** - "Designing Executive Benefits in ESOP Companies" - Gregory K. Brown et al. at p. 26.

| 187. | GreatBanc's expert Brown authored an article in which he stated: |
|---|---|
| | The problem here is the conflicts of interest that these multiple roles create, along with the lack of oversight and accountability that go with it. For example, the board of directors is typically responsible for appointment and monitoring of corporate officers, ESOP committee members, and ESOP trustee(s). If the same individuals are filling multiple roles, there really is no meaningful oversight by the board of the performance of the persons appointed as ESOP committee members, officers, or as ESOP trustee(s). Furthermore, if one or more persons is not performing adequately (or worse, is engaged in fraud, embezzlement, or other misconduct), there is little likelihood that such inadequate performance or bad acts will be stopped or corrected. This will, of course, be to the detriment of the ESOP participants.  Because the board has a legal responsibility to monitor the performance of the officers, ESOP committee members, and ESOP trustee(s), failure to remedy inadequate performance or bad acts by these persons exposes the board members to legal liability to the corporate shareholders, including the ESOP.  A real-world example of the foregoing was involved in *Delta Star v. Patton*, described in more detail in a separate case here. In that case, the trustee of the ESOP that owned 98% of the company was also the company's president and chairman. No outside directors served on the board of directors. The president/chairman/trustee unilaterally awarded himself enormous salary, bonus, and deferred compensation increases without even obtaining approval of the other members of the board of directors. Aside from being found liable for breach of corporate fiduciary duty of directors and corporate waste, he was also found liable for a breach of his fiduciary duties under ERISA for not using his authority as trustee to remove himself as an officer and director and preventing the misuse of corporate assets.  **PE 137** - NCEO Don't Do That - Common Mistakes in Operating an ESOP and What do Do About Them at p. 98–99. |

| 188. | GreatBanc's expert Brown authored an article in which he stated: |
|---|---|

The trustee might decide to solicit outside offers as an alternative to agreeing to a corporate redemption. This situation is somewhat rare, especially if the trustee does not have enough ownership to control the negotiation process. However, such a negotiation process may be a realistic alternative when the ESOP owns a controlling interest in the company.

**PE 138** - NCEO Terminating an ESOP Valuation and Fiduciary Issues - Gregory K. Brown et al. at p. 7.

Brown also authored the following:

example, a prudent practice for the trustee's financial advisor is to provide the trustee with an analysis of the going-concern value based on revenues and earnings along with the potential liquidation value. The trustee then will have sufficient information to use in purchase price negotiations. There have been many cases where the trustee was able to negotiate a higher redemption price as part of the termination of the ESOP by reflecting all or a portion of the higher liquidation value.

**PE 138** - NCEO Terminating an ESOP Valuation and Fiduciary Issues - Gregory K. Brown et al. at p. 8.

189. 

Dated: January 14, 2022                       Respectfully submitted,

By: _/s/ *Mark G. Boyko*

Mark G. Boyko (IL #6288036)
mboyko@baileyglasser.com
Bailey & Glasser LLP
34 N. Gore Ave. – Suite 102
Webster Groves, MO 63119
Telephone: (314) 863-5446
Facsimile: (314)-863-5483

Patrick O. Muench (IL #6290298)
pmuench@baileyglasser.com
Bailey & Glasser LLP
318 W. Adams St., Ste. 1606
Chicago, IL 60606
Telephone: (312) 500-8680
Facsimile: (202) 463-2103

Ryan T. Jenny
rjenny@baileyglasser.com
Gregory Y. Porter (admitted *pro hac vice*)
gporter@baileyglasser.com
Bailey & Glasser LLP
1055 Thomas Jefferson St., NW, Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103

Thomas E. Clark Jr. (IL #6294921)
tclark@wagnerlawgroup.com
Jordan D. Mamorsky (IL #6337130)
jmamorsky@wagnerlawgroup.com
The Wagner Law Group, PC
190 South LaSalle Street, Suite 2100
Chicago, IL 60603
Telephone: (314) 236-0065
Facsimile: (314) 236-5743

*Attorneys for Plaintiffs*